**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FRIENDS OF THE EARTH
1101 15th Street, NW
11th Floor
Washington, DC 20005

HEALTHY GULF
100 Common Street
Suite 902
New Orleans, LA 70112,

SIERRA CLUB
2101 Webster Street
Suite 1300
Oakland, CA 94612,

and,

CENTER FOR BIOLOGICAL DIVERSITY
378 N Main Avenue
Tucson, AZ 85701,

*Plaintiffs*

v.

DEBRA A. HAALAND, in her official capacity as
SECRETARY OF THE INTERIOR
1849 C Street NW
Washington, DC 20240,

LAURA DANIEL-DAVIS, in her official capacity
as ASSISTANT SECRETARY OF THE INTERIOR
FOR LAND AND MINERALS MANAGEMENT
1849 C Street NW
Washington, DC 20240,

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street NW
Washington, DC 20240,

and,

Civil Action No.    1:21-cv-2317

BUREAU OF OCEAN ENERGY MANAGEMENT
1849 C Street NW
Washington, DC 20240,

*Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. Plaintiffs Friends of the Earth, Healthy Gulf, Sierra Club, and Center for Biological Diversity challenge the unlawful decision by Secretary of the Interior Debra Haaland, acting through her delegated authority to Laura Daniel-Davis, the assistant secretary for land and minerals management, the Department of the Interior, and Bureau of Ocean Energy Management ("the Bureau") (collectively, "Interior"), to hold Offshore Oil and Gas Lease Sale 257 in the Gulf of Mexico in reliance on arbitrary environmental analyses, in violation of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA").

2. President Biden's administration has recognized that climate change presents immense harms and that bold, immediate actions are needed to achieve emission reductions and curb the climate emergency facing the globe. Despite this, the Biden administration's Interior Department is holding Lease Sale 257. The sale will offer over 80 million acres of public waters to the oil and gas industry, making it the largest offshore lease sale in U.S. history. The lease sale will allow for new fossil fuel extraction over the next 50 years and will magnify greenhouse gas emissions worldwide.

3. Lease Sale 257 will result in the production of up to 1.12 billion barrels and 4.4 trillion cubic feet of fossil fuels over the next 50 years. The combustion of these fossil fuels for energy and transportation is the main human activity that emits carbon dioxide and contributes to a warming climate. The lease sale will thus contribute substantially to greenhouse gas pollution

that, if not curbed, will exacerbate the climate crisis and burdens on communities in the Gulf of Mexico, which are already suffering from climate warming impacts like rising seas and worsening storms.

4.     On August 31, 2021, the Bureau released a Record of Decision to hold Lease Sale 257 in the Fall of 2021.

5.     While the Bureau claimed to have assessed the environmental effects of the sale before reaching its decision, its irrational NEPA analysis substantially underestimates and fails to account for the environmental harm from this massive lease sale. The Bureau did not rationally evaluate the impacts of greenhouse gas emissions that will result from the sale, in violation of NEPA. According to the Bureau's Record of Decision, producing up to 1.12 billion barrels of oil and 4.4 trillion cubic feet of natural gas that will result from the lease sale will *not* contribute to climate change. In fact, the Bureau's environmental analysis incredulously asserts that burning those fossil fuels will *reduce* greenhouse gas emissions.

6.     Interior also violated NEPA by relying on outdated NEPA analysis which by the time of the lease sale will be nearly five years old. The Bureau failed to update its analysis to include significant new information that demonstrates additional oil and gas leasing will exacerbate the climate crisis to an extent that the Bureau did not consider in its previous NEPA analysis. In addition, new information reveals that companies are increasingly drilling in deeper water with greater risks of accidents, undermining the Bureau's previous assumptions that drilling will be concentrated in shallower areas. New information also shows that Gulf drilling threatens several newly listed species under the Endangered Species Act, including one of the most imperiled marine mammals on Earth (the Rice's whale); that offshore well stimulation procedures like hydraulic fracturing are increasingly dangerous; that pipelines have not been

adequately inspected or decommissioned; that there is a substantial new interest in leasing the Gulf for wind energy projects; and that the fossil fuel industry is increasingly harming frontline communities. This new information indicates that Lease Sale 257 will significantly affect the environment to an extent not previously considered.

7.      Interior's arbitrary and capricious assumptions in its environmental analysis, and its failure to prepare a supplemental environmental impact statement to fully evaluate significant new information about the effect of the lease sale violate NEPA and resulted in Interior making its lease sale decision without an adequate understanding of the environmental effects, including the full effects of the resulting greenhouse gas emissions.

8.      Plaintiffs therefore ask this Court to declare that Interior's decisions to hold Lease Sale 257 violates NEPA and the APA, to vacate the unlawful decision to hold Lease Sale 257, and to vacate or enjoin any leases issued pursuant to unlawful Lease Sale 257.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 (federal question) and 5 U.S.C. §§ 702–706 (APA).

10.      Venue is appropriate under 28 U.S.C. § 1391(e)(1) because the Bureau's headquarters are located in this District, a plaintiff resides in this district, and a substantial part of the events and omissions which gave rise to this action occurred in this District.

11.      This Court has authority to grant the requested relief in this case pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

## PARTIES

12.      Plaintiff FRIENDS OF THE EARTH ("FoE") is a 501(c)(3) nonprofit, membership-based organization headquartered in Washington, DC. FoE currently has over 1.5

million activists and over 140,000 members, located across all 50 states and the District of

Columbia. FoE's primary mission is to defend the environment and champion a more healthy

and just world by collectively ensuring environmental and social justice, human dignity, and

respect for human rights and peoples' rights. FoE and its members are dedicated to fighting to

reduce greenhouse gas emissions and domestic reliance on fossil fuels and support the temporary

pause on oil and gas leasing on federal public lands and water. Specifically, FoE's Climate &

Energy and Oceans & Vessels programs directly engages in administrative and legal advocacy to

protect the environment and society from climate change, pollution, and industrialization

associated with fossil fuel development and greenhouse gas emissions. FoE's members recreate

and enjoy the waters and wildlife in the Gulf. For example, a Friends of the Earth member, who

is also a member of Sierra Club, visits the Gulf of Mexico with his family to fish and recreate.

He enjoys fishing, surfing, viewing the wildlife habitats, and visiting rescued turtles on South

Padre Island. His enjoyment depends on a healthy environment and abundant marine wildlife

protected from oil and gas impacts. Friends of the Earth brings this action for themselves and as

representatives of its members.

13.    Plaintiff HEALTHY GULF is a network of community, conservation,

environmental, and fishing groups and individuals committed to empowering people to protect

and restore the natural resources of the Gulf of Mexico. Healthy Gulf's purpose is to collaborate

with and serve communities who love the Gulf of Mexico by providing research,

communications, and coalition-building tools needed to reverse the long-pattern of over-

exploitation of the Gulf's natural resources. Healthy Gulf has been actively involved in efforts to

strengthen oversight of the offshore oil and gas industry and end new oil and gas leasing in this

region. Healthy Gulf is headquartered in New Orleans, La., with offices in Pensacola, Fla. and

Madison, Miss. Healthy Gulf's members live in the five Gulf states of Texas, Louisiana,

Mississippi, Alabama, and Florida, and nationwide. For example, a member of Healthy Gulf is a

small business owner of a Ship Island excursion company, which offers cruises to Ship Island,

offshore from Mississippi, as well as dolphin watching cruises in the Gulf. The business has been

in his family for generations. He relies on a healthy environment, clean waters, and healthy

marine life to continue the family business which has already been impacted by oil and gas

activities and resulting climate change. Healthy Gulf brings this action for itself and as

representative of its members.

14.     Plaintiff SIERRA CLUB is a not-for-profit organization dedicated to exploring,

enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible

use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and

restore the quality of the natural and human environment; and to using all lawful means to carry

out these objectives. Sierra Club is one of the oldest and largest conservation groups in the

country, with more than 800,000 members nationally in over 60 chapters in all of the 50 states,

the District of Columbia, and Puerto Rico; including over 38,000 members in its Gulf chapters.

Sierra Club members use the public lands and waters throughout the Gulf, including those that

would be affected by oil and gas activities, for quiet recreation, aesthetic pursuits, and spiritual

renewal. Sierra Club members further observe and enjoy wildlife found in the Gulf that may be

harmed by oil and gas activities. Sierra Club brings this action for itself and as representative of

its members.

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a nonprofit

corporation that maintains offices across the United States and Baja California Sur, Mexico. The

Center advocates for the protection of threatened and endangered species and their habitats

through science, policy, and environmental law. The Center's mission also includes protecting
air quality, water quality, and public health. The Center's Oceans Program focuses specifically
on conserving marine ecosystems, and seeks to ensure that imperiled species such as marine
mammals, corals, and sea turtles are properly protected from destructive practices in our oceans.
The Oceans Program also works to protect coastal communities from the air pollution, water
pollution, and other impacts that result from such practices. In pursuit of this mission, the Center
has been actively involved in protecting the Gulf of Mexico from the harmful impacts of
offshore oil and gas drilling. The Center has more than 84,300 members, including members
who live and recreate throughout the Gulf of Mexico region. These members appreciate and
benefit from wildlife in the Gulf of Mexico, such as Rice's whales, sperm whales, loggerhead sea
turtles, Kemp's ridley sea turtles, leatherback sea turtles, and corals threatened by noise
pollution, vessel traffic, oil spills, and/or climate pollution caused by oil and gas activity. For
example, the Center has a member who regularly visits the Gulf of Mexico to enjoy marine
wildlife. They go to the Gulf of Mexico to observe whales, sea turtles, and other marine
mammals. This member works to advocate for wildlife protections from threats such as oil and
gas development, pollution, and habitat destruction. Additionally, the Center's member has a
strong interest in conserving sea turtles, often visiting Gulf sea turtle habitat and nesting beaches.
The Center brings this action for itself and as representative of its members.

