**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRIENDS OF THE EARTH, et al.,<br>*Plaintiffs*,<br><br>v.<br><br>DEBRA A. HAALAND, et al.,<br>*Defendants*,<br><br>STATE OF LOUISIANA, by and through its<br>Attorney General, JEFF LANDRY<br><br>[*Proposed*] *Intervenor-Defendant*. | Case No. 1:21-cv-02317-RDM |

**MOTION TO INTERVENE
AND SUPPORTING STATEMENT OF POINTS AND AUTHORITIES[1]**

  The State of Louisiana respectfully moves to intervene as a Defendant to defend its interest in Lease Sale 257. This case is occurring against the backdrop of the Biden Administration's wider efforts to cancel oil and gas lease sales on the Outer Continental Shelf. Louisiana has challenged those efforts—including an earlier rescission of the Lease Sale 257 Record of Decision—in the U.S. District Court for the Western District of Louisiana. That Court sided with Louisiana and granted a preliminary injunction against Administration officials that has resulted in, among other things, Defendants' reissuing the ROD. The Louisiana court based its order in part on the States' statutory entitlement to revenues from Lease Sale 257.

  A victory for Plaintiffs in *this* suit, however, would contradict the Louisiana court's order. It would threaten Louisiana's statutory right to lease-sale revenues. In effect, it would reinstitute the same anti-development policy the Louisiana court already enjoined as contrary to statutory command. In short, if ever there were ever a case for mandatory intervention, this is it. The Court should grant Louisiana's motion or, alternatively, grant permissive intervention.

---

[1] Per LCvR 7(m), counsel for Louisiana emailed counsel for Plaintiffs and counsel for Secretary Haaland in the related *Louisiana* litigation. Plaintiffs responded but have not yet provided a position. In view of the conference set for tomorrow, Louisiana proceeds assuming its motion is opposed.

# BACKGROUND

## I.     Statutory Framework for Offshore Oil and Gas Leasing.

The Record of Decision challenged here is a component of the Outer Continental Shelf Lands Act (OCSLA) oil and gas leasing program. Congress enacted OCSLA in 1953 "to meet the urgent need for further exploration and development of oil and gas deposits." Pub. L. 83-212 (1953). OCSLA declares "the outer Continental Shelf" to be "a vital national resource reserve held by the Federal Government for the public." 43 U.S.C. §1332(3). After the shock of the OPEC oil embargo, years of declining domestic production, and dissatisfaction with the Secretary's management of the leasing program, Congress stepped in and amended OCSLA in 1978 to "establish policies and procedures for managing the oil and natural gas resources of the Outer Continental Shelf." *Id.* §1802(a). Those policies and procedures "are intended to result in expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." *Id.* To those ends, OCSLA directs the Secretary of the Interior to make the Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." *Id.*; *see also Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011) (noting "OCSLA's overriding policy of expeditious development").

OCSLA facilitates the expeditious development of oil and gas resources by directing the Secretary to administer a competitive leasing program that consists of four parts and includes multiple robust consultation requirements. *See Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984) ("Each stage includes specific requirements for consultation with Congress, between federal agencies, or with the States."). The first and second stages are relevant here.

First, the Secretary must formulate a five-year leasing plan. *See* 43 U.S.C. §1344(a) ("The leasing program shall consist of a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which he determines will best meet national energy needs for the five-year period following its approval or reapproval."). The five-year plan "achieves important practical and legal significance" because it serves as "the basis for future planning by all affected entities, from federal, state and local governments to the oil industry itself." *State of Cal. ex rel. Brown v. Watt*, 668 F.2d 1290, 1299 (D.C. Cir. 1981). Accordingly, "[c]ompliance with the mandates of [OCSLA] is extremely important to the expeditious but orderly exploitation of OCS resources." *Id.*

Reflecting its importance, the creation of the five-year plan is a massive undertaking consisting of environmental assessments, mandatory consultation requirements, and multiple comment periods. *See California*, 464 U.S. at 337. As particularly relevant here, OCSLA requires multiple State consultations when promulgating the five-year plan. During that time, the Secretary must "invite and consider suggestions for such program from ... the Governor of any State which may become an affected State under such proposed program." 43 U.S.C. §1344(c)(1). Then, after a proposed plan is completed, the Secretary "shall submit a copy of such proposed program to the Governor of each affected State for review and comment." *Id.* §1344(c)(2). If a State Governor requests "a modification of such proposed program, the Secretary shall reply in writing granting or denying such request in whole or in part, or granting such request in such modified form as the Secretary considers appropriate, and stating his reasons therefor." *Id.* "The proposed leasing program is then submitted to the President and Congress, together with comments received by the Secretary from the governor of the affected state." *California*, 464 U.S. at 337 (citing 43 U.S.C. §1344(d)).

The second stage of the OCSLA leasing process consists of holding lease sales and includes another round of mandatory State consultation. OCSLA grants "[a]ny Governor of any affected State or the executive of any affected local government" the right to "submit recommendations to the

Secretary regarding the size, timing, or location of a proposed lease sale." 43 U.S.C. §1345(a). The Secretary "shall accept" these recommendations if the Secretary "determines, after having provided the opportunity for consultation, that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." *Id.* §1345(c).

OCSLA specifically precludes the Secretary from making significant amendments to the five-year plan after its enactment and thereby circumventing this carefully wrought process of congressional and State consultation and analysis. It does so by expressly requiring that any "revision" of the five-year plan "shall be in the same manner as originally developed," unless the revision is "not significant." 43 U.S.C. §1344(e). The Department has long defined the term "not significant" narrowly in light of congressional intent and OCSLA's structure. *Louisiana v. Biden*, 2021 WL 2446010, at *14 (W.D. La. June 15, 2021).

