**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FRIENDS OF THE EARTH, et al.,
*Plaintiffs*,

   v.

DEBRA A. HAALAND, et al.,
*Defendants*,

and

STATE OF LOUISIANA,
*Intervenor-Defendant.*

Case No. 1:21-cv-02317-RDM

## OPPOSED MOTION TO TRANSFER AND SUPPORTING STATEMENT OF POINTS AND AUTHORITIES

Intervenor-Defendant the State of Louisiana respectfully moves this Court to transfer this case to the Western District of Louisiana under 28 U.S.C. §1404(a). Transfer is appropriate because proceedings in a related case—*Louisiana v. Biden*—are already well underway: in the district court, the government is compiling the administrative record as the parties prepare for summary judgment briefing. *See* No. 2:21-cv-778 (W.D. La.). And in the Fifth Circuit, the parties are briefing the Federal Defendants' appeal of the district court's preliminary injunction. *See* No. 21-30505 (5th Cir.). Because *Louisiana* involves precisely the same Lease Sale at issue here—Lease Sale 257—and the same underlying Record of Decision, there is a significant possibility that, absent transfer, this Court and the *Louisiana* court will issue conflicting orders and final judgments: If Plaintiffs win here, Defendants will be enjoined from holding Lease Sale 257 at this time; but if Louisiana wins in the Western District suit, Defendants may be compelled to hold Lease Sale 257 before the year ends. Given this risk of conflicting judgments, the substantial overlap between the issues, and the importance of this case to the Western District's residents, transfer serves the interests of justice.

## BACKGROUND

To avoid duplicative briefing, Louisiana incorporates by refence its discussion of OCSLA and the development of Lease Sale 257's ROD in its motion to intervene, Doc. 13, and focuses on the pending related *Louisiana v. Biden* litigation.

Six months ago, a Louisiana-led coalition of thirteen states filed suit in the Western District of Louisiana challenging President Biden's Moratorium on federal oil and gas leasing generally—and the Recission of Lease Sale 257's ROD specifically. After a hearing, the Western District entered a preliminary injunction holding that the recission of Lease Sale 257's ROD was final agency action and a substantive rule that could not be issued without notice and comment. *Louisiana v. Biden*, 2021 WL 2446010, at *13 (W.D. La. June 15, 2021). The court also specifically ordered that "Agency Defendants shall be ENJOINED and RESTRAINED from implementing said Pause, with respect to Lease Sale 257." *Id.* On August 17, 2021, Defendants appealed the preliminary injunction to the Fifth Circuit, which has not yet acted on the appeal. *See Louisiana v. Biden*, No. 21-30505 (5th Cir. filed Aug. 17, 2021).

Defendants did not apply for a stay of the injunction, nor did they immediately comply with it. Instead, for almost two months, they took no public action to reschedule Lease Sale 257. And all their intervening public statements indicated that the oil and gas leasing pause remained in place despite the injunction. Doc. 149-1, *Louisiana*, No. 2:21-cv-778. After nearly two months of continued irreparable harm, and with no sign that Lease Sale 257 would be held, on August 9 the States filed a motion for an order to show cause and to compel compliance with the preliminary injunction. *Id.* Defendants opposed this motion and revealed for the first time in their contempt briefing that Lease Sale 257's record of decision would be reissued on August 31, 2021. Doc. 155, *Louisiana*, No. 2:21-cv-778.

The new Record of Decision readopts the former ROD's conclusion that Lease Sale 257 will proceed as a Gulf of Mexico regionwide lease sale of all available blocks subject to limited exceptions. *See* Record of Decision for Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sale 257 (Aug. 31, 2021).[1] Defendants have indicated that "BOEM expects a Final Notice of Sale for LS 257 to publish in September, with a lease sale to follow in the fall of this year." BOEM, "BOEM Updates Gulf of Mexico Lease Sale 257 Record of Decision" (Aug. 31, 2021).[2]

The Western District case remains ongoing. The district court recently adopted the magistrate judge's Report and Recommendation and, over Defendants' objections, denied Defendants' motion to dismiss the complaint. Doc. 170, *Louisiana v. Biden*, No. 2:21-cv-778 (W.D. La.). Under the parties' Rule 26(f) scheduling order, the administrative record is due on October 1, and cross-motions for summary judgment are due 30 days after the administrative record is lodged unless motion to supplement record is filed. Docs 151, 153, 166, *Louisiana*, No. 2:21-cv-778.