16.     Plaintiffs and Plaintiffs' members and staff regularly use, enjoy, and benefit from
the marine and coastal environments of the Gulf of Mexico, including waters within and adjacent
to the five Gulf states. Plaintiffs and Plaintiffs' members and staff regularly enjoy and benefit
from the presence of healthy marine and avian life within those environments for recreational,
aesthetic, commercial, scientific, and environmental purposes, including whale watching, bird

watching, scientific study, boat touring, underwater diving, fishing, photography, and beach bathing. Lease Sale 257 will directly and irreparably injure these interests. Lease Sale 257 will, for example, increase vessel traffic and noise pollution and increase the risk of oil spills and other accidents; it will also increase greenhouse gas emissions. The abilities of Plaintiffs and Plaintiffs' members and staff to pursue these interests hinge on the health of the marine, coastal, and estuarine ecosystems (with clean water and oil-free beaches) and the well-being of the species that live, migrate, feed, and breed in areas affected by oil and gas activities. Interior is authorizing oil and gas development without a full and accurate analysis of its impacts or reasoned consideration of how to avoid or mitigate those impacts. As a result, Interior is enabling new oil and gas development to negatively impact the environment in which Plaintiffs and Plaintiffs' members and staff have an interest. The interests of Plaintiffs and Plaintiffs' members and staff have been, are being, and will be adversely affected by Interior's violations of federal law, as described herein. These harms can only be remedied if Interior is forced to comply with the requirements of NEPA and the APA. Were Interior directed to complete the required NEPA analysis, it could require additional environmental mitigation of the lease sale's impacts or adopt alternatives that would minimize or avoid such impacts in the first place. Plaintiffs have no other adequate remedy at law.

17.     Interior's failure to comply with NEPA by relying on flawed analysis and by failing to prepare a supplemental environmental impact statement also deprives Plaintiffs and their members of procedural rights and information guaranteed by the statute. Plaintiffs and their members have and will continue to advocate regarding Gulf oil and gas leasing and its environmental impacts; seek to discuss the issue with relevant decisionmakers to encourage consideration of alternatives that would avoid, minimize, or mitigate environmental harm; and

seek to provide information to the public and the media regarding the lease sale and its impacts

on the sensitive environmental resources of the Gulf of Mexico. If Interior had complied with

NEPA, the process would have generated additional information on the sale's impacts to the

species, climate, and other environmental resources in which Plaintiffs and their members have

an interest. Plaintiffs and their members would have access to this information and be better

informed about the program and its impacts, improving their ability to participate in

decisionmaking and to suggest potential mitigation. Interior's failure deprives them of this

information and the ability to comment on a draft NEPA analysis. If Interior is required to redo

its NEPA analysis and/or prepare a supplemental environmental impact statement, these

informational and procedural injuries would be redressed.

18.     Defendant DEBRA A. HAALAND is sued in her official capacity as the

Secretary of the Interior. She is the chief officer of the Department of the Interior charged with

overseeing the proper administration and implementation of the Outer Continental Shelf Lands

Act ("OCSLA"). OSCLA vests authority in the Secretary of the Interior to hold oil and gas lease

sales on the Outer Continental Shelf and to issue leases. The Secretary of the Interior is required

to comply with NEPA when taking any action affecting the environment.

19.     Defendant LAURA DANIEL-DAVIS is sued in her official capacity as the

Assistant Secretary of the Interior for Land and Minerals Management. The Assistant Secretary

for Land and Minerals Management is the official to whom the Secretary has delegated authority

to sign records of decision to hold lease sales under OCSLA. The Assistant Secretary for Land

and Minerals Management is required to comply with NEPA when taking any action affecting

the environment.

20.     Defendant U.S. DEPARTMENT OF THE INTERIOR is the federal department

with authority, through the Secretary, under OCSLA to hold oil and gas lease sales on the Outer

Continental Shelf and to issue leases. The Department of the Interior is required to comply with

NEPA when taking any action affecting the environment.

21.     Defendant BUREAU OF OCEAN ENERGY MANAGEMENT is the federal

agency within the Department of the Interior to which the Secretary has delegated authority

under OCSLA to hold oil and gas lease sales on the Outer Continental Shelf and to issue leases.

The Bureau is required to comply with NEPA when taking any action affecting the environment.

## STATUTORY BACKGROUND

I.     NATIONAL ENVIRONMENTAL POLICY ACT

22.     NEPA is this country's "basic national charter for protection of the environment."

40 C.F.R. § 1500.1(2019);[1] *see* 42 U.S.C. § 4331 *et seq.* Its purpose is to "promote efforts which

will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. The Council on

Environmental Quality has promulgated regulations implementing NEPA, which are "binding on

all federal agencies." 40 C.F.R. § 1500.3; *see id.* §§ 1500.1–1508.28.

23.     Congress enacted NEPA to ensure that federal agencies incorporate

environmental concerns into the decisionmaking process. 42 U.S.C. § 4331(a)–(b). To that end,

NEPA has two principal purposes: (1) to ensure agencies evaluate prospectively the

environmental impacts of proposed actions that they carry out, fund, or authorize; and (2) to give

the public a meaningful opportunity to participate in the decision-making process. NEPA ensures

that detailed information concerning significant environmental impacts "will be made available

---

[1] The Council on Environmental Quality recently revised its regulations implementing NEPA. 85 Fed. Reg 43,304 (July 16, 2020). Those new regulations do not apply to the NEPA analyses at issue here, which began in August 2016. 81 Fed. Reg. 55,480 (Aug. 19, 2016). *See also* 85 Fed. Reg. at 43,372, 43,340 (stating new regulations only "apply to any NEPA process begun after September 14, 2020").

to the larger [public] audience that may [] play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

24.     NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an Environmental Impact Statement ("EIS"), must describe: (1) the "environmental impact of the proposed action"; (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented"; (3) "alternatives to the proposed action"; (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." *Id.*; *see also* 40 C.F.R. § 1502.1.

25.     The decision to hold Lease Sale 257 is a major federal action subject to the requirements of NEPA. The Bureau is required to ensure it complies with the requirements of NEPA before holding the lease sale.

26.     Under NEPA, "agencies must 'take a "hard look" at [the] environmental consequences' of their actions, and 'provide for broad dissemination of relevant environmental information.'" *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1082 (D.C. Cir. 2016) (alteration in original) (quoting *Robertson*, 490 U.S. at 350). The EIS must fully consider and disclose the potential environmental impacts of proposed actions and alternatives to that action to take the "hard look" NEPA requires. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.4, 1502.1, 1502.5.

27.     NEPA requires agencies to use high quality, accurate scientific information and to

ensure the scientific integrity of their analyses. 40 C.F.R. §§ 1500.1(b), 1502.24.

28.     To comply with NEPA, an agency must consider the site-specific impacts of the action as well as the cumulative impact of the proposed action when combined with other past, present, and reasonably foreseeable future actions. 40 C.F.R. §§ 1508.7, .8, .25, .27.

29.     An EIS must analyze the direct, indirect, and cumulative effects of the proposed action and any identified alternatives thereto. *Id.* § 1508.25. Direct effects are those effects "which are caused by the action and occur at the same time and place." *Id.* § 1508.8(a). Indirect effects are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative effects are those that "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. "Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." *Id.* § 1508.8.

30.     Downstream greenhouse gas emissions, which are those that result from reasonably foreseeable transportation, processing, and especially combustion of fossil fuels, are effects that the agency must quantify and analyze. *See, e.g.*, *Sierra Club v. Fed. Energy Regul. Comm'n*, 867 F.3d 1357, 1373–74 (D.C. Cir. 2017).

31.     The Bureau's NEPA obligations do not end with the preparation of an EIS. NEPA and its implementing regulations impose a continuing duty on agencies to prepare a supplemental EIS if a major federal action remains to occur and when "(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii)

There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. §§ 1502.9(c)(1)(i), (ii). An agency may also prepare "supplements when [it] determines that the purposes of [NEPA] will be furthered by doing so." *Id*. § 1502.9(c)(2). An agency must prepare, circulate, and file a supplemental EIS "in the same fashion (exclusive of scoping) as a draft and final statement." *Id*. § 1502.9(c)(4).

32.     NEPA requires that an agency incorporate its environmental analysis into its decision-making process. "NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action." *Id*. § 1500.1(c); *see also id*. ("Ultimately . . . it is not better documents but better decisions that count."); *id*. § 1502.1 ("primary purpose" of an EIS is to "serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. . . . An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.").

33.     The NEPA data and analyses supporting an agency's decision must be presented in the EIS. *See id*. § 1502.1. An agency may not rely on its Record of Decision to alter or augment its analyses or cure deficiencies in an EIS.

II.     OUTER CONTINENTAL SHELF LANDS ACT

34.     OCSLA governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf. 43 U.S.C. § 1331 *et seq.* The Outer Continental Shelf extends from the outer boundary of state waters—typically three nautical miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10,605 (Mar. 14, 1983).

35.     In 1978, Congress amended OCSLA to provide, in part, for the development of resources on the Outer Continental Shelf "subject to environmental safeguards." 43 U.S.C. §

1332(3); *see* Pub. L. No. 95-372, 92 Stat. 632 *et seq.*

36.     OCSLA charges the Secretary of the Interior with managing oil and gas activities on the Outer Continental Shelf. *E.g.*, 43 U.S.C. §§ 1334(a), 1344(a).

37.     OCSLA prescribes four, tiered stages for the Secretary to sell and allow development of offshore oil and gas deposits: 1) five-year leasing programs; 2) lease sales; 3) exploration plans; and 4) development and production plans. *Id.* §§ 1337, 1340, 1344, 1351.

38.     At the five-year program stage, the Secretary designates "the size, timing, and location of leasing activity" over an upcoming five-year period. *Id.* § 1344(a).

39.     At the lease sale stage, the Secretary offers for sale leases that "entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area," subject to certain approvals. *Id.* § 1337. A lessee may conduct ancillary activities on its lease without any further federal approval under OCSLA. 30 C.F.R. §§ 550.105, .207–.209. These activities include geological and geophysical exploration, such as seismic reflection and refraction to detect the presence of oil or gas, and other surveys that are needed to determine how to explore or develop a lease. *Id.* §§ 550.105, .207.

40.     The Bureau is the federal agency within the Department of the Interior to which the Secretary has delegated authority to manage leasing, exploration, development, and production of oil and gas resources on the Outer Continental Shelf under OCSLA. 30 C.F.R. § 550.101.

41.     The Bureau begins the lease sale process by preparing and publishing a proposed notice of lease sale. *Id.* § 556.304.

42.     The Bureau publishes a final notice of sale at least 30 days before holding the lease sale. *Id.* § 556.308(a).

14

43.    The Bureau awards and executes leases once the winning bidder files the necessary paperwork and fees. *Id.* § 556.520. A lease becomes effective on the first day of the month after the Bureau executes the lease. *Id.* § 556.521.

III.    ADMINISTRATIVE PROCEDURE ACT

44.    The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

45.    The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

46.    Under the APA, a court shall also "hold unlawful and set aside" any agency action that was promulgated "without observance of procedure required by law." *Id*. § 706(2)(D).

47.    The APA also provides that the reviewing court "shall compel agency action unlawfully withheld or unreasonably delayed." *Id*. § 706(1).