## II.     The Current Five-Year OCS Program

Current lease sales in the Outer Continental Shelf are governed by the 2017-2022 Five Year Oil and Gas Leasing Program ("the Current Five-Year Program" or "Five-Year Program"). *See* BOEM, 2017-2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program 3-1 (Nov. 18, 2016).[2] The process of creating the Current Five-Year Program began in 2014 during the Obama Administration. President Obama's BOEM published a request for information in the Federal Register and sent a letter to Governors, Tribes, and interested federal agencies requesting input on the Program. *See* 79 Fed. Reg. 34349 (June 16, 2014). BOEM received over 500,000 comments in response to the RFI, allowing it to discharge its obligation under OCSLA to take into account economic, social, and environmental values in making its leasing decisions. *See* 43 U.S.C. §1344(a). In 2015, President Obama's BOEM published the Draft Proposed Program. That published draft incorporated responses

---

[2] https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-OCS-Oil-and-Gas-Leasing-PFP.pdf

to the RFI comments and set out a draft schedule of potential lease sales. And it started a 60-day comment period in which BOEM received over one million comments. 80 Fed. Reg. 4941 (Jan. 29, 2015).

After considering those comments, BOEM next published the Proposed Program, thereby starting a new 90-day comment period. 81 Fed. Reg. 14881 (Mar. 18, 2016). Again, BOEM received over one million comments, held public meetings, and created environmental impact statements in compliance with the National Environmental Policy Act (NEPA). *Id.*

After all that, President Obama's BOEM published the Proposed Final Program in November 2016. In it, the Secretary determined which areas to include in the lease sales. In recognition that "[t]he Gulf of Mexico is known to contain significant oil and gas resources and already has world-class, well-developed infrastructure, including established spill response capability," the "PFP schedules 10 region-wide lease sales in the areas of the Gulf of Mexico that are not under Congressional moratorium or otherwise unavailable for leasing." BOEM, 2017-2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program 3-1 (Nov. 18, 2016). The Proposed Final Program also observed that "[i]n the Gulf of Mexico, infrastructure is mature, industry interest and support from affected states and communities is strong, and there are significant oil and gas resources available." *Id.* Thus, "[t]o take advantage of these incentives to OCS activity, the region-wide sale approach makes the entire leasable Gulf of Mexico OCS area available in each lease sale." *Id.*

On January 17, 2017—60 days after the Final Program was transmitted to President Obama and Congress—the Secretary approved the Final Program, "which schedules 11 potential oil and gas lease sales, one sale in the Cook Inlet (Alaska) Program Area and 10 sales in the GOM Program Areas," with "one sale in 2017, two each in 2018-2021, and one in 2022." Record of Decision and Approval of the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program 3 (Jan. 17, 2017). The Secretary's approval further specifically affirms the Final Program's specification that "[t]he GOM

sales would be region-wide and include unleased acreage not subject to moratorium or otherwise unavailable ... to provide greater flexibility to industry, including more frequent opportunities to bid on rejected, relinquished, or expired OCS lease blocks." *Id.*[3]

### III.    Lease Sale 257

The Final Program approved and scheduled the lease sale at issue here—GOM OCS Oil and Gas Lease Sale 257. Lease Sale 257 covers the Western and Central Planning Areas of the Gulf of Mexico, together with a portion of the Eastern Planning Area not subject to congressional moratorium. *Id.* In accordance with the Five-Year Program, BOEM published a Proposed Notice of Sale for Lease 257 in the Gulf of Mexico in November 2020. *See* 85 Fed. Reg. 73508 (Nov. 18, 2020). As OCSLA requires, BOEM sent the Proposed Notice to Governors of the affected States. *Id.* It was also opened for public comment. *Id.*

The Secretary approved the Notice of Sale in a Record of Decision. *See* 86 Fed. Reg. 6365 (Jan. 21, 2021). In the ROD, the Secretary analyzed five separate alternatives, including a no-action option, and determined that Alternative A—a regionwide lease sale with minor exclusions—would be "in the best interest of the Nation and meets the purposes of the OCS Lands Act." Bernhardt Record of Decision at 5. The Secretary also determined that Lease Sale 257 "promotes domestic energy production, which can reduce the need for oil imports," and promotes other national interests including "continued employment, labor income, [and] tax revenues." *Id.* at 8. Additionally, the Secretary found that "[c]ontinued oil and gas leasing on the OCS may also reduce the risk of spills from the transportation of imported energy resources," and that "revenue sharing with applicable coastal states and political subdivisions ... can help mitigate the risks and costs assumed by the States and communities in the area of the lease sale." *Id.* at 5, 8.

---

[3] Until the halt of Lease Sale 257, all lease sales in the Five-Year Program occurred on schedule.

In the ROD, the Secretary rejected the no-action alternative because "the needed domestic energy sources and the subsequent positive economic impacts from exploration and production, including employment, would not be realized. Furthermore, revenue would not be collected by the Federal Government nor subsequently disbursed to the States." *Id.* at 10. Additionally, the Secretary found that other sources of energy "may have different but comparable levels of negative environmental impacts, such as the risk of spills from the transportation of alternative oil supplies over long distances." *Id.* That meant the no-action alternative "would not avoid the incremental contribution of the energy substitutes' impacts to those same cumulative effects." *Id.* Finally, the Secretary's approval noted that the Leased Sale 257 stipulations included "all practicable means to avoid or minimize environmental harm from the selected alternative." *Id.* at 11. Lease Sale 257 was formally scheduled for March 17, 2021. *Id.* at 1.[4]