## ARGUMENT

Under 28 U.S.C. §1404(a), this Court "may transfer a case to 'any other district or division where it might have been brought' for the 'convenience of [the] parties and witnesses, in the interest of justice.'" *Sandpiper Residents Ass'n v. U.S. Dep't of Hous. & Urb. Dev.*, 2021 WL 2582004, at *3 (D.D.C. June 23, 2021). The §1404(a) inquiry requires the Court first to determine "whether the case could have been brought in the transferee district," and second to "weigh the private and public interests at stake." *Id.* As the moving party, Louisiana "bears the burden of persuasion." *Id.* As discussed below, this case could have been brought in the Western District of Louisiana, and the public and private interests at stake favor transferring it there.

---

[1] https://www.boem.gov/sites/default/files/documents/oil-gas-energy/GOM-LS-257.pdf
[2] https://www.boem.gov/boem-updates-gulf-mexico-lease-sale-257-record-decision

I.      **Venue Is Proper in the Western District of Louisiana.**

The Western District of Louisiana is a proper venue for this case for two reasons. *First*, "[u]nder the general federal venue statute, venue in a suit against the federal government will lie in any district in which a substantial part of the events or omissions giving rise to the claim occurred." *Oceana, Inc. v. Pritzker*, 58 F. Supp. 3d 2, 4 (D.D.C. 2013) (citing 28 U.S.C. §1391(e)(1)(C)). *Second*, venue is appropriate where "a substantial part of property that is the subject of the action is situated." 28 U.S.C. §1391(e)(1)(B).

As to the first inquiry, a substantial part of the relevant events and omissions took place in the Western District of Louisiana. "'Substantiality' for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432-33 (2d Cir. 2005); *accord Ford-Bey v. United States*, 2020 WL 32991, at *12 (D.D.C. Jan. 2, 2020), *aff'd*, 2021 WL 2525374 (D.C. Cir. June 2, 2021). And "venue is not restricted to 'the district in which the most substantial events or omissions giving rise to a claim occurred.... [r]ather ...§ 1391(b)(2) contemplates that venue can be appropriate in more than one district.'" *Ford-Bey*, 2020 WL 32991, at *12. The substantiality requirement is thus "intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute." *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994).

Venue is appropriate in the Western District of Louisiana because "these claims touch on the same agency action that is now pending on appeal in the Court of Appeals for the [Fifth] Circuit after consideration in the" Western District. *Ute Indian Tribe v. U.S. Dep't of Interior*, 2021 WL 4189936, at *12 (D.D.C. Sept. 15, 2021). The Western District of Louisiana has already determined that the initial Lease Sale 257 ROD should not have been rescinded for further

environmental analysis. That decision is currently on appeal in the Fifth Circuit. The reissued

Lease Sale 257 ROD is substantially identical to that on appeal in the Fifth Circuit. Any challenge

to this same agency action could have been brought in the Western District either through an

original action or claim in intervention.[3] Accordingly, venue would be appropriate in the Western

District of Louisiana. *See id.*; *see also Me-Wuk Indian Cmty. of the Wilton Rancheria v.

Kempthorne*, 246 F.R.D. 315, 321 (D.D.C. 2007) ("As a threshold matter, this Court first finds that

plaintiff could have originally filed suit in the Northern District of California because of the related

Hardwick litigation that has been pending in that district since 1979.").

Plaintiffs' claims also meet the substantiality requirement because they stem from

Defendants' alleged failure to conduct environmental analyses in and of the areas potentially

affected by Lease Sale 257. There can be no dispute that Plaintiffs' claims affect lands within the

Western District of Louisiana. For instance, Plaintiffs allege that Defendants were required to

create a supplemental EIS to address "new information" indicating that drilling will take place in

shallower waters. Doc. 1, ¶¶124-129. Any examination of the alleged "significant new

information" would have to include acts along the entire Gulf Coast, including the Western District

of Louisiana. Indeed, Plaintiffs themselves assert that Defendants must conduct "site-specific"

analysis to comply with NEPA. Doc. 1, ¶28. In short, Plaintiffs base their NEPA claim on a

required action that Defendants allegedly failed to take in the Western District of Louisiana.