48.    The adequacy of an agency's NEPA analysis and its compliance with NEPA's requirements is reviewed under the APA.

**STATEMENT OF FACTS**

I.    LEASE SALE 257

49.    On November 18, 2020, the Bureau first announced the availability of the Proposed Notice of Sale for Lease Sale 257 in the Gulf of Mexico. 85 Fed. Reg. 73,508 (Nov. 18, 2020). The notice proposed a regionwide sale, which would offer for lease nearly all unleased areas in the Western and Central Gulf of Mexico, as well as additional unleased areas in the Eastern Gulf that are not subject to Congressional moratorium.

50.    On the last day of the Trump administration's term, the Bureau announced the availability of a Record of Decision to hold Lease Sale 257, as proposed, relying on flawed and

outdated environmental analyses. *See* 86 Fed. Reg. 6365 (Jan. 21, 2021). The Record of Decision stated that the Bureau would make available 79.7 million acres for sale. *Id*.

51.     The Biden Administration initially rescinded the decision to hold Lease Sale 257 in order to complete a comprehensive review of all Federal oil and gas activity, including climate impacts. 86 Fed. Reg. 10,132 (Feb. 18, 2021).

52.     Before completing the comprehensive review, however, the Bureau decided to reverse course on its rescission of the Lease Sale 257 decision document and opted to move forward with the lease sale. The Bureau signed a new Record of Decision on August 31, 2021, to hold the sale in Fall of 2021 and indicated a Final Notice of Sale for Lease Sale 257 would be published in September 2021.[2] The Bureau *increased* the area made available for lease from approximately 79.7 million acres to 80.8 million acres.

53.     The Bureau predicts that Lease Sale 257 will result in the production of up to 1.12 billion barrels of oil and 4.4 trillion cubic feet of natural gas. The Bureau expects production to continue on the leases sold for at least the next fifty years.

II.    THE RICH ECOSYSTEM OF THE GULF OF MEXICO

54.     The Gulf of Mexico is an extraordinary aesthetic, economic, and environmental resource to the five Gulf Coast states and the nation, supporting some of the most productive and biodiverse tropical and temperate ecosystems in the United States.

55.     The Gulf of Mexico is home to thousands of marine species, ranging from simple invertebrates, such as conchs and sponges, to complex and highly evolved fish and marine mammals. In addition, five of the world's seven species of sea turtles, as well as hundreds of shore and coastal bird species, reside in or migrate through the Gulf of Mexico. Over 300 species

---

[2] The Record of Decision is posted at https://www.boem.gov/sites/default/files/documents/oil-gas-energy/GOM-LS-257.pdf.

of coral, as well as other hard-bottom communities, wetlands, seagrass beds, mangroves, and soft bottom communities, provide the habitats necessary to support this rich assemblage of marine life.

56.     Over two dozen marine and coastal bird species living in the Gulf of Mexico are listed as endangered or threatened under the Endangered Species Act, including Rice's whale—one of the most endangered whales on the planet, with less than 50 individuals remaining.

57.     The Gulf of Mexico's environmental beauty and productivity also support a robust economy. The region produces more than one-third of the nation's domestic seafood supply. The Gulf's commercial fisheries and coastal tourism generate more than $40 billion annually in economic activity in the five Gulf Coast states.

III.    CLIMATE CHANGE IN THE GULF OF MEXICO

58.     The world has warmed substantially over the last 150 years, with remarkable acceleration in recent decades, resulting in changes in surface, atmospheric and oceanic temperatures, melting glaciers, reduced snow cover, shrinking sea ice, rising sea levels, ocean acidification, and changes in precipitation patterns, among other effects. Human activity, especially emissions of greenhouse gasses, are primarily responsible for this change. Indeed, current emissions of greenhouse gases are so high that there is no past analog for the conditions occurring today. This warming is expected to continue, and the effects of warming will accelerate and intensify.

59.     Climate change will undoubtedly affect the habitat, behavior, abundance, and distribution of all species present in the Gulf of Mexico. It will bring increased storms, flooding, rising seas, and other severe harms to the region. In fact, the effects of climate warming are already being acutely felt by vulnerable Gulf communities.

60.     Storms are becoming increasingly severe in the Gulf region in the face of climate

17

change. For example, Hurricane Harvey was a Category 4 storm when it hit the coast of Texas and dumped 60.5 inches of rain during the multi-day onslaught, killed at least 63 people, affected millions of others in several states, and caused $125 billion in damage. Scientists have concluded that climate change made the hurricane more powerful and increased its deadly flooding.

61.     Strong storms also frequently cause damage to infrastructure of both oil pipelines and platforms offshore. For example, Hurricane Ivan in 2004 caused a massive seafloor shift that toppled a production platform and resulted in the longest recorded spill in U.S. history. Hurricane Ike in 2008 caused 24 spills (18 from platforms and 6 from pipelines) totaling over 5,000 barrels of oil released into the environment.

62.     Flooding has become a common occurrence in Louisiana as a result of climate warming, bringing damage and destruction to the state. For example, in 2020, Hurricane Laura caused impacts that led to elevated toxic emissions along the Louisiana Coast from damage to industrial facilities.

63.     Sea level rise and coastal erosion is an acute threat in the Gulf Region. The Fourth National Climate Assessment issued in 2018 predicts that Texas alone will see an additional 1,300 deaths per year due to higher temperatures and as much as $21 billion in flooded coastal property by 2030.[3] Communities in Gulf states, such as the tribal community of Isle de Jean Charles in Louisiana, are being relocated because of severe land loss, sea level rise, and coastal flooding.

64.     New oil and gas leasing will only amplify climate harms in the Gulf region and throughout the nation. Carbon dioxide emissions account for over 80 percent of U.S. greenhouse

---

[3] U.S. Global Change Research Program, *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II* (2018), https://nca2018.globalchange.gov/.

gas emissions. The exploration, development, and production of oil and gas in the Gulf will release greenhouse gases from the use of combustion engines, construction, drilling, and through the deliberate or accidental release of methane.

65.     The main human activity that emits carbon dioxide is the combustion of fossil fuels (oil and gas) for energy and transportation. In addition to direct emissions, oil and gas production will result in downstream emissions of greenhouse gases from the processing of oil and gas products.

66.     While the harm caused by these emissions will be felt nationally and even globally, Gulf communities, which are already vulnerable to climate change impacts, will bear a disproportionate burden from these emissions as they contribute to increasing and worsening storms, rising seas, and land loss.

67.     Extensive research demonstrates the urgent need to reduce greenhouse gas emissions to levels that will maintain global average temperatures to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels.

68.     To limit warming to 1.5°C, or even 2°C, above pre-industrial levels will require substantial reductions in net global carbon dioxide emissions prior to 2030 and net carbon dioxide emissions of at least zero later in the century. A 2016 analysis found that carbon emissions from developed reserves in currently operating oil and gas fields and coal mines would already lead to global temperature rise beyond 2°C.[4] To stay well below 2°C, the study recommends that "[n]o new fossil fuel extraction or transportation infrastructure should be built,

---

[4] Greg Muttitt, *The Sky's Limit: Why the Paris Climate Goals Require a Managed Decline of Fossil Fuel Production* 5, Oil Change Int'l (Sept. 2016), http://priceofoil.org/content/uploads/2016/09/OCI_the_skys_limit_2016_FINAL_2.pdf.

and governments should grant no new permits for them" and that some fossil fuel fields "—primarily in rich countries—should be closed before fully exploiting their resources."

69.    Scientific studies have estimated that 68 to 80 percent of global fossil fuel reserves must not be extracted and consumed to limit temperature rise to 2°C.[5] An estimated 85 percent of known fossil fuel reserves must stay in the ground for a 50 percent chance of limiting temperature rise to 1.5°C.[6]

70.    Increasing fossil fuel extraction from federal waters is not compatible with the urgent action necessary to reduce emissions sufficiently to limit warming. The International Energy Agency recently issued a report that found in order to get to net zero from the energy sector by 2050, there can be no new oil and gas fields approved for development beyond the projects already committed to as of 2021.[7]

71.    President Biden's administration has recognized the extreme threat from climate warming. Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad" emphasizes the significant greenhouse gas emissions that result from oil and gas development and sets out a policy of aligning Federal public land management of public waters with the need to support robust climate action. 86 Fed. Reg. 7619 (Feb. 1, 2021). The administration has directed agencies to make significant reductions in greenhouse gas emissions; to build resilience

---

[5] To limit temperature rise to 2°C based on a 1,000 GtCO$_2$ carbon budget from 2011 onward, studies indicate that 80 percent (Carbon Tracker Initiative 2013), 76 percent (Raupach et al. 2014), and 68 percent (Oil Change International 2016) of global fossil fuel reserves must stay in the ground. *See generally* Carbon Tracker Initiative, *Unburnable Carbon – Are the world's financial markets carrying a carbon bubble?* 2 (2013); Michael R. Raupach et al., *Sharing a quota on cumulative carbon emissions*, 4 Nature Climate Change 873 (Sept. 21, 2014); Muttitt, *supra,* at 6.

[6] Muttitt, *supra*, at 15.

[7] International Energy Agency, *Net Zero by 2050: A Roadmap for the Global Energy Sector* (2021), https://www.iea.org/reports/net-zero-by-2050.

against the impacts of climate change; to address actions that conflict with these objectives; and to "combat the climate crisis" by implementing a Government-wide approach that reduces climate pollution in every sector of the economy.

72.     The United States has formally committed to climate change targets that require the nation to steadily decrease greenhouse gas emissions. Under the Paris Agreement, which the U.S. rejoined on January 20, 2021, the United States committed to holding the long-term global average temperature "to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels." The Agreement requires a "well below 2°C" climate target because 2°C of warming is no longer considered a safe guardrail for avoiding catastrophic climate impacts and runaway climate change. Under the Agreement, the U.S. Nationally Determined Contribution is to reduce net greenhouse gas emissions by 26–28 percent below 2005 levels by 2025 and by 50–52 percent below 2005 levels by 2030. The United States must halt new fossil fuel extraction and rapidly phase out existing production to avoid jeopardizing our ability to meet those targets.

73.     Holding Lease Sale 257 will cause substantial greenhouse gas emissions that are incompatible with action necessary to prevent catastrophic impacts of climate change. These emissions include those generated during construction and operation of oil and gas development on those leases, as well as refining and consuming the billions of barrels of oil and trillions of cubic feet of natural gas to be produced over the life of the leases.

IV.     THE BUREAU'S ARBITRARY AND CAPRICIOUS ANALYSES OF THE
        ENVIRONMENTAL EFFECTS OF LEASE SALE 257

74.     Despite the urgent need to address climate change and the nation's commitments to reducing the impacts of global warming, the Bureau decided to hold Lease Sale 257, the largest offshore oil and gas lease sale in U.S. history. The decision relied on flawed and outdated

environmental analyses which drastically miscalculated the greenhouse gas emissions that would result from the lease sale. The Bureau's decision also ignored significant new information about the climate change harms and other environmental effects of holding the sale.