## IV.   Implementation and Injunction of Oil and Gas Leasing Moratorium

The onshore and offshore lease sale machinery was halted in January 2021. A Department of the Interior fact sheet dated January 27 stated that President Biden would be issuing an executive order "direct[ing] the Department of the Interior to pause new oil and natural gas leasing on public lands and offshore waters." DOI, "FACT SHEET: President Biden to Take Action to Uphold Commitment to Restore Balance on Public Lands and Waters, Invest in Clean Energy Future" (Jan. 27, 2021).[5] As justification, the fact sheet speaks of the need to reduce greenhouse gas emissions, "[i]rresponsible leasing of public lands and waters," impact on community access, impact on wildlife,

---

[4] In the ROD, the Secretary referred to the Lease Sale 257 Final Notice of Sale several times. The FNOS had been sent to the Office of the Federal Register along with the ROD, but by happenstance was not published before the new Administration was able to pull it back from the Federal Register. *See Louisiana*, 2021 WL 2446010, at *15.

[5] https://www.doi.gov/pressreleases/fact-sheet-president-biden-take-action-uphold-commitment-restore-balance-public-lands

impact on cultural sites, proposed (and defeated) legislation, and the supposed stockpiling of leases by the oil and gas industry. *Id.* But the fact sheet does *not* mention NEPA compliance or pending court cases. Later that day, President Biden issued Executive Order 14008, which directed the Secretary to implement a nationwide moratorium on offshore and onshore oil and gas leasing.[6] 86 Fed. Reg. 7619 (Jan. 27, 2021).

The Department then acted to implement a comprehensive moratorium on oil and gas lease sales on the Outer Continental Shelf and public lands. This Moratorium canceled the entire machinery of oil and gas development on public lands and offshore waters. It includes a halt of offshore oil and gas lease sales previously scheduled by the Five-Year Plan and cancels all quarterly public land lease sales. The Moratorium not only canceled the sales themselves but also halted the environmental assessments that were scheduled to be completed in time to hold timely sales. As discussed below, this Moratorium is reflected in several discrete actions including the recission of Lease Sale 257's Record of Decision.

On February 18, 2021, Michael Celata, Regional Director of BOEM's Gulf of Mexico Office, issued a Notice to Rescind the Prior Lease 257 Record of Decision. 86 Fed. Reg. 10132 (Feb. 18, 2021). The Notice declared that the Record of Decision "is rescinded immediately." *Id.* BOEM's *only* stated rationale for rescinding the ROD was "to comply with Executive order 14008." *Id.*

On March 22, 2021, Louisiana submitted a notice of suit under OCSLA to the Secretary informing the Department that the States would be immediately injured by its violation of the law and

---

[6] Even before January 27, the Administration began laying the foundation for a Moratorium. *See Louisiana v. Biden*, 2021 WL 2446010, at *15 (W.D. La. June 15, 2021) ("[O]n January 20, 2021, (the day President Biden was sworn in), Walter Cruickshank sent an email to Loren Thompson in which he stated they had received instructions to withdraw any notices that were pending at the Federal Register, which included the Final Notice of Sale for Lease Sale 257 and the Notice of the Record of Decision for Lease 257. (The Notice of the Record of Decision was evidently withdrawn too late because it was published). Cruickshank told Thompson in the email that the withdrawals do not signify anything more than the new leadership team wanting to evaluate the pending items.").

were therefore preparing to file suit. On March 24, 2021, a coalition of thirteen states, led by Louisiana, filed suit against the Moratorium and on March 31, 2021, Plaintiff States moved for a preliminary injunction. On June 8, 2021, Defendants filed a motion to dismiss Plaintiff States' complaint. That motion remains pending, but the Magistrate Judge issued a Report and Recommendation recommending Defendants' motion be denied in full. Doc. 154, *Louisiana v. Biden*, No. 2:21-cv-00778 (W.D. La. Sept. 2, 2021).

The Louisiana court held a hearing on the States' preliminary injunction motion in Lafayette on June 10, 2021. Five days later, the court issued a nationwide preliminary injunction enjoining executive branch officials "from implementing the Pause of new oil and natural gas leases on public lands or in offshore waters as set forth in Section 208 of Executive Order 14008." *Louisiana*, 2021 WL 2446010, at *22. The court also specifically ordered that "Agency Defendants shall be ENJOINED and RESTRAINED from implementing said Pause, with respect to Lease Sale 257." *Id.* On August 17, 2021, Defendants appealed the preliminary injunction to the Fifth Circuit, which has not yet acted on the appeal. *See Louisiana v. Biden*, No. 21-30505 (5th Cir. filed Aug. 17, 2021).

Defendants did not immediately comply with this injunction, however. Instead, they took no public action to reschedule Lease Sale 257. And all public statements indicated that the oil and gas leasing pause remained in place, with Secretary Haaland testifying as much before a Senate Committee. Doc. 149-1, *Louisiana v. Biden*, No. 2:21-cv-00778 (W.D. La. Sept. 2, 2021). After enduring months of irreparable harm and with no sign that Lease Sale 257 would be held, the States filed a motion for an order to show cause and to compel compliance with the preliminary injunction on August 9, 2021. *Id.* Defendants contested this motion and revealed for the first time in its contempt briefing that Lease Sale 257's record of decision would be reissued on August 31, 2021, the day the States' reply to Defendants opposition brief was initially due. Contempt proceedings remain ongoing.