Similarly, Plaintiffs claim that Defendants failed to properly account for dangers to a Gulf

subspecies of Bryde's whale. But conducting studies that Plaintiffs would consider adequate would

---

[3] Plaintiffs' initial attempt to intervene in the Western District did not raise their NEPA claims. It
is unclear why Plaintiffs held back this argument so long—they could have raised this as a separate
defense in their intervention motion, but failed to do so. Having one court adjudicate these claims
would prevent any further gamesmanship.

require actions along the Louisiana coast, including in the Western District. For example, Plaintiffs rely (Doc. 1, ¶132 n.28) on a Biological Opinion that demonstrates that adequate study would require actions in the Western District to fully examine the effects of oil and gas leasing on the Bryde's whale population. *See* National Marine Fisheries Service, *Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of Mexico* 168, FPR-2017-9234 (Mar. 13, 2020) ("Of the six reported Bryde's whale strandings on the Gulf Coasts of Louisiana and Florida since 2005, at least one was attributed to blunt force trauma by ship strike."); *see also id.* 245 ("According to the status review, there are some recent sightings data of baleen whales westward into waters off Louisiana.").

Additionally, Plaintiffs rely (at Doc. 1, ¶135 n.32) on a study that was conducted in Lafayette, Louisiana, which is situated within the Western District. Plaintiffs also specifically allege that Defendants failed to sufficiently study the effect of Lease Sale 257 on the eastern black rail, whose "historical range" includes Louisiana. Indeed, if the eastern black rail exists at all in Louisiana, it is in the Western District. 85 Fed. Reg. 63764 (Oct. 8, 2020) (noting that east black rail "occurrences are concentrated in and around southwest Louisiana") (cited in Doc. 1, ¶139). Those citations demonstrate that to conduct what Plaintiffs consider to be adequate analysis, Defendants would have to take actions within the Western District.

Plaintiffs also allege (Doc. 1, ¶159) that Defendants violated NEPA by failing to consider "[n]ew studies [finding] that refineries and petrochemical plants that rely on oil and gas produced in the region are more likely to be in low-income and communities of color." One of those studies spotlights emissions in Shreveport, Louisiana, which is within the Western District. *See* Lesley Fleischman & Marcus Franklin, *Fumes Across the Fence-Line: The Health Impacts of Air Pollution from Oil and Gas Facilities on African American Communities*, NAACP & Clean Air Task Force

(Nov. 2017) (cited in Doc. 1, ¶159 n.38). Failure to consider such emissions is another alleged omission occurring in the Western District.

Because many of the harms underlying Plaintiffs' NEPA claims were caused by Defendants' alleged failure to take action in the Western District of Louisiana, venue is appropriate in that judicial district. *See, e.g.*, *Villa v. Salazar*, 933 F. Supp. 2d 50, 55 (D.D.C. 2013) (venue appropriate in judicial district where deficient investigation giving rise to NEPA claim occurred); *Aland v. Kempthorne*, 2007 WL 4365340, at *3 (N.D. Ill. Dec. 11, 2007) (although no formal agency decisions taken in district, Idaho proper venue for ESA suit because "FWS based its findings on significant quantities of information gathered in and around the [land in the district] because the material facts in this case are derived from" land within the district).

Courts in this Circuit have also looked to the effects of an administrative decision on a judicial district in determining whether a substantial portion of events occurred within a district. *See Oceana, Inc. v. Pritzker*, 58 F. Supp. 3d 2, 4 (D.D.C. 2013) ("Many of the fishermen affected by the challenged regulations, moreover, are located in Massachusetts, and the fish themselves populate the waters off the Bay State's coast. Venue is thus proper in that district."). As detailed in depth below, Lease Sale 257 has immense effects on the economy and governmental revenues in Western District of Louisiana. *Cf. Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996) (venue appropriate because *inter alia* "individuals that derive enjoyment from [] affected areas" in judicial district); *see also cf. Louisiana*, 2021 WL 2446010, at *22 ("The Plaintiff States' claims are substantial. Millions and possibly billions of dollars are at stake. Local government funding, jobs for Plaintiff State workers, and funds for the restoration of Louisiana's Coastline are at stake. Plaintiff States have a reliance interest in the proceeds derived from offshore and on land oil and gas lease sales.").

Finally, the Western District has a "real relationship to the dispute" because of Louisiana's role in the OCSLA consultation process. *Cottman Transmission Sys.*, 36 F.3d 291, 294 (3d Cir. 1994). The challenged ROD and the allegedly insufficient EISs all involved statutorily mandated consultation with and participation by Louisiana. *See, e.g.*, Final EIS 5-3 ("BOEM's Gulf of Mexico OCS Region's Regional Director makes an assessment of consistency, which is then sent to the States of Texas, Louisiana, Mississippi, Alabama, and Florida for proposed regionwide lease sales. ... If the State concurs, BOEM proceeds with the proposed lease sale."). Accordingly, Louisiana's role in creating the documents and decisions challenged as deficient creates a substantial nexus between the Western District and this dispute.