A.    The Bureau's NEPA Analysis for Its Gulf Lease Sales.

75.    On January 17, 2017, the Secretary of the Interior approved the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program (hereinafter "2017–2022 Program"), which proposed ten region-wide lease sales in the Gulf of Mexico (Lease Sales 249, 250, 251, 252, 253, 254, 256, 257, 259, and 261), and issued a Record of Decision for the Program. *See* 82 Fed. Reg. 6643 (Jan. 19, 2017).

76.    During the multi-stage process leading up to Lease Sale 257, the Bureau prepared three separate EISs to evaluate both the 2017–2022 Program and the Gulf of Mexico lease sales under that program: a programmatic EIS on the nationwide 2017–2022 Program, a programmatic EIS on the Gulf of Mexico lease sales under the Program, and a supplemental EIS ("Lease Sale EIS") on the effects of a proposed lease sale issued in December 2017, which in turn tiered to and incorporated by reference the two programmatic EISs. The Bureau relied on the Supplemental Lease Sale EIS in reaching its decision to hold Lease Sale 257.

77.    A number of conservation groups, including Plaintiffs, filed comments with the Bureau on all three EISs during the public comment periods. These comments highlighted the Bureau's failure to fully disclose, evaluate, or consider greenhouse gas emissions associated with oil and gas leasing, and detailed serious problems with the agency's analyses and consideration of the climate change harms caused by oil and gas development.

1.    *Programmatic EIS for the 2017–2022 Program*

78.    The Bureau released a draft programmatic EIS on the 2017–2022 Program on March 18, 2016. *See* 81 Fed. Reg. 14,885 (Mar. 18, 2016). The EIS's stated purpose was to

assess at a general level the effects of activities that could occur under leases issued pursuant to the Program, including exploration, development, and production activities.

79.     The Bureau finalized the programmatic EIS for the 2017–2022 Program [hereinafter "5-Year Program EIS"] in late 2016. *See* 81 Fed. Reg. 83,870 (Nov. 22, 2016).

80.     On January 17, 2017, the Secretary of the Interior approved the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program, which proposed ten region-wide lease sales in the Central and Western Planning Areas in the Gulf of Mexico, as well as the portion of the Eastern Planning Area in the Gulf not subject to a Congressional moratorium, and issued a Record of Decision for the 5-Year Program EIS. *See* 82 Fed. Reg. 6643 (Jan. 19, 2017).

2.     *Programmatic EIS for Gulf of Mexico 2017–2022 Leasing*

81.     On April 22, 2016, the Bureau provided notice of availability of a draft programmatic EIS purporting to evaluate the environmental effects of a single given lease sale in the Gulf of Mexico under the 2017–2022 Program. 81 Fed. Reg. 23,747 (Apr. 22, 2016). The stated purpose of this draft programmatic EIS was to assess at a general level the effects of activities likely to occur on leases executed in a single given lease sale in the Gulf pursuant to the 2017–2022 Program under certain oil and gas price and demand scenarios, including exploration, development, and production activities. The EIS did not assess the combined effects of all ten proposed lease sales.

82.     On March 10, 2017, the Bureau published notice of availability of the final programmatic EIS on the environmental effects of a single given lease sale planned for the Gulf of Mexico in 2017–2022 [hereinafter "Multisale EIS"]. 82 Fed. Reg. 13,363 (Mar. 10, 2017).

83.     When the Bureau published the Multisale EIS, it planned to supplement the EIS at least once a year. The Multisale EIS stated that the Bureau planned to supplement the Multisale EIS "on a regular basis to provide for more consistency and for planning purposes." The Bureau

expected "to issue a Supplemental EIS once a calendar year."

        *3.    2018 Supplemental EIS*

84.     On August 19, 2016, the Bureau published a notice of intent to prepare a

supplemental EIS to "focus on new information released since the publication" of the 5-Year

Program EIS. 81 Fed. Reg. 55,480 (Aug. 19, 2016).

85.     On March 31, 2017, the Bureau published notice of availability of a draft

supplemental EIS. 82 Fed. Reg. 16,060 (Mar. 31, 2017). The draft supplemental EIS stated that it

analyzed the effects of a single region-wide lease sale under the 2017–2022 Program, and was

intended to tier from and update the 5-Year Program EIS and Mulitsale EIS. The stated purpose

of the draft supplemental EIS was to assess the effects of activities likely to occur on leases

executed in a single given lease sale, including broadly the effects of exploration, development,

and production activities.

86.     The Bureau accepted public comments on the draft EIS through May 15, 2017.

87.     On December 15, 2017, the Bureau announced the availability of the final

supplemental EIS [hereinafter "Lease Sale EIS"]. 82 Fed. Reg. 59,644 (Dec. 15, 2017).

88.     The Lease Sale EIS intended to apply the analysis to inform later regionwide

lease sales, but indicated that it would supplement its analysis as necessary to inform later sales.

At the time that the Bureau published the Lease Sale EIS, it stated that "Supplemental NEPA

reviews, including opportunities for public involvement are currently planned to be conducted

annually for the remaining proposed lease sales."

89.     The Bureau subsequently issued a "Notice of Intent to Prepare a Supplemental

Environmental Impact Statement" which the agency "expected to . . . use[ ] to inform the

decisions for each of the two proposed lease sales scheduled in 2020 and the subsequent lease

sales through 2022." *See* 83 Fed. Reg. 66,302 (Dec. 26, 2018). The Bureau never issued such

supplemental analysis or even put a draft supplemental EIS out for public notice and comment.

90.     Since it published the final Lease Sale EIS in late 2017, the Bureau has not amended or supplemented its NEPA analyses.

B.     The Bureau's Record of Decision Is Unlawful.

91.     The three, tiered EISs that the Bureau relied on in its decision to hold the large lease sale are based on incorrect and illogical assumptions, fatally undermining the analyses and causing the Bureau to significantly underestimate and otherwise misjudge and misstate the greenhouse gas emissions and other environmental effects that a lease sale in the Gulf of Mexico will have on the environment.

92.     In addition, the Bureau ignored significant new information about environmental impacts when it reached its decision to hold Lease Sale 257 and failed to supplement its EISs to account for that new information, as required under NEPA before issuing its Record of Decision.

93.     It is critical that the Bureau accurately assess the effects of oil and gas exploration, development, and production likely to result from a lease sale at the lease sale stage because that is the last opportunity the agency has to adjust the number or locations of blocks it offers for lease to avoid unacceptable environmental impacts. *See, e.g.*, 81 Fed. Reg. at 55,480 ("During the pre-lease sale process, the size of any individual lease sale could be reduced, and a smaller area offered for leasing, should circumstances warrant.").

    1.     *The Bureau's Record of Decision is Unlawful Because it Relied on EISs that Contain Flawed Assessments and Misleading Disclosures Regarding Greenhouse Gases.*

94.     The Bureau's three EISs failed to properly examine the climate impacts of a lease sale in the Gulf of Mexico. In particular, the Bureau failed to properly estimate the global greenhouse gas emissions associated with Lease Sale 257.

95.     In order to analyze greenhouse gas emissions in the 5-Year Program EIS, the

Bureau prepared a separate technical analysis that calculated emissions using an "Offshore Environmental Cost Model" and estimated changes in energy consumption patterns using a market simulation model, "MarketSim."[8] The analysis concluded that adding up to 5.9 billion barrels of oil and 22.3 trillion cubic feet of gas to the world (from all the proposed lease sales) would make no difference for greenhouse gas emissions and in fact would *reduce* emissions compared to the No Action alternative of no new leasing.

96.     The Bureau based this irrational conclusion on its assumption that foreign sources of oil will substitute for reduced supply, and the production and transport of that foreign oil would emit more greenhouse gases.

97.     The Bureau's Multisale EIS and Lease Sale EIS both also relied on the same faulty modeling to analyze the lifecycle emissions for a single lease sale. In both the Multisale EIS and the Lease Sale EIS, the Bureau concluded that the greenhouse gas emissions from the activities resulting from a single lease sale would be *lower* than if the Bureau did not hold a lease sale. The Bureau based this irrational conclusion on the idea that foreign substitution effects would increase emissions if the U.S. did not hold a lease sale.

98.     The Bureau based its conclusions that greenhouse gas emissions would be higher under a no leasing alternative on the unfounded assumption of perfect substitution—that emission reductions gained by not allowing the future oil and gas production resulting from a lease sale will be offset by oil and gas production elsewhere.

99.     The Bureau's counterintuitive conclusion that not leasing will lead to higher, rather than lower, greenhouse gases is unfounded. The Bureau reached this conclusion by failing

---

[8] E. Wolvovsky & W. Anderson, *OCS Oil and Natural Gas: Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon*, BOEM OCS Report 2016-065 (2016).

to conduct a full accounting of the global greenhouse gas emissions that would result from not

holding lease sales. When applying its MarketSim model, the Bureau excluded any information

about foreign oil and gas markets, including a calculation of how holding a lease sale would

affect foreign oil consumption. Instead, the Bureau assumed that the global market would

produce an unrestricted supply of oil and gas to replace any oil or gas not produced on a leased

area in the Gulf.

100.    The Bureau attempted to justify its decision not to include the effects on foreign

oil consumption by stating that "[o]il consumption in each country is different, and [the Bureau]

does not have information related to which countries would consume less oil."[9]

101.    Yet, information available to the Bureau showed that when foreign consumption

is included, reducing U.S. oil production would result in a substantial reduction in global

consumption under a no leasing alternative. The Bureau estimated that each barrel of oil left

undeveloped would result in about a half-barrel decrease in global consumption, resulting in a

reduction in consumption of up to 6 billion barrels of oil over the entire 5-year program. At the

same time, the Bureau admitted that this available information was "not captured" in its

analysis.[10]

102.    Two courts have recently rejected the Bureau's greenhouse gas modeling and

determined that it is arbitrary and capricious. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d

723, 736–740 (9th Cir. 2020); *Sovereign Iñupiat for a Living Arctic v. Bureau of Land*

*Management*, No. 3:20-cv-00290, 2021 WL 3667986, at *10–14 (Aug. 18, 2021). This is

because available information "belies [the Bureau's] contention that it could not have

---

[9] Wolvovsky & Anderson, *supra*, at 23.
[10] *Id.*

27

summarized or estimated foreign emissions with accurate or credible scientific evidence." *Ctr. for Biological Diversity*, 982 F.3d at 738.