The new Record of Decision readopts the Bernhard ROD's selection of Alternative A, which is a Gulf of Mexico regionwide lease sale of all available blocks subject to limited exceptions. *See* Record of Decision for Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sale 257 (Aug. 31, 2021).[7] Defendants have indicated that "BOEM expects a Final Notice of Sale for LS 257 to publish in September, with a lease sale to follow in the fall of this year." BOEM, "BOEM Updates Gulf of Mexico Lease Sale 257 Record of Decision" (Aug. 31, 2021).[8]

## ARGUMENT

### I.   Louisiana is entitled to intervene as of right.

This Court "must grant a timely motion to intervene that seeks to protect an interest that might be impaired by the action and that is not adequately represented by the parties." *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014). Under Rule 24(a)(2), this Court grants intervention as of right if:

1.   The motion is timely;
2.   Movants have "a legally protected interest" in this action;
3.   This action "threaten[s] to impair that interest"; and
4.   No existing party is "an adequate representative of [Movants'] interests."

*Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008). Any movant "who satisfies Rule 24(a) will also meet Article III's standing requirement." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003).

"[T]he D.C. Circuit has taken a liberal approach to intervention." *Wilderness Soc. v. Babbitt*, 104 F. Supp. 2d 10, 18 (D.D.C. 2000); *see also Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967) (emphasizing "the need for a liberal application [of Rule 24(a)] in favor of permitting intervention"). Under any standard, liberal or otherwise, Louisiana satisfies each requirement of Rule 24(a).

---

[7] https://www.boem.gov/sites/default/files/documents/oil-gas-energy/GOM-LS-257.pdf
[8] https://www.boem.gov/boem-updates-gulf-mexico-lease-sale-257-record-decision

## A.      This motion is timely.

Louisiana filed a "timely motion" to intervene. Fed. R. Civ. P. 24(a). Louisiana filed this motion as quickly as it could—three weeks after the complaint was filed, before Defendants even entered an appearance, and months before the Defendants' answer is due. *See, e.g.*, *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (motion timely filed "less than two months after the plaintiffs filed their complaint and before the defendants filed an answer"); *Connecticut v. DOI*, 344 F. Supp. 3d 279, 304 (D.D.C. 2018) (motion timely filed "within a month of when Plaintiffs filed the complaint, and before Federal Defendants entered an appearance"); *WildEarth Guardians v. Jewell*, 320 F.R.D. 1, 3 (D.D.C. 2017) (motion timely filed "approximately sixteen weeks after the initial complaint was filed"). Regardless how many days it has been, courts "'do not require timeliness for its own sake'" but only to prevent harm to the court or the parties. *100Reporters LLC v. DOJ*, 307 F.R.D. 269, 274-75 (D.D.C. 2014). Since "no substantive progress has occurred in this action," Louisiana's intervention could not "unduly disrupt the litigation or pose an unfair detriment to the existing parties." *Id.* at 275. This motion is timely.

## B.      Louisiana has a protected interest in this action.

Louisiana also has a "legally protected interest in [this] action." *Karsner*, 532 F.3d at 885 (citing Fed. R. Civ. P. 24(a)(2)). This "interest" test is a "liberal" one. *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 105 F.R.D. 106, 109-10 (D.D.C. 1985). It is "primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse*, 385 F.2d at 700. The test is easily satisfied here.

Louisiana's interests in this action are, at a minimum, equal to Plaintiffs' claimed interests. Louisiana has two separate statutory entitlements to proceeds from OCS lease sales such as Lease Sale 257. First, Section 8(g) of OCSLA provides that coastal states receive 27 percent of bonus bids, ground rent, and production royalties from OCS oil and gas lease sales and production in adjacent waters. *See*

43 U.S.C. §1337(g)(2). Second, Louisiana (and other States) are entitled to 37.5 percent of OCS revenues from selected areas of the Gulf of Mexico under the Gulf of Mexico Energy Security Act of 2006. *See* P.L. 109-432, 120 Stat. 3000, 43 U.S.C. §1331 note; *see also* BOEM, *2017-2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program*, 8-13 (Nov. 2016).[9] And the Record of Decision challenged by Plaintiffs specifically acknowledges Louisiana's interests in Lease Sale 257:

> The decision to hold Lease Sale 257 recognizes the role that GOM oil and gas resources play in addressing the Nation's demand for domestic energy sources and fosters economic benefits, including employment, labor income, and tax revenues, which are highest in Gulf Coast States and also distributed widely across the United States. Revenues from offshore oil and gas lease sales support national conservation programs and coastal resiliency for applicable coastal states and political subdivisions under the Gulf of Mexico Energy Security Act of 2006.

BOEM, Record of Decision for Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sale 257 7-8 (Aug. 31, 2021). Indeed, in *WildEarth Guardians v. Jewell*, this Court found in nearly identical circumstances that States were entitled to intervene. 320 F.R.D. 1, 4 (D.D.C. 2017). There, this Court held that dips in States' revenue received from oil and gas leasing on public land is a protected interest warranting intervention of right. *See id.* (finding legally protected interest because States "benefit[] financially from federal oil and gas leases"). It is thus clear that States have a legally protected interest in proceeds from "federal revenue-sharing system[s]" such as OCSLA and GOMESA. *Id.* And given those statutory entitlements, a federal district court has already found that Louisiana has standing to challenge the federal government's failure to hold Lease Sale 257.