Consider one of Plaintiffs' primary claims—that Defendants failed to conduct a wide range of studies regarding species that live off coastline located in the Western District of Louisiana. Those studies would require action in that district, so the alleged failure is an "omission giving rise" to Plaintiffs' claims. Accordingly, at least "some of the operative" acts and omissions occurred in the Western District of Louisiana. *Greater Yellowstone Coal. v. Bosworth*, 180 F. Supp. 2d 124, 128 (D.D.C. 2001). No more is necessary for venue to be appropriate under §1391(e)(1)(C).

*Second*, venue is appropriate because "a substantial part of property that is the subject of the action is situated" in Louisiana. 28 U.S.C. §1391(e)(1)(B). As discussed above, Plaintiffs' complaint alleges that land in the Western District of Louisiana will be harmed by the alleged deficiencies in Defendants' environmental analyses. Courts in this Circuit have found such attacks on environmental analysis and RODs to be sufficient for venue purposes if the outcome affects land in the judicial district. *See Gulf Restoration Network v. Jewell*, 87 F. Supp. 3d 303, 311

(D.D.C. 2015) (venue appropriate to challenge ROD signed out of district because property affected by project approved by ROD situated within judicial district). So it is here.

## II.     The Private Interests Weigh in Favor of Transfer.

Under §1404(a), "the private interest factors that courts typically consider are: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to the sources of proof." *Wyandotte Nation v. Salazar*, 825 F. Supp. 2d 261, 268 (D.D.C. 2011). Several of these factors weigh in favor of transfer to the Western District and the remainder are neutral.

### A.     Defendants' Choice of Forum.

Although a "'plaintiff's choice of forum is generally afforded 'substantial deference,' ... "'that deference is not unyielding.'" *Sandpiper Residents Ass'n*, 2021 WL 2582004, at *3. Rather, "[a] defendant's 'choice of forum must be accorded some weight' if the defendant presents legitimate reasons for preferring to litigate the case in the transferee district." *Gulf Restoration Network*, 87 F. Supp. 3d at 313. Specifically, in APA cases, Defendants' choice of forum weighs in favor of transfer "where the harm from a federal agency's decision is felt most directly in the transferee district." *Id.*

For reasons discussed below, the harm would be felt most directly in Louisiana. Plaintiffs and Louisiana both agree that the ROD significantly affects Louisiana. Plaintiffs themselves allege several harms that would occur in the Western District, such as disparate impacts to minority communities in Shreveport and habitat destruction for endangered species on Louisiana's southwestern wetlands. Doc. 1, ¶¶139-140, 159. And Louisiana has successfully demonstrated that rescinding the ROD and cancelling Lease Sale 257 costs the State and local parishes millions in revenues and significantly harms the wellbeing of Louisiana citizens who rely on the oil and gas

industry.[4] Because the "people, businesses, and governments that depend on" offshore drilling and the coastal environment reside in Louisiana, rather than the District of Columbia, Defendants' choice of forum weighs in favor of transfer. *State v. U.S. Army Corps of Engineers*, 304 F. Supp. 3d 56, 65 (D.D.C. 2018); *see also Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 358 F. Supp. 3d 1, 11 (D.D.C. 2019) ("To the extent there is harm, the economic and environmental impacts of the BLM's approval of the drilling permits will be felt most acutely where Slawson plans to drill.").

## B.    Convenience to Parties and Witnesses.

While this factor is often neutral in APA cases, Plaintiffs have sought an expedited briefing schedule outside of this Court's usual procedure for adjudicating cases on the administrative record. Because most of the alleged on-the-ground failures occurred in Gulf Coast States, the Western District would provide a central location to collect information. And the Western District has already proven to be a convenient location for Federal Defendants and Louisiana in expeditiously conducting proceedings surrounding this same lease sale. As discussed below, that court is already thoroughly acquainted with Lease Sale 257 and its background, and would be able to expeditiously rule on this matter.

## III.    The Public Interests Weigh in Favor of Transfer.

The §1404(a) public interest factors include "(1) the transferee forum's familiarity with the governing laws and the pendency of related actions in that forum; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding

---

[4] Numerous refineries and natural gas facilities are located in the Western District of Louisiana, including CITGO Petroleum Lake Charles, Conoco Phillips – Lake Charles, Calcasieu Refining – Lake Charles, and Cheniere – Sabine Pass. *See generally* http://www.dnr.louisiana.gov/index.cfm?md=pagebuilder&tmp=home&pid=204.

local controversies at home." *Bader v. Air Line Pilots Ass'n, Int'l*, 63 F. Supp. 3d 29, 36 (D.D.C. 2014). The most significant public interest factor weighs heavily in favor of transfer.[5]