103.    For example, energy experts at the Stockholm Environment Institute ("SEI") "us[ed] standard energy contents (from the US Department of Energy) and carbon contents (from the US Environmental Protection Agency), and discount[ed] the oil used in products and not combusted (International Energy Agency)," to estimate that the reduction in global oil consumption would result in a savings of 2.3 billion metric tons of carbon dioxide in high-price scenarios for oil, 1.6 billion in mid-price scenarios, and 0.4 billion in the low-price scenarios.[11] The SEI analysis demonstrates that the decrease in global greenhouse gas emissions if the U.S. did not hold lease sales would be enormous.

104.    The SEI report found that not holding a lease sale over the entire 2017-2022 Leasing Program would result in a decrease of up to 2.3 billion tons of carbon dioxide—greater than a year's worth of emissions from the entire U.S. transportation sector (i.e., 1.7 billion tons carbon dioxide).

105.    Numerous analyses also showed that perfect substitution for oil and gas production simply does not occur in the real world and is not a reasonable assumption. Oil and gas production operates in a global market where changes in U.S. production translate into shifts in global prices, global consumption, and associated greenhouse gas pollution. All other things being equal, analyses show that increasing U.S. oil and gas production lowers oil prices and increases global consumption, while leaving U.S. oil and gas undeveloped increases oil prices and decreases global consumption. In short, every barrel of oil and unit of gas that is left

---

[11] P. Erickson, *Final Obama administration analysis shows expanding oil supply increases CO2*, SEI (Jan. 30, 2017).

undeveloped results in a reduction in global oil and gas consumption with associated decreases in greenhouse gas pollution.

106.    For example, a comprehensive analysis of the greenhouse gas consequences of ending new oil leasing on U.S. federal lands and waters, and avoiding renewal of existing leases for resources that are not yet producing found that ceasing new oil leasing would result in a large greenhouse gas and climate benefit.[12] This study accounted for the effects of substitution by other fuels for the oil that would be forgone by ending new leasing. It found that every barrel of federal oil left undeveloped would result in nearly half a barrel reduction in net oil consumption, with associated reductions in greenhouse emissions. The analysis estimated that ending new federal oil leasing would reduce 2030 global carbon dioxide emissions from oil consumption by 54 million metric tons of carbon dioxide, with an increase in carbon dioxide emissions from other fuels of 23 million metric tons of carbon dioxide, for a net emissions benefit of 31 million metric tons of carbon dioxide. Other studies have reached similar conclusions.[13]

107.    In comments to the Bureau on the 5-Year Program EIS, the Multisale EIS, and the Lease Sale EIS, a number of groups identified flaws with the Bureau's greenhouse gas emissions analyses and highlighted studies showing that the agency's conclusions and assumptions about foreign oil and gas markets were not supported. In response, the Bureau did not provide any additional information or analysis. It simply repeated its unsupported conclusion that emissions from limiting leasing would be offset by foreign substitutes.

---

[12] P. Erickson & M. Lazarus, *How would phasing out US federal leases for fossil fuel extraction affect CO2 emissions and 2°C goals?*, SEI, Working Paper No. 2016-2 (2016).

[13] P. Erickson & M. Lazarus, *Impact of the Keystone XL Pipeline on Global Oil Markets and Greenhouse Gas Emissions*, 4 Nature Climate Change 778 (2016); *see also* P. Erickson, *Rebuttal: Oil Subsidies—More Material for Climate Change Than You Might Think*, Council on Foreign Relations (Nov. 2, 2017); Jason Bordoff & Trevor Houser, *Navigating the U.S. Oil Export Debate*, Columbia SIPA Center on Global Energy Policy (Jan. 2015).

108.     The Bureau's failures to consider foreign oil consumption despite assuming an unrestricted supply of foreign oil for substitution fatally undermine its assumptions and disclosures in the three EISs regarding the true greenhouse gas emissions resulting from a lease sale. The Bureau significantly inflated consumption and lifecycle greenhouse gases that would result from not holding the lease sale. As a result, the Bureau's conclusion that holding a lease sale would reduce global greenhouse gas emissions is both arbitrary and misleading. The Bureau relied on this incorrect analysis when it decided to hold Lease Sale 257.

> 2.     *Before Issuing the Record of Decision, the Bureau was Required to Supplement its Lease Sale EIS Based on Significant New Information About the Environmental Effects of Holding a Lease Sale.*

109.     A variety of new information demonstrates new oil and gas leasing will exacerbate the climate crisis to an extent not previously considered in the Bureau's existing EISs. New information also demonstrates companies are increasingly drilling in deeper water, undermining one of the key assumptions in the prior EISs that exploration and production would be concentrated in shallow water. New information also reveals the scale of the threat that Gulf drilling poses to endangered species, including to the critically imperiled Rice's whale; the increasing dangers from offshore well stimulation practices; that pipelines are not adequately inspected or decommissioned; a substantial interest in leasing the Gulf for wind energy projects; and that frontline communities are being increasingly harmed by the fossil fuel industry.

110.     This significant new information about the effects of oil and gas development in the Gulf undermines multiple outdated assumptions in the Bureau's previous EISs.  Despite this, the Bureau did not prepare a supplemental EIS or consider any of this significant new information before adopting its decision to hold Lease Sale 257.

     i. New Information Demonstrates that Climate Change Impacts from Leasing are Greater than Previously Thought.

111. In its 2017 Lease Sale EIS, the Bureau concluded that greenhouse gas emissions from a lease sale would be lower than not leasing. Overall, the Bureau concluded that the impacts on air emissions from the lease sale would be minor for all lease sale action alternatives.

112. Since the Bureau completed its Lease Sale EIS in 2017, new information reveals that avoiding the worst impacts of climate change requires ending new leasing and abandoning large fossil fuel expansion altogether.

113. For example, in 2018, the IPCC issued a Special Report on Global Warming of 1.5°C that quantified the devastating harms that would occur at 2°C warming, highlighting the necessity of limiting warming to 1.5°C to avoid catastrophic impacts to people and life on Earth.[14]

114. The 2018 IPCC report showed that human-induced warming has already resulted in about a 1°C temperature rise above pre-industrial levels, increasing by 0.2°C per decade. The report confirmed that greenhouse gas emissions are principally responsible for global warming.

115. The 2018 IPCC report also provided overwhelming evidence that climate hazards are more urgent and more severe than previously thought, and that aggressive reductions in emissions within the next decade are essential to avoiding the most devastating climate change harms. The IPCC report concluded that pathways to limit warming to 1.5°C with little or no overshoot require "a rapid phase out of $CO_2$ emissions and deep emissions reductions in other [greenhouse gases]." In pathways consistent with limiting warming to 1.5°C, global net anthropogenic $CO_2$ emissions must decline by about 45 percent from 2010 levels by 2030,

---

[14] IPCC, *Special Report, Global Warming of 1.5°* (Oct. 6, 2018), http://www.ipcc.ch/report/sr15/.

reaching net zero around 2050; for a two-thirds chance for limiting warming to 1.5°C, $CO_2$ emissions must reach net zero in 25 years.

116.    This year, the IPCC released a new working group report on climate change, which incorporated updated methodologies and new climate evidence.[15] The latest report found that over the next 20 years, it is likely that global temperatures will meet or exceed 1.5°C of warming with current emissions. However, human actions can still change the course of future climates. The report confirmed that aggressive reductions in greenhouse gas emissions are necessary. It concluded that unless there are immediate and rapid reductions in emissions, limiting warming to 1.5°C or even 2°C will be beyond reach. The report showed that extreme climate changes will increase across the globe, including increased heat waves, more severe storms, and greater sea level rise. For example, the report stated that extreme sea level events that only used to occur once every 100 years could happen every year by the end of the century.

117.    New evidence shows that leasing on federal lands and in federal waters is responsible for a great majority of U.S. greenhouse gas emissions. A 2018 report from the U.S. Geological Survey estimated that carbon emissions released from extraction and end-use combustion of fossil fuels produced on federal lands and waters alone accounted for approximately one quarter of total U.S. carbon emissions during 2005 to 2014.[16] This research further establishes that the United States must halt new fossil fuel projects and close existing fields and mines before their reserves are fully extracted to achieve the Paris climate targets and

---

[15] IPCC, *Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change* (Aug. 6, 2021), https://www.ipcc.ch/report/sixth-assessment-report-working-group-i/.

[16] Matthew D. Merrill, et al., *Federal Lands Greenhouse Gas Emissions and Sequestration in the United States: Estimates for 2005–14*, U.S. Geological Survey (2018), https://pubs.er.usgs.gov /publication/sir20185131.

avoid the worst damages from climate change.

118.    A 2019 study also highlighted the importance of immediately halting all new fossil fuel infrastructure projects to preserve a livable planet.[17] The study found that every year of delay in phasing out fossil fuel infrastructure makes carbon "lock-in" more difficult to escape and the possibility of keeping global temperature rise below 1.5°C less likely. The study concluded that although difficult, "1.5 °C remains possible and is attainable with ambitious and immediate emission reduction across all sectors." Another 2019 analysis also underscored that the United States must halt new fossil fuel extraction and rapidly phase out existing production to avoid jeopardizing our ability to meet the Paris climate targets and avoid the worst dangers of climate change.[18]

119.    The United Nations' November 2019 "Emissions Gap" report reiterated the need for urgent action to cut fossil fuel emissions.[19] According to the report, if the world is to limit global warming to 1.5°C, countries must cut emissions by at least 7.6 percent per year over the next decade, for a total emissions reduction of 55 percent between 2020 and 2030. The United Nations' corresponding November 2019 "Production Gap" report shows that countries including the United States are on course to extract vastly more fossil fuels than what is allowed to meet a 1.5°C or even 2°C target. Countries' current fossil fuel production plans would lead to 120

---

[17] Christopher J. Smith, et al., *Current fossil fuel infrastructure does not yet commit us to 1.5°C warming*, 10 Nature Commc'ns. 101 (2019), doi.org/10.1038/s41467-018-07999-w; *see also* Fergus Green & Richard Denniss, *Cutting with both arms of the scissors: the economic and political case for restrictive supply-side climate policies*, 150 Climatic Change 73 (2018) (describing carbon lock-in).

[18] Oil Change International, *Drilling Toward Disaster: Why U.S. Oil and Gas Expansion Is Incompatible with Climate Limits* (Jan. 2019), http://priceofoil.org/drilling-towards-disaster.