In *Louisiana v. Biden*, the Western District of Louisiana held that Louisiana established an injury in fact resulting from "loss of proceeds as a result of the Pause for new oil and gas leases on federal lands and waters," including Lease Sale 257, and "from bonuses, land rents, royalties, and other income." *Louisiana v. Biden*, 2021 WL 2446010, at *10 (W.D. La. June 15, 2021). The court also found

---

[9] https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-OCS-Oil-and-Gas-Leasing-PFP.pdf

the Plaintiff States established an injury resulting from "loss of jobs and economic damage as a direct result of the Pause" and that "[t]hese alleged damages are concrete, particularized, and imminent." *Id.* The court also found that these injuries in fact were traceable to the cancellation of Lease Sale 257. *Id.* ("reduction in State revenues, damages to the economy, loss of jobs, higher oil and gas prices, and reduction in the energy export economy" traceable to Pause of oil and gas leasing, including Lease Sale 257). And the court held that Louisiana's injuries were redressable by an order enjoining the Pause, which included the cancellation of Lease Sale 257. *Id.* As the Court held, "[j]ust the cancellation of Lease Sale 257 itself has had immediate impact due to loss of bonus payments and ground rents." *Id.*[10]

Because Louisiana's standing is indisputable, it has also met its burden to demonstrate a legally protected interest in this action. *See Norton*, 322 F.3d at 735 ("Our conclusion that the NRD has constitutional standing is alone sufficient to establish that the NRD has 'an interest relating to the property or transaction which is the subject of the action.'"); *see also Defs. of Wildlife v. Salazar*, 2013 WL 12316816, at *2 (D.D.C. May 3, 2013) ("[A]rticle III standing, which as explained above Wyoming has, 'is alone is sufficient to establish that the [intervenor] has an interest relating to the property or transaction which is the subject of the action[.]'").

In any event, Louisiana also has an interest in opposing Plaintiffs' attempt to impose onerous and unlawful standards on OCS oil and gas leasing processes. A key purpose of OCSLA is to facilitate the expeditious development of oil and gas resources on the OCS. This development is essential to Louisiana's economy and budget, and to the economic well-being of its citizens. And "delays contravene Congress's expression of a national purpose and OCSLA's overriding policy of expeditious

---

[10] The court specifically held that Louisiana and its co-Plaintiffs "have proven standing through the normal inquiry." *Louisiana*, 2021 WL 2446010, at *10. Alternatively, the court held that Louisiana could also establish standing through special solicitude. *Id.* The same is true in this case.

development." *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011). Plaintiffs seek to undermine this system of expeditious and orderly development by fundamentally altering the way BOEM analyzes the effects of oil and gas lease sales under OCSLA, particularly in accounting for greenhouse gases. *See, e.g.*, Doc. 11, at 2-3. Additionally, Plaintiffs' assertion that supplementation of the programmatic Environmental Impact Statement, if adopted as a rule of decision, would greatly reduce the expeditious development of Gulf of Mexico energy resources to Louisiana and its citizens' detriment.

Finally, Louisiana has a statutorily vested interest and role in the OCS leasing-development process. OCSLA requires multiple State consultations while the federal government promulgates the five-year program. The Secretary is required to "invite and consider suggestions for such program from ... the Governor of any State which may become an affected State under such proposed program." 43 U.S.C. §1344(c)(1). Then, after a proposed plan is completed, the Secretary "shall submit a copy of such proposed program to the Governor of each affected State for review and comment." 43 U.S.C. §1344(c)(2). If a State Governor requests "a modification of such proposed program, the Secretary shall reply in writing granting or denying such request in whole or in part, or granting such request in such modified form as the Secretary considers appropriate, and stating his reasons therefor." *Id.* "The proposed leasing program is then submitted to the President and Congress, together with comments received by the Secretary from the governor of the affected state." *California*, 464 U.S. at 337 (citing 43 U.S.C. §1344(d)). The second stage of the OCSLA leasing process includes another round of mandatory State consultation. OCSLA grants "[a]ny Governor of any affected State or the executive of any affected local government" the right to "submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale." 43 U.S.C. §1345(a). The Secretary "shall accept" these recommendations if the Secretary "determines, after having provided the opportunity for consultation, that they provide for a reasonable balance between the national interest

14

and the well-being of the citizens of the affected State." Id. §1345(c). This statutorily vested role in the OCSLA oil and gas leasing process easily qualifies as a "protected interest" under Rule 24(a)(2). *See Mayo v. Jarvis*, 2014 WL 12804733, at *2 (D.D.C. Nov. 12, 2014) ("In light of Wyoming's undisputed interest in preserving its regulatory role as it pertains to the wildlife in its borders, as well its role in the challenged administrative decision-making process, the Court concludes that the State of Wyoming has demonstrated a legally protected interest in the action.").

### C.     This action threatens to impair Louisiana's interests.

Louisiana is "so situated that disposing of [this] action may as a practical matter impair or impede [its] ability to protect its interest." Fed. R. Civ. P. 24(a)(2). This language in Rule 24 is "obviously designed to liberalize the right to intervene in federal actions." *Nuesse*, 385 F.2d at 701. When applying it, "courts in this circuit look to the practical consequences that the applicant may suffer if intervention is denied." *100Reporters*, 307 F.R.D. at 278. The practical consequences for Louisiana if this Court enjoins Lease Sale 257 are immense.

A federal district court has already found that a pause of oil and gas lease sales on the OCS would irreparably harm Louisiana. *Louisiana*, 2021 WL 2446010, at *21 ("[T]he fact that new oil and gas leases on federal lands and in federal waters are paused will ultimately result in losses to Plaintiff States which they will likely not be able to recover [due to sovereign immunity]."). And the *Louisiana* court specifically held that the cancellation of Lease Sale 257 would irreparably harm Louisiana: "[J]ust with the loss of proceeds from Lease Sale 257, which would have been already completed, Plaintiff States would have been entitled to ground rents and bonuses that they will not receive." *Id.* This irreparable harm alone automatically satisfies the impairment factor. *See Fund For Animals*, 322 F.3d at 735 (because "loss of revenues during any interim period would be substantial and likely irreparable," impairment factor satisfied).