**A.      Related Litigation Is Ongoing in the Western District of Louisiana.**

The presence of "related litigation" in the transferee district is "the most significant factor" and "weighs very heavily in favor of transferring." *Barham v. UBS Fin. Servs.*, 496 F. Supp. 2d 174, 180 (D.D.C. 2007); *Holland v. A.T. Massey Coal*, 360 F.Supp.2d 72, 77 (D.D.C. 2004). "[T]here is a 'compelling public interest in avoiding duplicative proceedings (and potentially inconsistent judgments) [that] warrants transfer of venue" under §1404(a). *F.T.C. v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 28-30 (D.D.C. 2008). To count as "related" for §1404(a), the cases need not be identical or present precisely the same claim. *See, e.g.*, *Hisp. Affs. Project v. Perez*, 206 F. Supp. 3d 348, 377-78 (D.D.C. 2016), *aff'd sub nom.* 901 F.3d 378 (D.C. Cir. 2018) ("[E]ven though the back pay claims at issue here are different in nature and involve different questions of law, they would come to the same conclusion—whether, and how much, the plaintiffs are entitled to damages to compensate for lost wages due to allegedly unlawful activity on the part of the Association Defendants or invalid administrative rules issued by DOL."); *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 27 (D.D.C. 2002). Instead, the cases must be "possibly related," *Shawnee Tribe*, 298 F. Supp. 2d at 27, "very similar," *Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 922 F. Supp. 2d 51, 55-56 (D.D.C. 2013), be on "parallel tracks," *Holland v. A.T. Massey Coal*, 360 F. Supp. 2d 72, 77 (D.D.C. 2004), or "substantial[ly] overlap in many of the claims," *Env't Def. v. U.S. Dep't of Transp.*, 2007 WL 1490478, at *6 (D.D.C. May 18, 2007). And courts look to the "ultimate relief" sought rather than the precise statutes each suit is brought under, which

---

[5] There is no evidence of a significant enough imbalance between this Court and the Western District of Louisiana to implicate the second factor.

makes sense, given the need to avoid inconsistent judgments and obligations. *Id.* at *5-6; *see also Shawnee Tribe*, 298 F. Supp. 2d at 27.

This case should be transferred to the Western District of Louisiana due to the pendency of *Louisiana v. Biden*, which challenges, among other things, BOEM's recission of the Lease Sale 257 ROD as a separate final agency action. *See Louisiana v. Biden*, No. 2:21-cv-778, Doc. 1, ¶138 ("The Recission of Lease Sale 257's Record of Decision is a substantive rule that was issued without the notice-and-comment period required by 5 U.S.C. §553."). As relief, Louisiana seeks an "[a]n order compelling the Defendants to proceed with leasing sales under OCSLA and the MLA as previously scheduled with reasonable allowance for the time lost due to their unlawful actions and this resulting litigation." *Id.* at 50.

The Louisiana district court issued a preliminary injunction and specifically held that the Recission of Lease Sale 257's ROD was final agency action, arbitrary and capricious, and contrary to law. Defendants have appealed that judgment—implicating substantially the same ROD at issue here—to the Fifth Circuit. The district court case continues toward final judgment. Defendants' motion to dismiss has been denied, the Rule 26(f) status conference has been held, the administrative record is being compiled by Defendants and is due on October 1, and Plaintiffs' motion for summary judgment is due thirty days after the administrative record is filed.

As a result, *Louisiana v. Biden* and this case involve the same central issue: whether and when Lease Sale 257 will occur. In *Louisiana*, the State has specifically sought to reinstute the Lease Sale 257 ROD—the same ROD Plaintiffs challenge here. In *Louisiana*, the State seeks an order compelling Lease Sale 257 to go forward—the same sale Plaintiffs seek to enjoin here. That NEPA claims exist here but don't in *Louisiana* is irrelevant; what counts for §1404(a) is the ultimate result. *Shawnee Tribe*, 298 F. Supp. 2d at 27 ("While the posture of TOTO may be

somewhat different than the case at bar, it still involves central questions regarding the future of the SFAAP property, the resolution of which by the District Court in Kansas must precede a final decision on the property's disposal."); *Env't Def.*, 2007 WL 1490478, at *6 (transfer appropriate because "both suits seek as their ultimate relief declaratory and injunctive relief invalidating the Federal Defendants' approval of the ICC Project"). This case shows precisely why courts have the discretionary transfer power. As things stand—two cases running on parallel timelines with diametrically opposed relief requested in each—the court should "avoid subjecting a defendant to the grave risk of inconsistent judgments deriving from the same conduct." *Cephalon, Inc.*, 551 F. Supp. 2d at 29; *see also, e.g.*, *Env't Def.*, 2007 WL 1490478, at *6 ("[T]here would be a significant risk that this court and the [Louisiana] court would issue inconsistent orders subjecting [Defendants] to inconsistent obligations. Such considerations weigh heavily in favor of transfer.").