[19] United Nations Environment Programme, *Emissions Gap Report 2019*, at 25, 26, UNEP, Nairobi (2019), https://wedocs.unep.org/bitstream/handle/20.500.11822/30797/ EGR2019.pdf? sequence=1&isAllowed=y.

percent more fossil fuel emissions by 2030 than would be consistent with a 1.5°C pathway, and 210 percent more by 2040.[20] The United States is a primary contributor to this dangerous over-production of fossil fuels as the world's largest oil and gas producer and second largest coal producer.

120.    And the International Energy Agency ("IEA") recently issued a report concluding that "hav[ing] a fighting chance of . . . limiting the rise in global temperatures to 1.5°C . . . requires nothing short of a total transformation of the energy systems that underpin our economies."[21] The study articulates a pathway for the global energy sector to reach net zero emissions by 2050. Even with reliance on unproven future emissions reduction technologies, it cites the incompatibility of new fossil fuel supply projects with the goal of limiting warming to 1.5°C. In short, the IEA's report shows—like the earlier analyses and reports referenced above—that there is simply no room left in the global carbon budget for new federal fossil fuel leasing.

121.    Recent studies have also shown that existing operations in the Gulf of Mexico emit substantial amounts of methane, more than double previous estimates—amounts twice those from onshore operations in the Bakken comparable to those from the San Juan basin—far more methane than previously thought.[22] Methane is a powerful contributor to climate warming. Studies also show that many abandoned wells continue to leak oil as well as harmful gases,

---

[20]United Nations Environment Programme, et al., *The Production Gap Report: 2020 Special Report* 4, 14 (2019), http://productiongap.org/.

[21] International Energy Agency, *Net Zero by 2050: A roadmap for the global energy system* (2021), https://www.iea.org/reports/net-zero-by-2050.

[22] Alan M. Gorchov Negron et al., *Airborne Assessment of Methane Emissions from Offshore Platforms in the U.S. Gulf of Mexico,* 54 Env't Sci. Tech. 5112, 5118 (Apr. 13, 2020), https://pubs.acs.org/doi/10.1021/acs.est.0c00179.

including methane, benzene, nitrogen oxides, and carbon dioxide.[23]

122.    These recent studies highlight the need to reexamine the significant greenhouse gas emissions from offshore oil and gas leasing.

123.    None of these studies were considered in the Bureau's previous EISs. The Bureau failed to examine this significant new information about the effects of greenhouse gas emissions from additional offshore leasing before it decided to hold Lease Sale 257.

                    ii.    New Information Demonstrates that Companies are Increasingly Drilling in Deeper Water that Presents Higher Risks.

124.    One of the key assumptions in the existing EISs that the Bureau relied on in its decision to hold Lease Sale 257 was that the majority of future development and production resulting from a lease sale will occur in shallow waters. The Bureau assumed, for example, when analyzing different production scenarios, that most exploration drilling activity is expected to occur on the continental shelf in waters less than 650-feet deep.

125.    New information demonstrates that Interior has approved significantly more permits for drilling in deeper water over the last few years.

126.    So far in 2021, for example, Interior has approved 16 new well permits and 17 revised new well permits in shallow water (less than 500 ft deep) compared to 21 new well permits and *219* revised new well permits in deep water (more than 500 ft deep).[24] In 2020, Interior approved 10 new well permits and 25 revised new well permits in shallow water

---

[23] Torbjørn Vrålstad et al., *Plug & abandonment of offshore wells: Ensuring long-term integrity and cost-efficiency*, 173 J. Pet. Sci. & Eng'g 478 (Feb. 2019), sciencedirect.com/science/article/pii/S0920410518309173; Hannah Seo, *Unplugged: Abandoned oil and gas wells leave the ocean floor spewing methane*, Env't Health News (Dec. 8, 2020), https://www.ehn.org/oil-and-gas-wells-methane-oceans-2649126354.html.
[24] *Status of Gulf of Mexico Well Permits*, Bureau of Safety and Environmental Enforcement, https://www.bsee.gov/stats-facts/offshore-information/status-of-gulf-of-mexico-well-permits (last updated August 1, 2021).

compared to 54 new well permits and *410* revised new well permits in deeper water. In 2019, it approved 25 new well permits and 77 revised new well permits in shallow water compared to *416* new well permits and 35 revised new well permits in deeper water. This is true even as production has generally increased. As of 2020, oil production in deep water (greater than 1000 feet) makes up 93 percent of all oil production, and gas production in deep water makes up 73 percent of all production.[25]

127.    Drilling in deeper water increases the numerous inherent harms in offshore oil and gas drilling. Studies have shown, for example, that the probability of a serious accident, fatality, injury, explosion, or fire being reported increases by 8.5 percent with each additional 100 feet of depth at which an offshore platform operates.[26] This is true regardless of the platforms age or the quantity of oil or gas produced—the increased risk comes from working under greater pressure, both from the weight of water and the greater pressure within the oil and gas pockets. And the deeper the water is in which oil and gas activities occur, the more difficult oil spill or other responses are, as the Deepwater Horizon disaster highlights all too well.

128.    Increasing activity in deeper water comes with other harms as well. For instance, it also means that oil- and gas-related vessel traffic will increase as vessels will need to travel

---

[25] *Deepwater Production Summary by Year*, Bureau of Safety and Environmental Enforcement, https://www.data.bsee.gov/Production/ProductionData/Summary.aspx (last accessed July 23, 2021); *see also* Steven A. Murawski, et al., *Deepwater Oil and Gas Production in the Gulf of Mexico and Related Global Trends*, *in* Scenarios and Responses to Future Deep Oil Spills (S. Murawski, et al. eds. 2020) (describing increase in deepwater production, and noting that in 2017, 52 percent of US oil production was from ultra-deep wells).
[26] Lucija Muehlenbachs, et al., *The impact of water depth on safety and environmental performance in offshore oil and gas production,* 55 Energy Pol'y 699 (Apr. 2013).

farther, increasing the risk of vessels striking whales and other marine life and noise pollution.[27]

129.    None of this information was considered in the Bureau's previous EISs. The Bureau failed to analyze this significant new information undermining its earlier assumptions that leasing would be far more concentrated in shallow water—and thus less risky—before it decided to hold Lease Sale 257.

               iii.    New Information Demonstrates Significant Impacts on Vulnerable Species.

130.    At the time that the Bureau completed its Lease Sale EIS in 2017, the Bureau stated that there was no data to suggest that oil and gas activities offshore are significantly impacting any marine mammal populations. And it concluded that the incremental effects on marine mammals of holding another lease sale would be negligible. Likewise, the EIS determined that incremental impacts to protected birds would be negligible because the animals would not be exposed to routine oil and gas activities.

131.    Since the Bureau completed its Lease Sale EIS in 2017, new information reveals that Gulf leasing will have a more harmful effect on certain imperiled marine life than previously considered: the Rice's whale; giant manta ray; oceanic whitetip shark; and the eastern black rail.

132.    Since the Bureau completed the EIS, the National Marine Fisheries Service ("the Fisheries Service") listed the Gulf of Mexico population of Bryde's whale as endangered under the Endangered Species Act in 2019 due primarily to oil and gas development in its habitat. 84 Fed. Reg. 15,446 (Apr. 15, 2019). In the last few weeks, the Fisheries Service revised its listing to reflect that the Gulf of Mexico population of Bryde's whale is a separate species and to

---

[27] *See, e.g.*, Maxwell B. Kaplan & Susan Solomon, *A coming boom in commercial shipping? The potential for rapid growth of noise from commercial ships by 2030*, 73 Marine Pol'y 119 (Nov. 2016); Carlos M. Duarte, et al., *The soundscape of the Anthropocene ocean*, 371 Science (Feb. 5, 2021); Rosalyn L. Putland, et al., *Vessel noise cuts down communication space for vocalizing fish and marine mammals*, 24 Glob. Change Biology 1708 (Apr. 2018).

rename the species the Rice's whale. 86 Fed. Reg. 47,022 (Aug. 23, 2021). With only about 44 individuals remaining, it is one of the most endangered whales on Earth.[28]

133.    One recent study, for example, concluded that given the heavily industrialized nature of Gulf waters and the already restricted habitat for these whales, it is essential to accurately identify and remove anthropogenic threats through protective measures (*e.g.*, marine protected area establishment); and that to effect recovery, such protections must extend beyond currently occupied, remnant habitat.[29] The study also found that the whale's behavior—including their dive behaviors and tendency to spend a considerable amount of time at night within the upper 15 meters of the water column, which is within the draft depths of most commercial vessels—significantly raises the risk of vessel strikes.

134.    Further, the Fisheries Service recently determined that existing and planned activities related to the exploration and development of oil and gas on the Gulf of Mexico outer continental shelf will likely jeopardize the continued existence of Rice's whales. In its analysis, the Fisheries Service found that the species is threatened by oil spills, noise pollution, and vessel strikes (among other stressors) which can cause mortality, chronic stress, behavioral disruption, significant masking, and hearing loss, "all of which are expected to reduce the fitness of individuals." The Fisheries Service concluded that given the "precarious status [of the species], any effects that are expected to reduce the fitness of individuals or result in mortality are of great concern." A Gulf lease sale will increase the risk of oil spills, increase vessel traffic, and increase

---

[28] National Marine Fisheries Service, *Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of Mexico* 554, FPR-2017-9234 (Mar. 13, 2020) [hereinafter "Gulf Oil and Gas BiOp"].

[29] Melissa S. Soldevilla, et al., *Spatial distribution and dive behavior of Gulf of Mexico Bryde's whales: potential risk of vessel strikes and fisheries interactions*, 32 Endangered Species Rsch. 533 (June 2017).

noise pollution, thereby exacerbating the stressors that are already threatening the whale with extinction.

135.    And in 2021, based on new genetic evidence, scientists determined that the whale, previously considered one of two subspecies of the Bryde's whale that exists around the world,[30] is in fact a unique baleen whale species. The newly discovered species,[31] is the only large whale species that resides exclusively in the northern Gulf of Mexico. Moreover, new information indicates that the biologically important area for the whale is larger than what the Bureau considered in its EISs.[32]

136.    The Fisheries Service listed the giant manta ray as threatened in 2018. 83 Fed. Reg. 2916 (Jan. 22, 2018). The Service noted that the ray has declined significantly throughout a significant portion of its range—by 95 percent in some regions. *Id.* at 2918.

137.    The Fisheries Service also listed the oceanic whitetip shark as threatened in 2018. 83 Fed. Reg. 4153 (Jan. 30, 2018). In listing the shark, the Fisheries Service explained that the species has "experienced significant historical and ongoing abundance declines in all three ocean basins (i.e., globally)" and may have declined as much as 88 percent in the Atlantic, including the Gulf of Mexico. *Id.* at 4162.