Apart from the irreparable harm to Louisiana's revenue, Plaintiffs' success in this suit would also practically impair Louisiana's interests by causing the cancellation or further delay of Lease Sale 257, which will have significant effects on Louisiana's economy and fiscal health. Indeed, the challenged ROD itself acknowledges the harm to Louisiana under the no-action alternative, which is precisely what Plaintiffs seek: "GOM Lease Sale 257 would not be held under Alternative E, which is the No Action Alternative analyzed in the 2018 GOM Supplemental EIS. Alternative E was not selected because if it were, revenue would not be collected by the Federal Government nor subsequently disbursed to the States." Record of Decision 9.

And a remand to BOEM for further consideration would cause the very irreparable injury found by the *Louisiana* court—Louisiana is being harmed every day Lease Sale 257 does not occur in the form of lost ground rents and proceeds from bonus bids. *Louisiana*, 2021 WL 2446010, at *21. This harm would continue while the agency reconsiders and creates the supplemental EIS Plaintiffs demand. Whether Lease Sale 257 is delayed or cancelled, Louisiana's interests are practically impaired. *See Norton*, 322 F.3d at 735.

This Court's holding in *WildEarth Guardians*, discussed above, is also dispositive on this element. The Court there held that the movant-States' interests in leasing revenue would be impaired because a ruling for Plaintiffs would delay and otherwise imperil their receipt of statutorily entitled revenue. 320 F.R.D. at 4 ("[I]f Plaintiffs were successful in this case, the economic and regulatory interests of Wyoming, Colorado, and Utah would likely be impaired. Other courts in this jurisdiction have found that similar situations justified intervention.") (collecting cases). And this impairment was sufficient despite the possibility of further administrative proceedings. *Id.* ("'[T]he interest of a prospective defendant-intervenor may be impaired where a decision in the plaintiff's favor would return the issue to the administrative decision-making process, notwithstanding the prospective intervenor's ability to participate in formulating any revised rule or plan.'"). Finally, given that the ROD

16

allows a beneficial lease sale to go forward, this is the quintessential situation to allow intervention. *See, e.g.*, *Mayo*, 2014 WL 12804733, at *3 ("[T]he movant can show that its interest will be impaired where the government's 'decision below was favorable to [the proposed intervenor], and the present action is a direct attack on that action.'"); *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 14 (D.D.C. 2010); C*ty. of San Miguel, Colo. v. MacDonald*, 244 F.R.D. 36, 44 (D.D.C. 2007).

### D.   The existing parties do not adequately represent Louisiana's interests.

Finally, no existing party is "an adequate representative of [Louisiana's] interests." *Karsner*, 532 F.3d at 885 (citing Fed. R. Civ. P. 24(a)(2)). This inadequate-representation requirement is "not onerous" and "should be treated as minimal." *Dimond v. Dist. of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986); *100Reporters*, 307 F.R.D. at 279. It is satisfied when "the applicant shows that representation of his interest 'may be' inadequate"; "[t]he applicant need … not [show] that representation will in fact be inadequate." *100Reporters*, 307 F.R.D. at 279; *Dimond*, 792 F.2d at 192; *see Am. Tel.*, 642 F.2d at 1293 ("[Intervention is] ordinarily … allowed … unless it is clear that the party will provide adequate representation for the absentee."). Representation is inadequate when the existing parties have "a 'different' interest" from the movant, even if they have "'a shared general agreement,'" "'tactical similarity [in their] legal contentions,'" or "general alignment" on the correct outcome. *Fund for Animals*, 322 F.3d at 737; *Crossroads*, 788 F.3d at 321.

There is no straight-faced argument that any of the parties here adequately represent Louisiana's interests. As recounted above, Louisiana has been in a protracted legal struggle with Defendants for months. Since January 2021, Defendants' consistent position has been that Lease Sale 257 should be cancelled or substantially delayed. On January 20, 2021, Defendants immediately moved to halt Sale 257 by pulling back the Final Notice of Sale from the Federal Register and attempting to do the same for the Record of Decision. *See Louisiana*, 2021 WL 2446010, at *15. On January 27, 2021, President Biden issued Executive Order 14008 directing Defendants to "pause" all onshore and

17

offshore oil and gas leasing. *Id.* On February 18, 2021, the Lease Sale 257 Record of Decision was rescinded to comply with the Executive Order. *Id.*

Defendants issued the new Lease Sale 257 Record of Decision only as a result of a lawsuit Louisiana filed against them. On March 24, 2021, Louisiana challenged Defendants' cancellation of Lease Sale 257 and recission of the ROD in federal district court, and, on March 31, they moved for a preliminary injunction against the halt of Lease Sale 257 and other onshore and offshore oil and gas lease sales. *Id.* at *1. Throughout that litigation, Defendants asserted that the Executive had the discretion to unilaterally cancel lease sales, that doing so was reasonable in light of climate concerns, and that the courts had no jurisdiction to review such actions. *Id.* at *8.

Though Defendants have since issued a new ROD authorizing Lease Sale 257, Defendants have not departed from their legal positions of the *Louisiana* lawsuit, or the policy positions that led to the initial recission of the ROD. Indeed, they are actively appealing the *Louisiana* court's preliminary injunction. *See Louisiana v. Biden*, No. 21-30505 (5th Cir. filed Aug. 17, 2021). And Defendants failed to comply with the injunction for months. Not until Louisiana filed a motion for contempt and to compel compliance with the injunction did Defendants even issue the challenged ROD. As a matter of policy and of law, Defendants' positions remain adverse to Louisiana.