And even looking to the claims themselves, they are at least "related" and "similar." The two cases present two sides of the same coin. Plaintiffs' complaint raises the central question of whether Lease Sale 257's ROD is arbitrary and capricious or contrary to law. Louisiana, in turn, argues that rescinding the ROD is arbitrary and capricious under the APA and conflicts with OCSLA's statutory command of expeditious development. *Louisiana*, No. 2:21-cv-778, Doc. 1, ¶144. Plaintiffs argue that the retention of the ROD is arbitrary and capricious under the APA and conflicts with NEPA. Doc. 1, ¶¶183, 194. Plaintiffs also allege that "the United States must halt new fossil fuel projects and close existing fields and mines"—an allegation in irreconcilable tension with Louisiana's claims in the *Louisiana* suit. *Compare* Doc. 1, ¶117, *with Louisiana*, No. 2:21-cv-778, Doc. 1 ¶83 ("This unexplained delay is particularly egregious given 'OCSLA's overriding policy of expeditious development.'" (quoting *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011)), *id.* ¶89 ("This lack of reasoning, combined with OCSLA's

purpose of expeditious development, requires the Court to compel performance of this unreasonably and unlawfully delayed action."). Resolving these "substantially overlapping" claims in one case would "serve the interests of judicial economy and efficiency" and avoid the dangers of conflicting judgments. *Shawnee Tribe*, 298 F. Supp. 2d at 27.

Both courts are ultimately called upon to determine whether Lease Sale 257 will occur in Fall 2021. Both courts must determine whether Lease Sale 257's Record of Decision is sufficient under or compelled by federal law. Accordingly, the "most significant factor" weighs heavily in favor of transfer. *Cephalon*, 551 F. Supp. 2d at 29.

But several other considerations also counsel in favor of transfer in light of the ongoing *Louisiana v. Biden* litigation. *First*, the *Louisiana* court is thoroughly familiar with this precise issue and these parties. "Although 'all federal courts are presumed to be equally familiar with the law governing federal statutory claims,'" the Western District of Louisiana has "specialized knowledge of both the parties, their history of litigation, and the statute at issue in the present litigation." *Wyandotte Nation v. Salazar*, 825 F. Supp. 2d 261, 267 (D.D.C. 2011). The litigation surrounding Lease Sale 257 has been ongoing in the Western District since March. The *Louisiana* court and magistrate have issued extensive rulings examining the relation between the OCSLA framework, Five Year OCS Oil and Gas Leasing Plan, APA, and Lease Sale 257. Additionally, the district court has presided over disputes surrounding the compilation of the administrative record regarding Lease Sale 257. Accordingly, "[t]hat court's familiarity with these facts—and the law as applied to these facts—supports transfer to the [Western District of Louisiana] for judicial efficiency purposes." *Cephalon*, 551 F. Supp. 2d at 31. Moreover, because this case is still in early non-merits stages, transfer will not delay resolution, and will likely expedite a final judgment on all claims. *See, e.g.*, *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 57 (D.D.C. 2000) ("'It is not

evident that a transfer ... will lead to unnecessary delay. ... Since this case is in its earliest stages, there would be no delay associated with the [transferee] district court's having to familiarize itself with this case.' ... This rationale is even stronger here, because the [transferee court] is already well acquainted with the facts and legal issues implicated in the instant complaint."); *accord State v. U.S. Army Corps of Engineers*, 304 F. Supp. 3d 56, 68-69 (D.D.C. 2018) (collecting cases).

*Second*, the process through which the challenged Lease Sale 257 ROD was reinstituted demonstrates the close relationship of the cases. The Lease Sale 257 ROD challenged here, which is substantially the same as the rescinded Lease Sale 257 ROD at issue in *Louisiana v. Biden*, was issued as a result of the Western District litigation. Defendants have been clear that they stand by the Recission of Lease Sale 257's ROD, and that they reissued Lease Sale 257's ROD only in response to the filing of a contempt motion in the Western District. When an agency action "springs" from a court decision, transferring challenges to the court of the original decision is warranted. *State v. U.S. Army Corps of Engineers*, 304 F. Supp. 3d at 68-69; *accord Wyandotte Nation v. Salazar*, 825 F.Supp.2d 261, 267 (D.D.C. 2011); *Alaska Wilderness League v. Jewell*, 99 F. Supp. 3d 112, 117 (D.D.C. 2015).