138.    The Fisheries Service considers vessel strikes and marine pollution a threat to giant manta rays; and marine pollution can also harm sharks. Gulf leasing will increase these

---

[30] *Bryde's Whale*, NOAA Fisheries, https://www.fisheries.noaa.gov/species/brydes-whale.
[31] *New Species of Baleen Whale in the Gulf of Mexico*, NOAA Fisheries (Jan. 22, 2021), https://www.fisheries.noaa.gov/feature-story/new-species-baleen-whale-gulf-mexico; Patricia E. Rosel, et al., *A new species of baleen whale (*Balaenoptera*) from the Gulf of Mexico, with a review of its geographic distribution*, 37 Marine Mammal Sci. 577 (2021).
[32] *See* Patricia E. Rosel, et al., *Status review of Bryde's whales (*Balaenoptera edeni*) in the Gulf of Mexico under the Endangered Species Act* 13–14, NOAA Tech. Mem. NMFS-SEFSC-692, U.S. Department of Commerce (Dec. 2016).

threats to the species by increasing vessel traffic and the risk of ship strikes and increasing

marine pollution within the known range of these species. Indeed, scientists recently discovered

the world's first known manta ray nursery in the Gulf.

139.    Additionally, the U.S. Fish and Wildlife Service listed the eastern black rail as

threatened in 2020. 85 Fed. Reg. 63,764 (Oct. 8, 2020). While this bird species once occurred

across much of the eastern United States, the population has dramatically declined over the last

century. The greatest threat to the species' continued existence is the loss, degradation, and

fragmentation of wetland habitat.

140.    Several states that comprise a substantial portion of the eastern black rail's

historical range, including Louisiana, have lost 70 percent or more of their wetlands, and there

are no indications that loss of habitat for the eastern black rail has ceased or that extensive areas

have been restored. The species is also threatened by sea level rise, and climate change will

exacerbate the effects of past and ongoing habitat loss.

141.    Lease Sale 257 will contribute to habitat destruction and climate change that

imperils the species. Indeed, onshore activity associated with offshore drilling will occur within

the known range of the species.

142.    None of this information was considered in the Bureau's previous EISs.  The

Bureau failed to analyze this significant new information about the effects of additional leasing

on wildlife populations before it decided to hold Lease Sale 257.

iv.    New Information on Fracking Shows Increased Harms.

143.    In the Multisale EIS, the Bureau generally described induced hydraulic fracturing

("fracking" or "acidization") procedures that occur offshore. The Bureau did not estimate the

number of instances of fracking or acidizing that might occur over the lifespan of a lease as a

result of a lease sale. Yet, it determined that production discharges from stimulation treatments

and other discharged fluids from offshore fracking would result in negligible impacts because they must meet regulations from the Environmental Protection Agency.

144.    Fracking occurs frequently in the Gulf. There have been at least 3,039 instances of offshore fracking and at least 760 instances of acidizing from 2010 through 2020.[33]

145.    New information shows these techniques lead to dangerous pollution. A 2021 preliminary report provided to the Environmental Protection Agency by the oil industry analyzed fracking waste in concentrations likely to occur around offshore drilling platforms. The report found that fracking effluent kills species in laboratory tests.[34] The report indicated that 520 barrels, or 21,840 gallons, of well treatment, completion, and workover fluids (collectively called "TCW" fluids) with industrial chemicals like biocides, polymers and solvents were discharged with every frack.

146.    The report shows that from 2010 through 2020, the oil industry discharged an estimated 66.3 million gallons of TCW fluids chemicals into the Gulf. (The actual amount discharged is likely higher as the industry is not required to report or track the amount of fracking chemicals discharged along with produced wastewater). Toxicity data indicate that fracking fluid discharges from offshore platforms in the Gulf may cause acute toxicity to marine organisms such as fish and mysids in concentrations that are likely to occur near offshore wells.

147.    None of this information was considered in the Bureau's previous EISs.  The Bureau failed to analyze this significant new information about the magnitude and degree of harm from fracking before it decided to hold Lease Sale 257.

---

[33] Center for Biological Diversity, *Toxic Waters: How Offshore Fracking Pollutes the Gulf of Mexico* 1 (July 2021) (citing FOIA data provide by the Bureau of Safety and Environmental Enforcement (2010–2019), https://www.data.bsee.gov/Well/eWellAPM/Default.aspx  (2020)).
[34] AECOM, *Year 1 Interim Report: Joint Industry Project Study of Well Treatment, Completion, and Workover Effluents* (2021).

    v.  New Information Demonstrates that Pipelines Pose Greater Risks.

148. In the Multisale EIS and Lease Sale EIS, the Bureau assumed that its sister agency, the Safety Bureau, conducts pipeline inspections regularly to ensure safe operations. In the Multisale EIS, the Bureau noted specifically that improved safety, as well as increased regulatory checks and inspections make the risk of a catastrophic oil spill less likely. In addition, the Bureau assumed that operators on new leases would complete decommissioning and removal at the end of production operations, as required under existing regulations.

149. New information indicates that the Bureau's assumptions in the existing EISs regarding the safety of current operations due to pipeline inspections and the ability of companies to decommission infrastructure in the future were incorrect. A 2021 report from the Government Accountability Office concluded that the Safety Bureau does not have a strong inspection program for ensuring the integrity of the roughly 8,600 miles of active offshore oil and gas pipelines in the Gulf of Mexico and does not adequately make sure companies clean and bury pipelines no longer in use.[35]

150. Specifically, the report finds that the Safety Bureau does not generally conduct or require any subsea inspections of active pipelines. Instead, the Bureau relies on monthly surface observations and pressure sensors to detect leaks, despite recognizing that these methods and technologies are not always reliable for detecting ruptures.

151. The report also finds that while cleaning and pulling up unused pipelines is supposed to be the rule, the Safety Bureau has allowed the offshore oil and gas industry to leave 97 percent of pipelines (totaling 18,000 miles) on the seafloor when no longer in use. It also

---

[35] Government Accountability Office, *Updated Regulations Needed to Improve Pipeline Oversight and Decommissioning*, Report No. GAO-21-293 (Mar. 2021), https://www.gao.gov/assets/720/713144.pdf.

notes that although pipelines can contain oil or gas if not properly cleaned in decommissioning, the Safety Bureau does not ensure that relevant standards, such as cleaning and burial, are met. Indeed, the report found that the Safety Bureau does not have a robust process to address the environmental and safety risks posed by leaving decommissioned pipelines in place on the seafloor due to the cumulative effects of oversight gaps before, during, and after the decommissioning process.

152.    This new information contradicts the assumptions about the efficacy of the Safety Bureau's pipeline decommissioning and inspection process made in the Bureau's previous EISs. The Bureau failed to analyze this significant new information demonstrating the environmental and safety risks posed by the Safety Bureau's lax enforcement before it decided to hold Lease Sale 257.

> vi.    New Information Reveals that Lease Sale 257 Could Preclude Planned Wind Energy Leasing.

153.    The Bureau has recently begun to actively pursue wind leasing options in federal waters in the Gulf of Mexico. The Bureau recently issued a "Request for Interest in Commercial Leasing for Wind Power Development on the Gulf of Mexico Outer Continental Shelf," 86 Fed. Reg. 31,339 (June 11, 2021); recently approved an offshore wind project in the Atlantic; and is otherwise actively promoting offshore wind projects.[36]

154.    Selling lease parcels for oil and gas development is incompatible with leasing for wind energy. Even after oil and gas companies end production, abandoned wells on lease areas create conflicts for the future development of offshore wind or other infrastructure.

---

[36] *See, e.g.*, White House, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

155.   The Bureau's existing EISs do not address whether new oil and gas leasing would preclude the ability to construct offshore wind facilities in federal Gulf waters.

156.   These new circumstances were not considered in the Bureau's previous EISs. The Bureau failed to analyze this significant new information about the effects of additional leasing on the potential for wind energy development before it decided to hold Lease Sale 257.

            vii.   New Information Demonstrates Increased Harms to Frontline Communities.

157.   As detailed in Executive Order 12898 "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," federal agencies are to use the NEPA process to analyze the environmental, human health, social, and economic effects of federal actions on low-income communities and communities of color. 59 Fed. Reg. 7629 (Feb. 16, 1994).

158.   New information both demonstrates the importance of taking a hard look at the impacts of Gulf oil and gas activities on the wellbeing of communities most severely harmed by the nation's dependence on offshore oil and the urgent need to dismantle the systemic racism that has harmed these communities.

159.   New studies have found, for example, that refineries and petrochemical plants that rely on oil and gas produced in the region are more likely to be in low-income and communities of color.[37] African Americans are 75 percent more likely to live near toxic pollution than the rest of Americans and are exposed to 38 percent more air pollution than white people.[38]

160.   The coastal areas affected by drilling include some of the most important cultural

---

[37] Jill Johnston & Lara Cushing, *Chemical Exposures, Health, and Environmental Justice in Communities Living on the Fenceline of Industry*, 7 Current Env't Health Reps. 48 (2020).
[38] Lesley Fleischman & Marcus Franklin, *Fumes Across the Fence-Line: The Health Impacts of Air Pollution from Oil and Gas Facilities on African American Communities*, NAACP & Clean Air Task Force (Nov. 2017).

resources for Indigenous nations. Tribal lands in coastal Louisiana are suffering severe land loss

from pipeline canals displacing people from their ancestral lands.[39] Moreover, hurricane

disasters have highlighted the vulnerabilities of communities of color to the oil industry. Severe

storms—exacerbated by climate change and land loss from offshore oil activities—have

destroyed homes, displaced families, and triggered toxic spills.[40]

161.    Carefully analyzing the impacts on affected communities is particularly important

considering President Biden's recent Executive Order Advancing Racial Equity mandating that

"agencies shall consult with members of communities that have been historically

underrepresented in the Federal Government and underserved by, or subject to discrimination in,

Federal policies and programs" 86 Fed. Reg. 7009 (Jan. 25, 2021), and earlier directives that

requires "[t]o the greatest extent practicable and permitted by law," that Interior "make achieving

environmental justice part of its mission by identifying and addressing . . . disproportionately

high and adverse human health or environmental effects of [its] activities on minority

populations and low-income populations." 59 Fed. Reg. 7629 (Feb. 16, 1994).

162.    None of this information was considered in the Bureau's previous EISs.  The

Bureau failed to analyze this significant new information about the effects of additional leasing

on low-income communities and communities of color before it decided to hold Lease Sale 257.

       *3.    The Bureau has Unlawfully Failed to Supplement its Lease Sale EIS Based
          on this Significant New Information.*

163.    In the Record of Decision for Lease Sale 257, the Bureau acknowledged that

courts have found its greenhouse gas emissions analysis inadequate but stated, without

---

[39] Lawrence A. Palinkas, *Fleeing Coastal Erosion: Kivalina and Isle de Jean Charles*, Glob. Climate Change, Population Displacement, and Pub. Health 127 (May 8, 2020).