Start with policy. Since January, Defendants' policy positions have been aligned with Plaintiffs'. Throughout the *Louisiana* litigation, Defendants maintained that the halt of Lease Sale 257 was necessary "to allow for a comprehensive review of the offshore leasing program." *See, e.g.*, Doc. 120 at 17, *Louisiana v. Biden*, No. 2:21-cv-00778 (W.D. La. Sept. 2, 2021). And Defendants have maintained that environmental review has been insufficient for the oil and gas leasing program and that more robust environmental analyses are needed. *See, e.g.*, DOI, "Interior Department Issues Statement on Oil and Gas Leasing Program" (Aug. 16, 2021) ("[T]he current programs fail to adequately incorporate consideration of climate impacts into leasing decisions."); BOEM, "BOEM

Updates Gulf of Mexico Lease Sale 257 Record of Decision" ("The Interior Department continues to review the programs' noted shortcomings."); DOI, "FACT SHEET: President Biden to Take Action to Uphold Commitment to Restore Balance on Public Lands and Waters, Invest in Clean Energy Future" (Jan. 27, 2021) ("Irresponsible leasing of public lands and waters impacts communities' access to clean air, clean water, and outdoor recreation; carves up important wildlife habitat; and threatens cultural and sacred sites."). In short, Defendants share Plaintiffs' precise policy concerns.

On law, Defendants and Louisiana also diverge. Based on Defendants' filings in *Louisiana*, Louisiana does not expect Defendants to argue that they lack discretion to cancel or pause Lease Sale 257. But Louisiana vigorously and successfully argued that point in *Louisiana*; that Court held Defendants lack discretion to rescind the Lease Sale 257 ROD without following the detailed procedures set out in OCSLA. *See Louisiana* 2021 WL 2446010, at *20. And Defendants are unlikely to argue that the Administration's publicly stated policy position—more environmental analyses is needed in the oil and gas leasing program—is arbitrary and capricious. But again, this is a key contention raised by Louisiana. *Id.* at *6. Indeed, demonstrating that Defendants' adverse legal position has not changed, they have indicated that they intend to object to the Louisiana Magistrate Judge's Report and Recommendation that their motion to dismiss be denied. *See* Doc. 159, *Louisiana v. Biden*, No. 2:21-cv-00778 (W.D. La. Sept. 2, 2021). That Defendants and Louisiana are currently engaged as adverse parties in litigation involving this same lease sale should be dispositive.

Accordingly, Louisiana will make "real and legitimate additional or contrary arguments" to Defendants, which "is sufficient to demonstrate that the representation may be inadequate." *Brumfield*, 749 F.3d at 346. At the very least, Louisiana will "serve as a vigorous and helpful supplement" to Defendants, will "make a more vigorous presentation" than Defendants, and "can reasonably be expected to contribute to the informed resolutions of these questions." *Castle*, 561 F.2d at 912-13;

*accord 100Reporters*, 307 F.R.D. at 286 ("Though the Court agrees that the DOJ can represent capably many of the interests asserted by the [movant], the Court also has found that … the strength of the DOJ's position will be enhanced by the assistance of the [Movant].").

More broadly, the D.C. Circuit "look[s] skeptically on [federal] government entities serving as adequate advocates for private parties," *Crossroads*, 788 F.3d at 321—much less for separate *sovereigns* like Louisiana. *Fund for Animals*, 322 F.3d at 736. As federal officials, Defendants have no direct interest in Louisiana's revenues, economic wellbeing, or role in the OCSLA consultation process. *Id.* at 736-37; *see also Nuesse*, 385 F.2d at 703 (explaining that the federal government does not adequately represent States because, unlike them, it usually tries to maximize federal power). It is clear that Defendants "merely seeks to defend the present suit and would accept a procedural victory." *Wal–Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 569 (5th Cir. 2016). Given the history recounted above and their present policy positions, Defendants could win as a policy matter by losing this suit. Louisiana, by contrast, want a definitive ruling that rejects Defendants' discretion to rescind Lease Sale 257's ROD. *See, e.g., Crossroads*, 788 F.3d at 321 (finding the federal government an inadequate representative of the movant's interests because the government planned to raise a procedural standing argument).

Overwhelming precedent in this Circuit supports Louisiana's intervention. *See, e.g., WildEarth Guardians*, 320 F.R.D. 1, 4-5 (D.D.C. 2017) ("Several previous cases have permitted intervention by states when the federal government was already a party."). Because "Federal Defendants' duty runs to the interests of the American people as a whole" while "the state-intervenors will primarily consider the interests of their own citizens," and States "may have unique sovereign interests not shared by the federal government," it is "straightforward to conclude that [] Federal Defendants representation of" sovereign states "'may be' inadequate." *Id.* In fact, because "the federal government represents the public interest of its citizens as a whole," courts have noted that the federal government would be

"'shirking its duty were it to advance [a] narrower interest'"—such as Louisiana's interest in statutory oil and gas revenues—"'at the expense of its representation of the general public interest.'" *Cayuga Nation v. Zinke*, 324 F.R.D. 277, 283 (D.D.C. 2018) (quoting *Fund for Animals*, 322 F.3d at 737; *see also Friends of Animals v. Ashe*, 2015 WL 13672460, at *3 (D.D.C. July 10, 2015) ("[W]hile FWS and the Department of the Interior will defend the lawfulness of the permits, they do not adequately represent the Ministry's interests in generating revenue for Namibia's conservation efforts and protecting its resources."). That's at least partly why courts in this Circuit consistently find the federal government to be an inadequate representative of State interests in substantively identical circumstances. *See WildEarth Guardians*, 320 F.R.D. at 4; *Mayo*, 2014 WL 12804733, at *3 ("[B]ecause Wyoming's sovereign interest in the wildlife at issue is distinguishable from the general interests of the federal defendants, the Court finds that Wyoming has satisfied the fourth factor."); *Defs. of Wildlife v. Salazar*, 2013 WL 12316816, at *2 (D.D.C. May 3, 2013) ("Although the federal defendants ... seek to have this Court uphold the delisting decision, Wyoming's interest ... is not identical to the interests of the other defendants. [Federal Defendants do not] seek to defend Wyoming's sovereign right to police wildlife within its borders, and it is not clear that their interests will always align with Wyoming's interest such that they would protect Wyoming's interest fully."); *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 20 (D.D.C. 2010) ("The mere fact that other defendants might hypothetically take Wyoming's interests into account when shaping their arguments does not mean that they would afford the same primacy to Wyoming's interests in, for instance, maintaining its unique role in regulating coal mining operations and environmental quality or its financial and social economic interests in the development of coal mining operations within its borders."); *Earthworks v. U.S. Dep't of Interior*, 2010 WL 3063143, at *2 (D.D.C. Aug. 3, 2010) ("Because Alaska's interests in the natural resources within state borders and the economic effects on the state of mining regulation are not necessarily represented by federal agencies or private companies, the Court concludes that Alaska has met its