*Third*, transfer would facilitate judicial economy by expediting and consolidating the creation of the administrative record and integrating the significant factual development that has already occurred regarding Lease Sale 257 in the *Louisiana* case. *See, e.g.*, *Env't Def.*, 2007 WL 1490478, at *5 ("Judicial economy strongly favors consolidation of these two large cases so that the overlapping issues and records may be considered together."). The Western District has already conducted extensive factfinding on the basis of a preliminary administrative record and extensive exhibits presented by both the State, Defendants, and Plaintiffs (who participated as amici). And the submission of the administrative record, which includes the administrative record for Lease

Sale 257's ROD, is set to occur imminently—on October 1. Under the existing scheduling order in *Louisiana*, the government's lodging of the administrative record will institute either summary judgment proceedings or a round of challenges to the record's sufficiency. Thus, transfer here would allow all parties to participate in the finalization of one unified administrative record, rather than having two records produced regarding similar matters on parallel tracks. *Cf. Fed. Hous. Fin. Agency v. First Tennessee Bank Nat. Ass'n*, 856 F. Supp. 2d 186, 195 (D.D.C. 2012) ("at a minimum such a transfer could facilitate the coordination of pretrial discovery").

In sum, the most important factor, the presence of a related case, overwhelmingly counsels in favor of transfer.

### B.   This Case Is of Overwhelming Local Interest to the People of Louisiana.

"Courts have recognized that justice is promoted by having a 'localized controversy [ ] resolved in the *region* it impacts,'" because "'[i]n cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only.'" *Gulf Restoration Network*, 87 F. Supp. 3d at 315-16. These "'policies must protect not only the interests of the technical defendants ... but, more importantly, those whose rights and interests are in fact most vitally affected by the suit.'" *Id.* This commitment to local access "'applies equally to the judicial review of an administrative decision which will be limited to the administrative record.'" *Wei Lai Dev. LLC v. U.S. Citizenship & Immigr. Servs.*, 2021 WL 2073403, at *5 (D.D.C. May 24, 2021).

Lease Sale 257 is of enormous importance to the people of the Western District of Louisiana. Local governments rely on the Sale for substantial revenue. For example, the Calcasieu Parish in the Western District received $1,006,346.20 in GOMESA funds for coastal restoration efforts in one year alone. *See* LCPRA, "Louisiana's Share of Federal Offshore Oil & Gas Revenue

Increases 14.4 Percent for Coastal Restoration" (Apr. 20, 2019).[6] Similarly, as Louisiana's expert opined in the Western District case, cancellation of "Lease Sale 257 will imminently harm Louisiana's coastline by depriving the State of GOMESA funding for the Coastal Master Plan," including funds for the construction of "a permanent gate structure that will protect portions of six parishes from storm surges and flooding." *Louisiana*, No. 2:21-cv-778, Doc. 3-4 at 5 ¶27 (citing U.S. DOI, "Interior Disburses $353 Million in GOMESA Revenues for Gulf State Coastal Conservation and Hurricane Protection Projects" (Mar. 30, 2020), https://on.doi.gov/3cRMvOi); *see also Louisiana*, 2021 WL 2446010, at *6 ("Zeringue declares that the cancellation of Lease 257 caused an immediate short-term loss for projected funds under OCSLA. He further declares that if the funds vanish or are reduced, Louisiana will essentially be left without a major source of funding for a $50 billion coastal recovery and restoration program."). And the Western District's economy depends on ongoing oil and gas development on the OCS and on Lease Sale 257 particularly. *Id.* at *7 ("These job losses would result in reduction of Louisiana's energy export economy, and the loss of 114 jobs for each deep-water well not drilled as a result of the Pause. He additionally noted losses to state and local government revenues as a result of the Pause.").

These significant harms to Louisiana's revenue and economy demonstrate the local importance of this dispute to Louisiana's citizens. *See Intrepid Potash-New Mexico, LLC v. U.S. Dep't of Interior*, 669 F. Supp. 2d 88, 99 (D.D.C. 2009) ("The agency's decision directly affects New Mexico citizens because fifty percent of royalties received by the federal government for oil and gas drilling on the land in dispute would go to New Mexico under 30 U.S.C. § 191 and the drilling would affect the local economy."); *see also State v. U.S. Army Corps of Eng'rs*, 304 F.