[40] Aaron B. Flores, et al., *Petrochemical releases disproportionately affected socially vulnerable populations along the Texas Gulf Coast after Hurricane Harvey*, 42 Population & Env't 279 (2020).

explanation, that the reasoning did not change its conclusions in the EISs it relied on for this sale. The Bureau also acknowledged that climate change information "may be a significant consideration in the future," but concluded there was no cause to amend or supplement its EIS before holding Lease Sale 257.

164.    Interior signed the Record of Decision for Lease Sale 257 on August 31, 2021.

165.    The information related to climate change impacts, increased drilling in deeper water, newly listed species, increased fracking harms, increased pipeline risks, increased interest in wind leasing, and greater harms to frontline communities constituted significant new information relevant to the environmental impacts of Lease Sale 257.

166.    The Bureau was aware of this significant new information when it signed its Record of Decision to hold Lease Sale 257. Prior to the Bureau's decision to hold the lease sale, several Plaintiffs sent the Bureau a letter describing in detail the significant new information and providing copies of relevant studies to the Bureau.

167.    To date the Bureau has not amended or supplemented its Lease Sale EIS to account for this significant new information.

168.    The Bureau decided to hold Lease Sale 257, relying on the outdated Lease Sale EIS that does not account for this significant new information.

## CLAIMS FOR RELIEF

### First Cause of Action

**Violation of NEPA and APA: Failure to Take a Hard Look at the Effects of the Lease Sale**

169.    The allegations made in paragraphs 1–168 are realleged and incorporated by this reference.

170.    The Record of Decision for Lease Sale 257 is final agency action for which there is no other adequate remedy in a court. *See* 5 U.S.C. § 704.

171.    The Bureau was required to complete an EIS prior to reaching its decision to hold

Lease Sale 257. 42 U.S.C. § 4332(2)(C); *see Sec'y of the Interior v. California*, 464 U.S. 312,

338 (1984); *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 494 (9th Cir. 2014).

172.    NEPA requires that the Bureau take a "hard look" at the environmental

consequences of its actions in its EIS before action is taken. *Pub. Emps. for Env't Resp. v.

Hopper*, 827 F.3d 1077, 1082 (D.C. Cir. 2016). NEPA and its implementing regulations require

the Bureau to assess the environmental impacts of the proposed action, including direct, indirect,

and cumulative effects, which are reasonably foreseeable in its EIS. 42 U.S.C. § 4332(2)(C); 40

C.F.R. §§ 1502.1, 1508.7, 1508.8; *see also Point Hope*, 740 F.3d at 494. NEPA and its

implementing regulations further require the Bureau to use high quality, accurate scientific

information in its EIS and to ensure the scientific integrity of this analysis. 40 C.F.R.

§ 1500.1(b); *see also* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.24.

173.    The presentation of incomplete or misleading information in an EIS violates

NEPA.

174.    In reaching its decision to hold Lease Sale 257, the Bureau relied on the Lease

Sale EIS, which in turn tiered to the 5-Year Program EIS and the Multisale EIS.

175.    In reliance on these EISs, the Bureau concluded in its three EISs that adding

billions of barrels of oil and trillions of cubic feet of natural gas to the world as a result of Lease

Sale 257 would make no difference to global greenhouse gas emissions and would instead reduce

emissions compared to the alternative of not holding a lease sale.

176.    The Bureau's forecasts in the Lease Sale EIS of reduced greenhouse gas

emissions from Lease Sale 257 and the resulting environmental effects were based on the

incorrect and unsubstantiated assumptions that foreign sources of oil would substitute from any

reduced U.S. supply and that the production and transport of that substituted oil would emit more greenhouse gases than the expected production resulting from Lease Sale 257.

177.    Available information demonstrates that the Bureau's assumptions are incorrect. Scientific analysis instead demonstrates that the decrease in global greenhouse gas emissions from not holding a lease sale are enormous. For example, evidence shoes that the global greenhouse gas emissions over the life of the entire 2017–2022 leasing program would decrease by up to 2.3 billion tons of carbon dioxide from not holding lease sales, resulting in the reduction of more than a year's worth of emissions from the entire U.S. transportation sector.

178.    The Bureau improperly excluded foreign oil consumption from the market simulation model it used to estimate net greenhouse gas emissions from the lease sale.

179.    The flaws in the Bureau's analysis in the EISs caused it to underestimate and understate the potential impacts of the lease sales to the environment and wildlife of the Gulf of Mexico and to the communities of the Gulf States that rely on the economic benefits from Gulf ecosystems. The EISs are thus misleading or incomplete and the Bureau's reliance on them in its Record of Decision for Lease Sale 257 is arbitrary and capricious.

180.    Interior may not rely on subsequent statements presented for the first time in the Record of Decision for Lease Sale 257 to cure the flaws in the Bureau's NEPA analyses and the EISs. The information and rationalizations that Interior presented in the Record of Decision for Lease Sale 257 do not provide the necessary support to sustain the Bureau's flawed NEPA review or the Lease Sale EIS.

181.    The Bureau's reliance in its Record of Decision for Lease Sale 257 on unsubstantiated and incorrect assumptions in estimating the greenhouse gases likely to result from Lease Sale 257 violates its duties to use "[a]ccurate scientific analysis" and "high quality"

information and to take a hard look at the environmental effects of its actions, in violation of

NEPA and its implementing regulations, and is arbitrary and capricious, in violation of the APA.

5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.1(b), 1502.24.

182.     The Bureau's reliance on the unsubstantiated and incorrect assumption in the

three EISs that the emission reductions gained by not holding a lease sale will be offset by oil

and gas production elsewhere are arbitrary and misleading, in violation of NEPA and its

implementing regulations, and is arbitrary and capricious, in violation of the APA. 5 U.S.C.

§ 706(2)(A); 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.1(b), 1502.24.

183.     By relying on tiered EISs that fail to meet the requirements of NEPA, its

implementing regulations, and governing precedent to support its decision to hold Lease Sale

257, Interior's Record of Decision is arbitrary, capricious, an abuse of discretion, and not in

accordance with law, and without observance of procedures required by law, in violation of

NEPA, 42 U.S.C. § 4332, its implementing regulations, and the APA, 5 U.S.C. §§ 701–706.

184.     These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at

law.

### Second Cause of Action

### Violation of NEPA and APA: Failure to Supplement EIS

185.     The allegations made in paragraphs 1–184 are realleged and incorporated by this

reference.

186.     NEPA and its implementing regulations impose a continuing duty on agencies to

prepare a supplemental EIS whenever "(i) The agency makes substantial changes in the proposed

action that are relevant to environmental concerns; or (ii) There are significant new

circumstances or information relevant to environmental concerns and bearing on the proposed

action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i), (ii).

187.     In reaching its decision to hold Lease Sale 257, the Bureau relied on the Lease Sale EIS, which in turn tiered to the 5-Year Program EIS and the Multisale EIS.

188.     The Bureau announced the availability of the final Lease Sale EIS on December 15, 2017.

189.     The Lease Sale EIS failed to consider a slew of new information related to the environmental impacts of holding Lease Sale 257, including new information about increased climate impacts.

190.     This new information constituted "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" because it demonstrates: climate impacts from the lease sale would be greater than the Bureau assumed in its previous EISs; that activities on new leases as a result of Lease Sale 257 will take place in deeper waters that present greater environmental risks; that Lease Sale 257 will have impacts on newly listed species, including one of the most endangered whales on the planet; that fracking on leased areas is releasing more toxic chemicals than the Bureau understood; that the risks of a pipeline accident are greater than the Bureau assumed; that Lease Sale 257 could preclude other planned activities to conduct offshore wind lease sales in the Gulf; and that Lease Sale 257 will have greater impacts on low-income communities and communities of color. NEPA's implementing regulations require the Bureau to prepare a supplemental EIS analyzing this significant new information prior to signing of the Record of Decision for Lease Sale 257.

191.     On August 31, 2021, Interior signed the Record of Decision to hold Lease Sale 257, relying on the flawed EISs described above. Interior was aware of the new, significant information related to the lease sale before it signed this Record of Decision.

192.     The Bureau issued its Record of Decision without completing a supplemental EIS.

It failed to consider whether a supplemental analysis was required in light of the new information.

193.    The APA authorizes reviewing courts to compel agency action unlawfully withheld and to set aside federal agency action that is arbitrary, capricious, an abuse of discretion, and not in accordance with law. 5 U.S.C. §§ 701–706.

194.    By failing to supplement its outdated EISs and continuing to rely on EISs that fail to meet the standards laid out in NEPA, its implementing regulations, and governing precedent to support its decisions to hold Lease Sale 257, Interior has unlawfully withheld agency action under 5 U.S.C. § 706(1). And Interior's Record of Decision is arbitrary, capricious, not in accordance with law, and without observance of procedures required by law in violation of NEPA, 42 U.S.C. § 4332, and the APA, 5 U.S.C. §§ 701–706.

195.    These actions have harmed Plaintiffs and Plaintiffs have no adequate remedy at law.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.    Declare that Interior's Record of Decision to hold Lease Sale 257 violates NEPA and its implementing regulations, and is arbitrary and capricious and not in accordance with law in violation of the APA;

2.    Declare that the EISs issued by the Bureau in connection with holding Lease Sale 257 are unlawful, in violation of NEPA and its implementing regulations and the APA;

3.    Declare that Interior violated NEPA by failing to prepare a supplemental environmental impact statement that addresses the environmental impacts of its Record of Decision to hold Lease Sale 257;

4.      Vacate the Record of Decision to hold Lease Sale 257;

5.      Vacate or enjoin leases executed pursuant to Lease Sale 257;

6.      Enter any other appropriate injunctive relief to ensure that Defendants comply with NEPA and the APA, and to prevent irreparable harm to Plaintiffs and to the environment until such compliance occurs;

7.      Award Plaintiffs their costs, reasonable attorneys' fees, and other expenses pursuant to 28 U.S.C. § 2412; and

8.      Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 31st day of August, 2021.

/s/ Stephen D. Mashuda
Stephen D. Mashuda (DC Bar No. WA0005)
Shana Emile (*pro hac vice* pending)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
206-343-1526 Fax
smashuda@earthjustice.org
semile@earthjustice.org

Brettny Hardy (*pro hac vice* pending)
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
bhardy@earthjustice.org

*Attorneys for Plaintiffs Friends of the Earth, Healthy Gulf, Sierra Club, and Center for Biological Diversity*