burden of showing that its interests may not be adequately represented."); *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 7 (D.D.C. 2008) ("[T]he existing defendants, the DOI and the Secretary, have no clear interest in protecting Alaska's sovereignty."); *Guardians v. U.S. Bureau of Land Mgmt.*, 2012 WL 12870488, at *2 (D.D.C. June 7, 2012) (fourth factor met because "no other party approaches the case from the state's unique perspective").

Finally, the "burden is on those opposing intervention to show the adequacy of the existing representation." *Smuck*, 408 F.2d at 181 (cleaned up). It is well-established that the positions and personnel of the Executive Branch can change over the course of a single case, so it is "not realistic to assume" that Defendants will continue to defend Lease Sale 257. *Utah Ass'n of Ctys. v. Clinton*, 255 F.3d 1246, 1256 (10th Cir. 2001). Louisiana "should not need to rely on a doubtful friend to represent its interests, when [Louisiana] can represent itself" as intervenor-defendant. *Crossroads*, 788 F.3d at 321. Defendants have proven a "doubtful friend" to Louisiana.

## II.    Alternatively, Louisiana is entitled to permissive intervention.

Even if Louisiana were not entitled to intervention as of right under Rule 24(a), this Court should grant them permissive intervention under Rule 24(b). Exercising broad judicial discretion, courts grant permissive intervention when the movant makes a "timely motion" and has "a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). Courts also consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Id.* "While permissive intervention may be denied in order to avoid the likelihood of undue delay," it should not be denied based on the natural burdens that always come with adding parties—the likely delay must be "undue." *Nuesse*, 385 F.2d at 704 & n.13. Courts in this Circuit are particularly "hospitable" to "governmental application[s]" for permissive intervention, like this one. *Id.* at 705.

22

The requirements of Rule 24(b) are all met here. As explained, Louisiana filed a timely motion. And Louisiana will raise defenses that share many common questions with the parties' claims and defenses—including whether the ROD adequately accounts for environmental matters; whether the ROD is required by OCSLA; and whether the programmatic EIS must be supplemented. These "similarities between the issues presented by [the proposed intervenor-defendant] and those raised by the DOJ" and Plaintiffs warrant permissive intervention. *100Reporters*, 307 F.R.D. at 286.

Louisiana's intervention will not unduly delay this litigation. Louisiana swiftly moved to intervene while the case was "at … a nascent stage," *id.*, and its participation will add no delay beyond the norm for multiparty litigation. Although Louisiana will make "additional and different legal arguments," Plaintiffs will not be prejudiced because they "will have a full opportunity, in their … brief[s], to counter any such legal arguments." *United States v. Philip Morris USA Inc.*, 2005 WL 1830815, at *5 (D.D.C. July 22, 2005).[11]

"The proper approach" to permissive intervention, this Court has explained, "is to allow all interested parties to present their arguments in a single case at the same time." *100Reporters*, 307 F.R.D. at 286. Louisiana is an interested party, it has important interests to represent, its unique arguments are essential to the accurate resolution of this case, and this Court will benefit from its involvement. Louisiana should be granted leave to intervene.

## CONCLUSION

The Court should grant this motion and allow Louisiana to intervene as defendant.

---

[11] Louisiana imminently intends to file a motion to transfer this case to the Western District of Louisiana. Courts in this Circuit routinely grant motions to intervene to movants who intend to seek transfer of venue. *See Defs. of Wildlife v. Jewel*, 74 F. Supp. 3d 77, 84 (D.D.C. 2014) ("Intervenors may move to transfer venue and courts will grant such motions where appropriate.").

Respectfully submitted,

Dated: September 13, 2021

**JEFF LANDRY**
**ATTORNEY GENERAL OF LOUISIANA**

*/s/   Elizabeth B. Murrill*

ELIZABETH B. MURRILL
  Solicitor General
JOSEPH S. ST. JOHN*
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
:  Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

TYLER R. GREEN
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

*Counsel for State of Louisiana*

* L.R. 83.2(f) registration forthcoming

## **CERTIFICATE OF SERVICE**

I filed this motion and its attachments with the Court via ECF, which will notify Plaintiffs' counsel. I am causing a copy of this motion to be deposited in the U.S. mail, postage pre-paid, addressed to:

Hon. Merrick Garland, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Channing D. Phillips, Acting U.S. Attorney
Office of the U.S. Attorney for the District of Columbia
555 4th Street N.W.
Washington, DC 20530

I am further causing a copy of this motion to be sent via electronic mail to Michael Sawyer, Michael.sawyer@usdoj.gov, and Thomas Ports, Thomas.ports.jr@usdoj.gov, who are counsel of record for Defendant Secretary Haaland in the related *Louisiana* litigation.

Dated: September 13, 2021                    */s/ Elizabeth Murrill*