---

[6] https://www.ecomagazine.com/news/policy/louisiana-s-share-of-federal-offshore-oil-gas-revenue-increases-14-4-percent-for-coastal-restoration

Supp. 3d 56, 67 (D.D.C. 2018) ("[T]he impact will be on local residents ..., local governments, local economies, local recreational opportunities, and local navigation."); *Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 922 F. Supp. 2d 51, 55-56 (D.D.C. 2013) ("'The challenged project would have substantial impacts on the local economy,' and '[c]onsidered as a whole, the magnitude of these local interests weigh heavily in favor of transfer.'"); *Shawnee Tribe*, 298 F. Supp. 2d at 26-27 (transfer appropriate because agency decision "necessarily implicates considerable local economic, political, and environmental interests").

To be sure, Louisiana acknowledges that this case is also of national interest. But the localized interest here predominates. The actions taken in the District of Columbia regarding the Lease Sale 257 ROD do not outweigh the significant and statutorily mandated input from (and consultation with) Louisiana. This substantial participation, combined with the local importance of Lease Sale 257, overcomes any national implications of this case. *See Wildearth Guardians*, 922 F. Supp. 2d at 55-56 ("The recognition of the significant local interest in this matter does not refute the national importance of the land management, energy, and environmental concerns raised by this case. It does, however, provide an additional reason to transfer this case to Wyoming.").

Finally, this Court's holding in *Oceana v. Bureau of Ocean Energy Management* is distinguishable and should not be followed here. As an initial matter, any precedential force of *Oceana* is diminished by the fact that "precedent in this circuit does not require or even encourage resolution in this forum of ESA and other environmental claims involving nationally known resources." *Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 68 (D.D.C. 2003). Instead, D.C. Circuit courts "conduct 'an individualized, case-by-case' inquiry to determine whether transfer of venue is warranted under section 1404(a)." *Id.*; *W. Watersheds Project v. Tidwell*, 306 F. Supp. 3d 350, 362-63 (D.D.C. 2017). For the reasons discussed above, the individualized circumstances of this

case, including the particular impact of this particular lease sale on the Western District and the pending ligation there, demonstrate that transfer is appropriate.

In any event, *Oceana* is distinguishable for several reasons. First, that decision was based in part on the fact that the transferee court "would not treat this case as related to the earlier, similar matter" because that matter was "no longer pending in that district." *Oceana v. Bureau of Ocean Energy Mgmt.*, 962 F. Supp. 2d 70, 79 (D.D.C. 2013).[7] Thus, the most significant factor— concurrently pending litigation—was not at issue in *Oceana*. Second, the *Oceana* court rejected the relevance of prior litigation and factual development regarding *different* lease sales. *Id.* at 78-79. By contrast, the *Louisiana* litigation has developed and extensively documented the specific impacts of Lease Sale 257. Unlike *Oceana*, the connections between Louisiana and the specific lease sale under review are firmly established. Third, the Western District of Louisiana has already emphasized Louisiana's "substantial financial interest" in OCS lease sales as "a state bordering on the Gulf of Mexico" in the context of a transfer motion. *State v. Biden*, 2021 WL 1885650, at *5 (W.D. La. May 10, 2021) (denying Federal Defendants' motion to transfer). Finally, whatever *Oceana*'s relevance on the national-importance factor, the related pending-suit factor is entitled to greater weight. *See, e.g.*, *Cephalon, Inc.*, 551 F. Supp. 2d at 29 ("Indeed, the most significant factor weighing in favor of transferring a case is the presence of closely related litigation.") (cleaned up).

## CONCLUSION

The Court should grant this motion and transfer the case to the Western District of Louisiana.

---

[7] The minutes of the status conference provide no pause on this point. Although Judge Doughty stated that the "issues are not the same," that does not preclude their consolidation and transfer. Doc. 167, *Louisiana*, No. 2:21-cv-778. Issues need only be similar—not identical—to warrant transfer.

Dated: September 27, 2021                    Respectfully submitted,

**JEFF LANDRY**
**ATTORNEY GENERAL OF LOUISIANA**

 /s/  *Elizabeth B. Murrill*

ELIZABETH B. MURRILL
  Solicitor General
JOSEPH S. ST. JOHN
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

TYLER R. GREEN
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

*Counsel for Intervenor-Defendant State of Louisiana*

## CERTIFICATE OF SERVICE

I filed this motion and its attachments with the Court via ECF, which will notify Plaintiffs'

and Defendants' counsel.

Dated: September 27, 2021                     /s/ *Elizabeth B. Murrill*