**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRIENDS OF THE EARTH, et al., | |
| *Plaintiffs,* | |
| v. | Case No. 21-cv-02317-RC |
| DEBRA A. HAALAND, et al., | |
| *Defendants*, and | |
| STATE OF LOUISIANA, | |
| *Intervenor-Defendant.* | |

**[PROPOSED]** *AMICUS CURIAE* **BRIEF OF MEMBERS OF CONGRESS
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................1

CERTIFICATION ......................................................................................................................4

INTERESTS OF *AMICI* ..........................................................................................................4

ARGUMENT ...............................................................................................................................5

I.     Congress' directives in the OSCLA do not override NEPA's fundamental mandate that an agency makes an informed decision. ..................................................................5

II.    The Bureau arbitrarily relied on outdated NEPA documents that the Bureau has decided require a comprehensive review. ..........................................................................8

III.   The Bureau failed to take a hard look at greenhouse gas emissions as required by NEPA and the APA. ....................................................................................................12

      A.  Without justification, the Bureau applied a methodology that has been flatly rejected by courts. ................................................................................................12

      B.  The Bureau's argument that it could not estimate foreign emissions is unsupported and contradicted by the agency's own admission that it is quantifying those emissions in a separate lease sale................................................16

IV.   The Bureau's decision not to prepare a supplemental EIS violates NEPA and the APA.............................................................................................................................18

      A.  The Bureau ignored information warranting a supplemental EIS ..............................19

      B.  The Bureau's attempt to place the burden on Plaintiffs to show that a supplemental EIS was required must be rejected. ................................................21

V.    The Court must vacate Lease Sale 257. ..........................................................................23

CONCLUSION............................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................................................ 23, 24

*\*Am. Bird Conservancy, Inc. v. FCC*,
  516 F.3d 1027 (D.C. Cir. 2008) ............................................................................ 8, 23

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) ................................................................................. 8

*\*Amerijet Int'l, Inc. v. Pistole*,
  753 F.3d 1343 (D.C. Cir. 2014) ............................................................................... 15

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council*,
  462 U.S. 87 (1983) .................................................................................................. 12

*Baptist Med. Ctr. v. Burwell*,
  No. 1:11-cv-0899, 2015 U.S. Dist. LEXIS 194085 (D.D.C. Aug. 24, 2015) .......... 10

*BFI Waste Sys. of N. Am., Inc. v. FAA*,
  293 F.3d 527 (D.C. Cir. 2002) ................................................................................. 21

*Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*,
  716 F.3d 183 (D.C. Cir. 2013) ................................................................................. 21

*Calvert Cliffs' Coord. Comm. v. United States A.E. Com'n*,
  449 F.2d 1109 (D.C. Cir. 1971) ................................................................................. 5

*\*Camp v. Pitts*,
  411 U.S. 138 (1973) ................................................................................................ 20

*Center for Biological Diversity v. Bernhardt*,
  982 F.3d 723 (9th Cir. 2020) ................................................................................... 13

*City of Davis v. Coleman*,
  521 F.2d 661 (9th Cir. 1975) ................................................................................... 22

*City of Los Angeles v. NHTSA*,
  912 F.2d 478 (D.C. Cir. 1990) ................................................................................... 1

*City of Phoenix v. Huerta*,
  869 F.3d 963 (D.C. Cir.2017) .................................................................................. 23

*Comm. of 100 on the Fed. City v. Foxx*,
  87 F. Supp. 3d 191 (D.D.C. 2015) ........................................................................... 13

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008) ................................................................................... 8

*\*Friends of the Capital Crescent Trail v. Fed. Transit Admin.*,
  200 F. Supp. 3d 248 (D.D.C. 2016) ......................................................................... 19

*Friends of the Clearwater v. Dombeck,*
  222 F.3d 552 (9th Cir. 2000) ........................................................................ 22

*Genuine Parts Co. v. EPA,*
  890 F.3d 304 (D.C. Cir. 2018) ...................................................................... 17

*Humane Soc'y of U.S. v. Locke,*
  626 F.3d 1040 (9th Cir. 2010) ...................................................................... 20

*Louisiana v. Biden¸*
  No. 2:21-CV-00778, 2021 U.S. Dist. LEXIS 112316 (W.D. La. June 15, 2021) ........... 2, 9, 10

*Marsh v. Oregon Nat. Res. Council,*
  490 U.S. 360 (1989) ..................................................................................... 19

*McDonnell Douglas Corp. v. United States Dep't of the Air Force,*
  375 F.3d 1182 (D.C. Cir. 2004) .................................................................... 21

*NAACP v. Trump,*
  298 F. Supp. 3d 209 (D.D.C. 2018) .............................................................. 16

*Nat'l Audubon Soc'y v. Dep't of the Navy,*
  422 F.3d 174 (4th Cir. 2005) ........................................................................ 20

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
  235 F. Supp. 2d 1143 (W.D. Wash. 2002) ................................................... 15

*\*Natural Resources Defense Council v. Lujan,*
  768 F. Supp. 870 (D.D.C. 1991) .................................................................... 6

*NRDC v. Hodel,*
  865 F.2d 288 (D.C. Cir. 1988) ..................................................................... 12

*Oceana v. Bureau of Ocean Energy Mgmt.,*
  37 F. Supp. 3d 147 (D.D.C. 2014) ............................................................... 15

*Oglala Sioux Tribe v. United States NRC,*
  896 F.3d 520 (D.C. Cir. 2018) ....................................................................... 8

*Oregon Natural Desert Ass'n v. BLM,*
  531 F.3d 1114 (9th Cir. 2008) ...................................................................... 21

*\*Physicians for Social Responsibility v. Wheeler,*
  956 F.3d 634 (D.C. Cir. 2020) ................................................................. 10, 11

*Powder River Basin Res. Council v. United States BLM,*
  37 F. Supp. 3d 59 (D.D.C. 2014) ................................................................. 15

*\*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ..................................................................................... 17

*San Juan Citizens Alliance v. United States BLM,*
  326 F. Supp. 3d. 1227 (D.N.M. 2018) .......................................................... 16

*\*Secretary of the Interior v. California,*
  464 U.S. 312 (1984) ....................................................................................... 6

*Sierra Club v. United States Army Corps of Eng'rs*,
   990 F. Supp. 2d 9 (D.D.C. 2013) ................................................................. 5, 19

*Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*,
   Nos. 3:20-cv-00290, 3:20-cv-00308-SLG, 2021 U.S. Dist. LEXIS 18945 (D. Alaska, Feb. 1,
   2021) ................................................................................................... 13

*Te-Moak Tribe of W. Shosone of Nev. v. U.S. DOI*,
   608 F.3d 592 (9th Cir. 2010) ................................................................ 22

*Vill. of Barrington v. Surface Transp. Bd.*,
   636 F.3d 650 (D.C. Cir. 2011) ................................................................. 6

*W. Deptford Energy, LLC v. FERC*,
   766 F.3d 10 (D.C. Cir. 2014) ................................................................ 18

*W. Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011) ................................................................ 17

*WildEarth Guardians v. Bernhardt*,
   502 F. Supp. 3d 237 (D.D.C. 2020) ...................................................... 16

*WildEarth Guardians v. Bureau of Land Management*,
   870 F.3d 1222 (10th Cir. 2017) ....................................................... 13, 14

*WildEarth Guardians v. Jewell*,
   738 F.3d 298 (D.C. Cir. 2013) ............................................................. 22

*WildEarth Guardians v. Zinke*,
   368 F. Supp. 3d 41 (D.D.C. 2019) .......................................... 16, 17, 22, 23

**Statutes**

5 U.S.C. §§ 701–706 ............................................................................... 1

42 U.S.C. § 4332 .................................................................................... 5

42 U.S.C. §§ 4321 *et seq* ......................................................................... 1

43 U.S.C. § 1332(3) ................................................................................ 6

43 U.S.C. § 1344(a)(1) ............................................................................ 6

43 U.S.C. § 1344(d)(2) ............................................................................ 4

**Rules**

40 C.F.R. § 1500.1(b) ............................................................................ 12

40 C.F.R. § 1502.14(a) ........................................................................... 15

40 C.F.R. § 1502.14(d) ........................................................................... 15

40 C.F.R. § 1502.24 .............................................................................. 12

**Federal Register**

86 Fed. Reg. 7,619 (Jan. 27, 2021) ............................................................ 2

86 Fed. Reg. 10,132 (Feb. 18, 2021) ..................................................... 9, 11

*Amici Curiae* file this brief in support of plaintiff environmental organizations' request to find that the Bureau of Ocean Energy Management's (the Bureau) review and approval of Lease Sale 257 violates the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*., and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.  On November 17, 2021, *Amici* filed a motion for leave to file this brief, ECF No. 49, and no party filed an opposition to that motion.

For the reasons detailed in plaintiffs' motion for summary judgment and reply in support thereof, as well as those described in this amicus brief, the Court should vacate the Bureau's Lease Sale 257 decision and require the Bureau conduct a proper, complete environmental review of Lease Sale 257 in compliance with NEPA, the APA, and applicable federal law.

## INTRODUCTION

Now, more than ever, the exigency of climate change demands strict compliance with NEPA and the standards for reasoned decision-making required by the APA.  Indeed, NEPA "was designed explicitly to take account of impending as well as present crises in this country and in the world as a whole."  *City of Los Angeles v. NHTSA*, 912 F.2d 478, 491 (D.C. Cir. 1990).  There is no greater environmental crisis than climate change, and no greater contributor to climate change than the extraction and consumption of fossil fuels.

Lease Sale 257 is the largest lease sale in history.  It made available for oil and gas extraction some 80 million acres of the Gulf of Mexico with fossil fuel reserves, which could include an estimated extraction and production of up to 1.18 billion barrels of oil and 4.42 trillion cubic feet of natural gas.  *See* Record of Decision (ROD) 3 (Aug. 31, 2021), ECF No. 14-2.  The potential of such a large sale to have significant environmental impacts on climate change, as well as impacts on marine life and ecosystems, seems self-evident.  As members of Congress, and concerned citizens, *Amici* are deeply concerned about the Bureau's failure to adequately analyze the environmental impacts of Lease Sale 257.  *Amici* are particularly shocked that the

Bureau has now admitted that it has the ability to perform the greenhouse gas (GHG) emissions analysis it previously said it could not perform *and* that the Bureau is pushing forward with Lease Sale 257 even as it has sought to pause the entire leasing program in order to implement major reforms to the leasing program to address environmental issues including climate change and GHG emissions.  As members of Congress with oversight responsibility, *Amici* are deeply troubled by the Bureau's determination to proceed with Lease Sale 257 despite its own findings that the largest lease sale in history has not had an adequate environmental reviewed.

The Bureau's decision to hold Lease Sale 257—while simultaneously seeking to enforce a wholesale stay of the leasing program based on concerns over the environmental review of lease sales—is arbitrary and strikes at the heart of NEPA's fundamental requirement that a federal agency be fully informed of the environmental consequences of its decisions.  Though the district court in *Louisiana v. Biden*¸ No. 2:21-CV-00778, 2021 U.S. Dist. LEXIS 112316, at *63–*65 (W.D. La. June 15, 2021) enjoined the Department of the Interior[1] from implementing the pause of new leases pursuant to Section 208 of Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7,619 (Jan. 27, 2021) (EO 14008), that decision in no way excused the Bureau from satisfying all the requirements of NEPA and administrative law governing federal agency decisions.  Yet in proceeding with Lease Sale 257, the Bureau ignored well-established requirements of NEPA and the APA by relying on environmental reviews that courts and the Bureau itself have found to be inadequate, flawed, and outdated.

*First*, the Bureau approved Lease Sale 257 based on past environmental reviews that have been found so alarmingly flawed that the Bureau has sought to pause all other new lease sales.

---

[1] For the purpose of this brief, the term "Bureau" shall include its parent agency the Department of the Interior.

Just weeks *before* the Bureau approved Lease Sale 257, the Bureau concluded that, among other things, "the current [leasing] programs fail to adequately incorporate consideration of climate impacts into leasing decisions or reflect the social costs of greenhouse gas emissions . . . ."[2]  The Bureau failed to explain why Lease Sale 257 should nonetheless proceed.

*Second*, the Bureau relied on a GHG emission analysis that has been unequivocally invalidated by two federal courts and, as revealed by the Bureau in this litigation, does not reflect the Bureau's admitted ability to quantify foreign GHG emissions.  *See* Fed. Defs. Mot. Summ. J. Mem. (Fed. Br.) 17 n.6., ECF No. 45.  The Bureau's reliance on an analysis that had been deemed unlawful, that *the Bureau knew was flawed*, and that the Bureau can now revise to include foreign GHG emissions, is the very definition of arbitrary decision-making.

*Third*, the Bureau failed to address the substantial new information about the environmental impacts of Lease Sale 257 that requires the preparation of a supplemental environmental impact statement (EIS).

The Bureau's indifference to information showing that it had significantly understated the environmental impacts of Lease Sale 257 at this critical time for the world's fight against climate change violated NEPA and the APA.  NEPA does not allow the Bureau to bury its head in the sand and ignore the substantial information casting doubt on the agency's environmental review of a lease sale decision.  The Bureau's decision to hold Lease Sale 257 without a sufficient environmental analysis violates NEPA, lacks any rational basis, and defies Congress' and the administration's efforts to address the environmental impact of oil and gas extraction.

---

[2] Department of the Interior, *Interior Program Issues Statement on Oil and Gas Leasing Program* (Aug. 16, 2021) (Statement on Leasing Program), *available at* https://www.doi.gov/pressreleases/interior-department-issues-statement-oil-and-gas-leasing-program (last visited on November 29, 2021).

## CERTIFICATION

In accordance with Local Rule 7(o), the members of Congress certify that (1) this brief was authored entirely by its counsel and not by counsel for any party in whole or in part; (2) no party or a party's counsel contributed money to fund preparing or submitting this brief; and (3) apart from members of Congress and its counsel, no other person contributed money to fund preparing or submitting this brief.

## INTERESTS OF *AMICI*

*Amici's* brief is necessary to provide the perspectives and represent the interests of members of Congress that are not present in the parties' briefs.  *Amici* are Representatives Alan Lowenthal, Raúl Grijalva, and Jared Huffman who are members of Congress and the House Committee on Natural Resources that, among other things, oversees and monitors the development of oil and gas on onshore and offshore federal lands.  *Amici* are devoted to promoting policies and laws addressing climate change—the most important environmental issue of our time—while supporting and promoting smart, sustainable use and development of the country's natural resources.  Congress' interests in lease sales decisions and the adequacy of environmental review is expressly recognized in the Outer Continental Shelf Lands Act (OSCLA), which requires that the Secretary of the Interior submit any proposed leasing program to Congress at least 60 days prior to approving the program. 43 U.S.C. § 1344(d)(2).

The members of Congress are actively working on federal policies and laws intended to promote the reduction of GHG emissions and promote sustainable energy development.[3]  As part

---

[3] *See Solving the Climate Crisis*, *The Congressional Action Plan for a Clean Energy Economy and a Healthy, Resilient, and Just America*, House Select Committee on the Climate Crisis, Majority Report (June 2020), at 479–487 (discussing actions by members of Congress to address climate change impacts of leasing on federal lands), *available at* https://climatecrisis.house.gov/sites/climatecrisis.house.gov/files/Climate%20Crisis%20Action%20Plan.pdf (last visited November 29, 2021).

of those efforts, the members of Congress work to gather, disseminate, and promote current, accurate information and data on climate science and the environmental, societal, and economic impacts of GHG emissions, which is critical to understanding and solving the crisis of climate change in the United States and globally.  The members of Congress rely on the enforcement of environmental laws currently in place—including NEPA—to ensure that climate change is adequately addressed in federal decisions, which enables Congress to focus its effort on what additional laws and measures are needed to advance the nation's climate change policy.

*Amici* file this brief to uphold the objectives of NEPA and ensure that the current work of Congress and the Biden Administration to direct the United States on a path towards limiting the effects of climate change are not thwarted by the Bureau's unlawful Lease Sale 257 decision.

## ARGUMENT

### I.   Congress' directives in the OSCLA do not override NEPA's fundamental mandate that an agency makes an informed decision.

The Bureau and intervenors' defense of the Bureau's Lease Sale 257 decision relies on an interpretation of OSCLA inconsistent with Congressional intent in enacting OSCLA and NEPA.

Congress expressly required that NEPA apply broadly and that agencies must comply with NEPA "to the fullest extent possible."  42 U.S.C. § 4332.  "As a general matter, Congress enacted NEPA as a call to the federal government to consider the environmental consequences of its actions . . . , and the regulations implementing NEPA describe it as the country's 'basic national charter' for environmental protection."  *Sierra Club v. United States Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 18 (D.D.C. 2013) (citations omitted).  The "sweep of NEPA is extraordinarily broad, compelling consideration of any and all types of environmental impact of federal action."  *Calvert Cliffs' Coord. Comm. v. United States A.E. Com'n*, 449 F.2d 1109, 1122 (D.C. Cir. 1971).  Given the broad sweep of NEPA, "which requires government agencies to

comply with its strictures 'to the fullest extent possible,' courts have been especially reluctant to hold that another statute overrules it." *Natural Resources Defense Council v. Lujan*, 768 F. Supp. 870, 880 (D.D.C. 1991) (citation omitted).

Members of Congress are alarmed by the Bureau's and intervenor's position that OSCLA somehow diminishes NEPA's fundamental "hard look" standard. Proposed-Intervenor American Petroleum Institute (API) goes so far as to argue that "[b]ecause under OCSLA Interior *must* move forward with additional lease sales regardless of whether it holds this particular lease sale, the cumulative impact of any specific lease sale – including Lease Sale 257 – is not material." [Proposed] Intervenor-Def. API Cross-Mem. Summ. J. Mem. (API Br.) 36, ECF No. 43-1. The argument has no merit.

Congress directed the Bureau to make resources "available for expeditious and orderly development," but "subject to environmental safeguards," 43 U.S.C. § 1332(3), and in due consideration of "environmental values," *id*. § 1344(a)(1). Before the Bureau makes a lease sale decision under OSCLA, the "[r]equirements of the National Environmental Policy Act and the Endangered Species Act must be met first." *Secretary of the Interior v. California*, 464 U.S. 312, 338 (1984). Nothing in OSCLA overrides the fundamental requirements of NEPA that apply to all federal agency decisions. Rather, NEPA actually bolsters OSCLA's environmental safeguards. As the D.C. Circuit states, "where Congress delegates a discretionary decision to an agency, NEPA may, within the boundaries set by Congress, 'authorize[] the agency to make decisions based on environmental factors not expressly identified in the agency's underlying statute.'" *Vill. of Barrington v. Surface Transp. Bd*., 636 F.3d 650, 665-666 (D.C. Cir. 2011). NEPA adds to the OCSLA's express environmental requirements, and nothing in the OCSLA

can be read to override the Bureau's obligation to comply with NEPA "to the fullest extent possible."

OSCLA's multi-stage process does not transform the Bureau's burden at the leasing stage into a "*semi*-hard look" standard.  Recognizing the gaps in the Bureau's administrative record, the Bureau and the intervenors now contend that the environmental review the Bureau did was "good enough" at least for now at this OSCLA stage.  *See* Fed. Br. 33–34 (citing to "additional NEPA analysis" as another justification for not conducting a supplemental EIS); *see also* Intervenor-Def. Louisiana Cross-Mot. Summ. J. Mem. (La. Br.) 14, ECF No. 42-1 (asserting that the Bureau "was not required to consider downstream emissions at the lease sale stage and certainly not to the degree of detail Plaintiffs suggest"); API Br. 30 (the Bureau's "'brief discussion'" satisfies NEPA).  Those arguments find no support in OSCLA or its regulations and fall flat against the clear objectives of NEPA.

The many pages the Bureau and intervenors devote to discussing OSCLA's leasing stages are a distraction from the central issue in this litigation:  did the Bureau's environmental review of Lease Sale 257 *at this stage* satisfy NEPA and the APA?  The lack of any analysis regarding new information on the environmental impacts of the lease sale in administrative record proves that the answer to that question is "no."  Further, the assertion that the possibility of future review cures any flaw in the Bureau's current environmental review of Lease Sale 257 lacks any legal basis.  NEPA requires a hard look at environmental consequences of an agency's decision *before* the decision is made.  The Bureau's reliance on potential future environmental review rings particularly false here because it is likely that little to no additional environmental review will occur following the lease sale.  *See* Reply in Sup. of Mot. Summ. J. (Plaintiffs Reply Br.) 26–27, ECF No. 51.

NEPA "'expresses a Congressional determination that procrastination on environmental concerns is no longer acceptable.'" *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (citation omitted).  Although NEPA establishes various levels of environmental review, it does not allow agencies to defend flawed decisions based on the promise of some unknown environmental review at some point in the future.  *See Oglala Sioux Tribe v. United States NRC*, 896 F.3d 520, 534 (D.C. Cir. 2018) ("If even 'significant' deficiencies in NEPA reviews are forgiven because they are merely procedural, there will be nothing left to the protections that Congress intended the Act to provide.").  The "'basic thrust of the agency's responsibilities under NEPA is to predict the environmental effects of a proposed action before the action is taken and those effects fully known.'" *Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1033 (D.C. Cir. 2008) (citation omitted).

## II.    The Bureau arbitrarily relied on outdated NEPA documents that the Bureau has decided require a comprehensive review.

The Bureau's decision to hold the largest lease sale in history is wholly out of step with the current policies of the Congress and the federal government, *including the Bureau's own finding* that the current leasing program does not adequately account for environmental harms. At a moment in history when further GHG emissions risk vast environmental damage, the Bureau's approval of Lease Sale 257 is reckless, and arbitrary by any legal standard.

Under the APA, an agency must "at least display awareness that it is changing position and show that there are good reasons for the new policy." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017) (citation omitted).  An agency's "[g]loss[ing] over or swerv[ing] from prior precedents without discussion" may lead the agency to "cross the line from the tolerably terse to the intolerably mute." *Id.* (internal citations and quotations omitted). In violation of the APA, the Bureau failed to explain the reversal in its position in relying on

previous NEPA documents that had just recently been deemed inadequate and warranting a pause of all new lease sales, including Lease Sale 257.

On February 18, 2021, the Bureau issued a Notice to Rescind the Prior Lease 257 Record of Decision declaring that it "is rescinded immediately." 86 Fed. Reg. 10,132 (Feb. 18, 2021). The Bureau stated that "*[a]fter* completion of the review specified in [EO 14,008], [the Bureau] *may* reevaluate GOM Lease Sale 257 and publish an appropriate ROD in the Federal Register." *Id.* (emphasis added).

The Bureau identified the flaws in the existing leasing program.  On August 16, 2021, the Bureau stated that the "offshore oil and gas leasing programs are responsible for significant [GHG] emissions and growing climate and community impacts.  Yet the current programs fail to adequately incorporate consideration of climate impacts into leasing decisions or reflect the social costs of GHG emissions including, for example, in royalty rates."[4]  According to the Bureau, the "federal oil and gas programs inadequately account for environmental harms to lands, waters, and other resources [and] foster speculation by oil and gas companies . . . ."[5]  The Bureau stated that it had "appealed the preliminary injunction entered by the district court in *Louisiana v. Biden*, which enjoined the Interior from implementing the pause in new federal oil and gas leasing . . . ."[6]

The Bureau is currently seeking to enforce the pause of the leasing program—which would include Lease Sale 257—before the Fifth Circuit, in its appeal of the district court's injunction.  *See Louisiana v. Biden,* Case No. 21-30505 (5th Cir. 2021).  The Bureau argues before the Fifth Circuit that its "rescission of the Lease Sale 257 Record of Decision" was not

---

[4] Statement on Leasing Program, *supra* n.2.
[5] *Id.*
[6] *Id.*

arbitrary and capricious because it did so "in order to allow for a comprehensive review of the offshore leasing program." Appellant's Opening Br. 47, filed November 16, 2021, ECF No. 00516096201, *Louisiana v. Biden,* Case No. 21-30505 (5th Cir. 2021) (Appellant's Br.). Stated another way, it is the Bureau's position, at least in another proceeding, that the Bureau is justified in pausing the leasing program because the earlier environmental reviews of the leasing program—*i.e.* the Programmatic EIS, Regional EIS, and Lease Sale EIS—do not adequately evaluate the environmental harms of oil and gas leasing, such as GHG emissions.

Yet in this case, and in its approval of Lease Sale 257, the Bureau maintains that those very same environmental documents *are* adequate for its NEPA review of Lease Sale 257 that is challenged in this action. *See* Determination of NEPA Adequacy for Gulf of Mexico Regionwide Lease Sale 257, at 1–2 (Aug. 27, 2021), AR_0029803–04. Those two positions cannot be reconciled: the environmental review cannot simultaneously be adequate and in need of revision. Of particular importance here, the Bureau never even attempts to reconcile those two contradictory positions. That kind of unexplained inconsistency is the posterchild of arbitrariness. *See Baptist Med. Ctr. v. Burwell,* No. 1:11-cv-0899, 2015 U.S. Dist. LEXIS 194085, at *20 (D.D.C. Aug. 24, 2015) (finding that a violation of the APA where "agency did not mention below, much less address, its contradictory position" regarding the interpretation of a statute in earlier litigation).

Though an agency can take differing positions as administrations and policies change, it is "axiomatic that the APA requires an agency to explain its basis for a decision" and "[t]his foundational precept of administrative law is especially important where, as here, an agency changes course." *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020). Under the APA, "reasoned decision-making requires that when departing from

precedents or practices, an agency must offer a reason to distinguish them or explain its apparent rejection of their approach . . . .  [H]owever the agency justifies its new position, what it may not do is gloss over or swerve from prior precedents without discussion."  *Id.* at 644–45 (internal citations and quotations omitted).

A reasoned explanation for the Bureau's reliance on the previous environmental documents is particularly warranted here.  The Bureau's position changed from recognizing the need to pause the *entire leasing program* so it could conduct "comprehensive review" of lease sales in light of the acknowledged climate change crises, *see* 86 Fed. Reg. 10,132, to plowing ahead with Lease Sale 257, opening up 80 million acres of the Gulf of Mexico to leasing based on the environmental documentation the Bureau has deemed in need of a comprehensive review. The Bureau's approval of Lease Sale 257 based on the earlier NEPA documents cannot be reconciled with the Interior's conclusions that the Bureau's leasing program, including Lease Sale 257, "inadequately account for environmental harms."[7]

Even if the Bureau's conflicting positions could be explained, the APA demands that the Bureau provide that explanation in its administrative record.  The Bureau makes no mention in the record regarding the Bureau's moratorium on lease sales or the fact that the Bureau sought a pause of the leasing program because, among other things, the deficiencies in the environmental review of lease sales.  Nor does the record include an explanation from the Bureau on how it can reasonably proceed with Lease Sale 257 given the contradiction between the Bureau's findings regarding the leasing program and those in its Determinations of NEPA Adequacy.  *See Wheeler*,

---

[7] *See id*; *see also* Department of Interior, Report on the Federal Oil and Gas Leasing Program, Prepared in Response to Executive Order 14008 (November 2021), *available at* https://www.doi.gov/sites/doi.gov/files/report-on-the-federal-oil-and-gas-leasing-program-doi-eo-14008.pdf (last visited November 30, 2021) (Leasing Program Report).

956 F.3d at 647 (internal citations) ("An agency's wholesale failure to address past practice and formal policies . . . let alone to explain its reversal of course is arbitrary and capricious.").

III.    **The Bureau failed to take a hard look at greenhouse gas emissions as required by NEPA and the APA.**

As members of Congress with extensive experience in oversight of federal agencies, we are deeply concerned with the Bureau's bungling of its analysis of GHG emissions in approving Lease Sale 257.  The fact that the Bureau was willing to rely on an emissions model that two courts had deemed improper—indeed inconsistent with basic principles of supply and demand— is alone sufficient to overturn the Bureau's decision.  Now, however, the Bureau has admitted that it can now perform the modeling necessary to quantify foreign GHG emissions and attempt to correct the flaws in its model.  For the Bureau to nonetheless proceed based on a model it knows is wrong and that it knows how to fix is a flagrant violation of  NEPA's "twin aims" that "place[] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action" and to "inform the public that [the agency] has indeed considered environmental concerns in its decisionmaking process."  *Baltimore Gas & Electric Co. v. Natural Resources Defense Council*, 462 U.S. 87, 97 (1983) (citation omitted).  The Bureau's knowing reliance on a flawed emissions model at a time when the nation, and the world, need federal agencies to fully consider the effect of their decisions on climate change an uninformed decision in violation of NEPA.

A.    **Without justification, the Bureau applied a methodology that has been flatly rejected by courts.**

Under NEPA's hard look requirement, an agency's analysis of environmental impacts must be "fully informed," "well-considered," and based on "[a]ccurate scientific analysis." *NRDC v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988); 40 C.F.R. §§ 1500.1(b), 1502.24.  The Bureau failed to adequately consider downstream GHG emissions by relying on an unsupported

theory that Lease Sale 257 would actually produce less emissions than the no action alternative. In doing, the Bureau violated NEPA's requirement that an agency "consider potential environmental effects objectively and in good faith." *Comm. of 100 on the Fed. City v. Foxx*, 87 F. Supp. 3d 191, 205 (D.D.C. 2015).

*First*, the Bureau's claim that *not* drilling for oil in the 80 million acres of the Gulf of Mexico would result in more GHG emissions is a non-sensical claim that has been rejected by the Ninth Circuit in *Center for Biological Diversity v. Bernhardt (Liberty)*, 982 F.3d 723, 736–40 (9th Cir. 2020) and by the district court for the District of Alaska in *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.* (*Willow*), Nos. 3:20-cv-00290, 3:20-cv-00308-SLG, 2021 U.S. Dist. LEXIS 18945, *10–12 (D. Alaska, Feb. 1, 2021). As described by the Ninth Circuit, the Bureau's methodology defies common sense and is "counterintuitive." *See Liberty*, 982 F.3d at 739 ("An agency acts arbitrarily and capriciously when it reaches a decision that is 'so implausible that it could not be ascribed to a difference in view or product of agency expertise.'"). In addition to *Liberty* and *Willow*, courts have routinely rejected attempts by agencies offering similar economic assumptions that minimize environmental impacts of proposed mining projects. For instance, in *WildEarth Guardians v. Bureau of Land Management*, 870 F.3d 1222, 1234–38 (10th Cir. 2017), the Tenth Circuit rejected the Bureau of Land Management's (BLM) assertion that it could ignore climate impacts of coal mining in Wyoming's Powder River Basin because under the no action alternative, demand for coal would be met by other coal sources. In taking that position, BLM "[f]ail[ed] to disclose the data critical to the key distinction between two alternatives [which] led to what appears, on the record, to be an uninformed agency decision and did not adequately disclose the BLM's rationale to the public." *Id*. at 1237. The Court found "that it was an abuse of discretion to rely on an economic

assumption, which contradicted basic economic principles, as the basis for distinguishing between the no action alternative and the preferred alternative." *Id*. at 1237–38.

Accepting the Bureau's reasoning would allow agencies to make the argument that allowing more lease sales, more mining, and more mineral extraction would actually reduce global GHG emissions (or other impacts).  Such a proposition defies common sense, in addition to defying a fundamental economic principle that Lease Sale 257 would increase oil supplies resulting in lower prices, which will increase demand for, and consumption of, oil and gas, leading to increased GHG emissions.[8]

*Second*, even if the Bureau could somehow defend its methodology in light of *Liberty* and *Willow*, which it cannot, the Bureau did not provide that reasoning in the administrative record, a particularly egregious omission given the advance notice by federal courts that its methodology was flawed and invalid.  Absent from the Bureau's Determination of NEPA Adequacy Addendum (the Addendum), AR_0029962, as well as the administrative record, is evidence or reasoning that supports the Bureau's selection of certain assumptions over others—especially the Bureau's conclusion that, without Lease Sale 257, GHG emissions "outside of the U.S. would be lower than if new development were to occur as a result of the Proposed Action." AR0029966; *see WildEarth Guardians v. BLM*, 870 F.3d 1222, 1235 (10th Cir. 2017) (an assumption lacking record support was "enough for [the Tenth Circuit] to conclude that the

---

[8] Other analyses of Lease Sale 257 show results dramatically different than the Bureau's emission calculations.  For instance, an analysis by the Center for American Progress determined that Lease Sale 257 "has the potential to emit 723 million metric tons of $CO2^*$ into the atmosphere over its lifetime, equivalent to operating more than 70 percent of the United States' coal-fired power plants for a year."  Center for American Progress, *How Oil Lobbyists Use a Rigged System to Hamstring Biden's Climate Agenda* (Sept. 30, 2021), *available at* https://www.americanprogress.org/article/oil-lobbyists-use-rigged-system-hamstring-bidens-climate-agenda/ (last visited Dec. 3, 2021).

analysis which rests on this assumption is arbitrary and capricious").  Under the APA,

"conclusory statements will not do; '[the Bureau's] statement must be one of *reasoning*.'"

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation omitted).

  *Third*, the Bureau's, as well as the intervenors', attempt to minimize the error in

excluding foreign emissions from the no action alternative is unavailing.  *See* Fed. Br. 11–14.

Notably, nowhere in the Addendum (or administrative record) does the Bureau conclude that the

flaws identified by the Ninth Circuit in *Liberty* are minor or inconsequential, and therefore, had

no impact on the agency's NEPA review, nor could it.  The Bureau's flawed treatment of foreign

GHG emissions is the distinguishing factor between the proposed action, other alternatives, and,

importantly, the no action alternative, which "serves as a benchmark" for comparing the other

alternatives.  *Powder River Basin Res. Council v. United States BLM*, 37 F. Supp. 3d 59, 70

(D.D.C. 2014).

  NEPA "demands that the agency '[r]igorously explore and objectively evaluate all

reasonable alternatives,' including 'the alternative of no action.'  *Oceana v. Bureau of Ocean*

*Energy Mgmt*., 37 F. Supp. 3d 147, 171 (D.D.C. 2014) (quoting 40 C.F.R. §§ 1502.14(a), (d)).

The Bureau's error resulted in a significant understatement of GHG emissions, which prevented

an objective and meaningful comparison among alternatives under NEPA.  *See Nat'l Wildlife*

*Fed'n v. Nat'l Marine Fisheries Serv.*, 235 F. Supp. 2d 1143, 1157 (W.D. Wash. 2002) ("An EIS

that relies upon misleading economic information may violate NEPA if the errors subvert

NEPA's purpose of providing decisionmakers and the public an accurate assessment upon which

to evaluate the proposed project.").  Legal counsel's arguments in briefing cannot change that.

  *Fourth*, Louisiana's and API's contention that the Bureau "was not required to consider

the effects of Lease Sale 257 on carbon emissions" to comply with NEPA is another post hoc

rationalization.  *See* La. Br. 13; *see also* API Br. 36 (under OSCLA, the cumulative impact of

Lease Sale 257 "is not material").  The plain fact is that the Bureau *did* attempt to evaluate GHG

emissions as it is required to do, but it failed to accurately reflect the impacts of Lease Sale 257.

*See NAACP v. Trump,* 298 F. Supp. 3d 209, 237 (D.D.C. 2018) (citation omitted) ("[B]ecause 'a

reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by

the agency,' post hoc explanations that the agency did not articulate when it acted are

insufficient.").

Moreover, in recent years, courts across the country have held that consideration of

downstream GHG emissions is a fundamental component of environmental review of lease sales

under NEPA.  *See WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 83 (D.D.C. 2019) (finding

that BLM was required to assess at the leasing stage the reasonably foreseeable impacts of

drilling, including GHG emissions from the downstream use of oil and gas produced on the

leased parcels); *WildEarth Guardians v. Bernhardt,* 502 F. Supp. 3d 237, 248 (D.D.C. 2020)

(finding that BLM "did not analyze the cumulative impact that the Wyoming Lease Sales would

have when added to the lease sales in neighboring states"); *San Juan Citizens Alliance v. United*

*States BLM*, 326 F. Supp. 3d. 1227, 1243–44 (D.N.M. 2018) ("[S]everal persuasive cases . . .

have determined that combustion emissions are an indirect effect of an agency's decision to

extract those natural resources [and] it is erroneous to fail to consider, at the earliest stage

feasible, the environmental consequences of the downstream combustion of the coal, oil, and gas

resources potentially open to development" (citations omitted)).

**B.**    **The Bureau's argument that it could not estimate foreign emissions is**
         **unsupported and contradicted by the agency's own admission that it is**
         **quantifying those emissions in a separate lease sale.**

As this Court has stated, "[a]ccurate scientific analysis' is essential to implementing

NEPA.  NEPA requires an agency to ensure 'scientific integrity' in its environmental

assessments." *WildEarth Guardians*, 368 F. Supp. 3d at 79 n.31 (quoting 40 C.F.R. §§ 1500.1(b), 1502.24).  Under the APA, "an agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (citations omitted).

As detailed by plaintiffs, the Bureau failed to address evidence showing that foreign emissions can be quantified, and thus, contradicted the Bureau's position.  *See* Plaintiffs Mot. Summ. J. Mem. 11–12 (Plaintiffs Br.), ECF No. 34-1; Reply Br. 10–18.  The Bureau's revelation in its brief that it is "undertaking a quantitative analysis" of foreign GHG emissions for Lease Sale 258, Fed. Br. 17 n.6, proves that it *can* perform that analysis but failed to meaningfully account for foreign emissions in its approval of Lease Sale 257, in violation of NEPA.

The Bureau's NEPA review "must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made . . . ." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011).  An agency's compliance with NEPA "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).  The Bureau did not provide the public with all relevant information regarding its analysis of GHG emissions.

The Bureau's insistence in the Addendum that "it is simply not possible at this time to calculate quantitative estimates with necessary credibility or scientific rigor," AR_0029965— when it was in fact doing just that in its analysis of another lease sale—violates NEPA's fundamental principles of transparency, objectivity, and informed decisionmaking.  Moreover, the Bureau's two conflicting approaches to foreign GHG emissions for Lease Sale 257 and Lease

Sale 258 is the height of arbitrariness.  *See W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) ("It is textbook administrative law that an agency must provide a reasoned explanation for . . . treating similar situations differently.").

The Bureau's vague statement that the new quantitative analysis for Lease Sale 258 "was not reasonably available during the timeline for Lease Sale 257 decision," Fed. Br. 17, n.6, does not comport with the Bureau's earlier explanation that quantification for Lease Sale 257 could not be completed with the "necessary credibility or scientific rigor," AR_0029965.  The Bureau relied on the purported impossibility of performing the analysis, and it cannot now shift ground and argue that it did not have time to perform the analysis.  Further, there is no evidence in the record to support the notion that there was any deadline, much less one that could not be met.

The Bureau's tepid explanation simply highlights the impropriety of the Bureau's environmental review of Lease Sale 257, which was formally concluded in August 2021, just weeks before the Bureau published the draft EIS for Lease Sale 258.  *See* Fed. Br. 17, n.6.  The questions regarding the Bureau's inherently contradictory positions prevent the Court from finding a rational basis for its treatment of foreign GHG emissions.

Fundamentally, the Bureau's disclosure that it *can quantify foreign GHG emissions* disposes of any argument that the Bureau's conclusions about Lease Sale 257 warrant deference from this Court.  *See* API Br. 20–23 (arguing that the Bureau's analysis of greenhouse gas emissions is entitled to an "extreme degree of deference").  Now that the Bureau has admitted that it can quantify foreign GHG emissions, its prior position that it cannot is entitled to no credibility, much less deference, under any standard.

## IV.    The Bureau's decision not to prepare a supplemental EIS violates NEPA and the APA.

The crisis of climate change demands that Congress, federal agencies, and governments consider the continual development of research, models, and information regarding the

environmental impact of human activities, including mineral and fossil fuel extraction, in making decisions.  Congress intended that NEPA "insure[] the integrity of the agency process by forcing [an agency] to face those stubborn, difficult-to-answer objections without ignoring them or sweeping them under the rug."  *Sierra Club v. United States Army Corps of Eng'rs*, 772 F.2d 1043, 1049 (2d Cir. 1985).  The Bureau's NEPA review of lease sales must be a backstop to making decisions that exacerbate climate change.

In "'the context of reviewing a decision not to supplement an EIS,' as here, courts must 'carefully review[] the record and satisfy[] themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information.'"  *Friends of the Capital Crescent Trail v. Fed. Transit Admin*., 200 F. Supp. 3d 248, 253 (D.D.C. 2016) (quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989)) (finding that defendant agencies "wholly failed to evaluate the significance of the documented safety issues" with rail transit project).

### A.    The Bureau ignored information warranting a supplemental EIS

The Bureau's administrative record for Lease Sale 257 demonstrates that the agency did not take a hard look at the new information on environmental impacts that had been gathered and developed over the past four years, since the Programmatic EIS and Multisale EIS, including the information submitted by plaintiffs to the Bureau before its approval of Lease Sale 257.

*First*, the administrative record does not demonstrate that the Bureau made a "reasoned decision based on its evaluation of the significance—or lack of significance—of the new information."  *Friends of the Capital Crescent*, 200 F. Supp. 3d at 253.  As detailed by plaintiffs, the Bureau had a substantial amount of new information that was not included in the previous EIS's.  *See generally* Complaint, ECF No. 1.  Plaintiffs submitted comments and information in the summer of 2021 *before* the Bureau's approval of Lease Sale 257 on August 31, 2021.  *See*

Plaintiffs Br. at 24.  NEPA and the APA required that the Bureau show that a supplemental environmental review was not warranted based on that new information.  The Bureau did not address such information; it simply ignored it.  The Bureau's decision to ignore new scientific evidence violated the fundamental NEPA requirement that the Bureau take a hard look at environmental effects.  *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 194 (4th Cir. 2005) ("An agency's hard look should include neither researching in a cursory manner nor sweeping negative evidence under the rug").

The Bureau's only justification for not pursuing a supplemental EIS is proffered by its legal counsel in its brief without any analyses or reasoning found in the administrative record. *See* Fed. Br. 28–38.  But under the APA, the "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  The Bureau's post hoc attempt to justify its decision does not remedy its NEPA violation.  To the contrary, counsel's "post hoc explanations serve only to underscore the absence of an adequate explanation in the administrative record itself."  *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1050 (9th Cir. 2010).

*Second*, the limited statements in the record that do relate new information on the environmental impacts of Lease Sale 257 are unsupported and do not reflect reasoned decisionmaking.  For example, the Bureau identifies the Intergovernmental Panel on Climate Change's August 9, 2021 Report as a source "detailing observations of a rapidly changing climate."  *See* Record of Decision 7.  However, the Bureau summarily dismisses the relevance of the Report, stating without elaboration that it "may be a significant consideration in the [the Bureau's] decisions regarding oil and leasing programs in the future," *id*., but not a consideration in the Bureau's evaluation of Lease Sale 257, the largest lease sale in the country's history.

But, the Bureau does not, and cannot, explain why the Report could be a significant consideration in future sales, but not in Lease Sale 257.  Indeed, at the time the Report was issued, Lease Sale 257 was still a future sale.  The information in the Report is plainly relevant to *all* lease sales, not just to selected future lease sales.  The Bureau's bare conclusions that the Report and other information does not warrant a supplemental EIS are unsupported conclusions that violate the APA.  *See BFI Waste Sys. of N. Am., Inc. v. FAA*, 293 F.3d 527, 532 (D.C. Cir. 2002) (an agency's decision is "arbitrary and capricious if, inter alia, [it is] 'not supported by substantial evidence' in the record as a whole").

*Third*, the Bureau's decision not to conduct a supplemental EIS is not entitled to any deference.  Recognizing that the administrative record does not support the Bureau's reliance on four-year old environmental documents, the Bureau and intervenors rely heavily on deference instead.  *See* Fed. Br. 24, 28–30; API Br. 20–23.  However, the Bureau does not and cannot point to any analysis in the administrative record to which the Court can defer.  *See McDonnell Douglas Corp. v. United States Dep't of the Air Force,* 375 F.3d 1182, 1187 (D.C. Cir. 2004) (Courts "do not defer to the agency's conclusory or unsupported suppositions.).  A court may "'defer to the informed discretion of the [agency],'" *Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 197 (D.C. Cir. 2013) (citation omitted), but it "cannot defer to a void" in record.  *Oregon Natural Desert Ass'n v. BLM*, 531 F.3d 1114, 1142 (9th Cir. 2008).

**B.     The Bureau's attempt to place the burden on Plaintiffs to show that a supplemental EIS was required must be rejected.**

In violation of NEPA, the Bureau did not address the new information warranting a supplemental environmental review of Lease Sale 257 *before* its decision.  The Bureau does not rebut that fact.  *See* Fed. Br. 28–38.  Recognizing this clear error, it simply argues *for the first time in its brief* that the "numerous reports and studies" submitted by plaintiffs "fail to

demonstrate that the information in those documents rose to the level of significance" warranting a supplemental EIS. *See id.* 32. There is no legal basis for the Bureau's argument that plaintiffs bear the "burden" to show that new information requires a supplemental EIS. *Id.*

Under NEPA, "fulfillment of [NEPA] should not depend on the vigilance and limited resources of environmental plaintiffs. It is the federal agency, not environmental action groups or local government, which is required by NEPA to produce an [environmental analysis]." *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975). The Bureau cannot willfully ignore information and flout NEPA's procedural requirements, then avoid responsibility by arguing in litigation that plaintiffs failed to show enough evidence regarding new environmental information that the Bureau did not review in the first place. *See WildEarth Guardians*, 368 F. Supp. 3d at 69 (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 303 (D.C. Cir. 2013)) (rejecting BLM's attempt to "place[] the burden of analyzing the data on the public"). Accepting the Bureau's theory brought forth for the first time in its brief, would permit an agency to turn NEPA on its head and require affected parties—instead of the agency—to anticipate and ascertain environmental impacts of the agency action. *See Te-Moak Tribe of W. Shosone of Nev. v. U.S. DOI*, 608 F.3d 592, 605 (9th Cir. 2010) (to show agency's failure to "conduct a sufficient cumulative impact analysis, [plaintiffs] need not show what cumulative impacts would occur").

The Bureau's contention that plaintiffs must show significant environmental impacts is another post hoc attempt to obscure the Bureau's failure to comply with NEPA's requirement that it take a hard look at new information and provide a reasoned explanation on whether or not that information required the Bureau to prepare a supplemental EIS. *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558 (9th Cir. 2000) (citation omitted) ("When new

information comes to light the agency must consider it, evaluate it, and make a reasoned

determination whether it is of such significance as to require [an SEIS].").

**V.      The Court must vacate Lease Sale 257.**

Failure to comply with NEPA requirements warrants vacatur of an agency's decision.

*See Am. Bird Conservancy v. Fed. Commc'n Comm'n*, 516 F.3d 1027, 1033–34 (D.C. Cir. 2008)

(vacating FCC order for failure to conduct environmental analysis required by NEPA); *see City

of Phoenix*, 869 F.3d at 972, 975 (vacating flight procedures because FAA's NEPA analysis was

arbitrary and capricious, among other reasons).

The factual circumstances in this proceeding justify vacatur of the Bureau's decision to

hold Lease Sale 257.  In determining that the Programmatic EIS and Multisale EIS remained

"adequate" four years later, the Bureau inexplicably relied on methodology that had been

invalidated by two federal courts.  Also, the Bureau's revelation that it now can quantify foreign

GHG emissions—but could not just a few months ago—undermines its entire rational for its

methodology in the Addendum.  *See* AR0029965 (stating "[a] quantitative approach for this is

not currently or reasonably feasible").  The "seriousness" of the Bureau's violations is further

demonstrated by the fact that the Bureau approved Lease Sale 257 based on earlier

environmental reviews that the Bureau has determined must be reevaluated, the Bureau

continues to acknowledge the inadequacies of its previous environmental analyses of lease sales,

and the Bureau is currently defending the pause of the leasing program at the Fifth Circuit.  *See

Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).

The Bureau's violations of NEPA and the APA cannot be cured by a paper exercise on

remand, as Louisiana contends.  *See* La. Br. 21–22 (citing *WildEarth Guardians* 368 F. Supp. at

84).  Here, the Bureau's violations of federal laws are not merely a failure to "fully discuss the

environment effects" of Lease Sale 257.  *See WildEarth Guardians*, 368 F. Supp. 3d at 84.  The

Bureau has before it substantial information demonstrating the need for a supplemental EIS, the Bureau itself has found that the environmental analysis is inadequate, and, by its own admission, the Bureau can conduct a quantitative analysis of foreign GHG emissions that could significantly alter its alternatives analysis for Lease Sale 257.  Vacatur ensures that the Bureau's analysis on remand will be meaningful and informed, as intended by NEPA.

In addition, the intervenors have not shown that vacatur will have any disruptive consequences.  *See Allied-Signal*, 988 F.2d at 151.  Though API and Louisiana provide sweeping, unverified claims of economic consequences and "unprecedented uncertainty" of vacating Lease Sale 257, they do not claim that vacatur would stop drilling, prevent jobs, or thwart economic growth in the short term.  *See* API Br. 45.  The Bureau's own leasing information shows that over 8.1 million acres out of the 10.8 million total leased acreage of active offshore leases in the Gulf of Mexico—75 percent—is currently non-producing.[9]  Of the millions of acres under lease, in the Bureau's words, the "55 percent of the leased acreage that is non-producing may be in an earlier stage of the development process, or being held for speculative reasons, indicating a sufficient inventory of leased acreage to sustain development for years to come."[10]  Clearly, there is sufficient lease acreage available for development to provide continued employment and economic activity while the Bureau performs the tasks necessary to comply with NEPA and the APA.

Moreover, any potential harm from vacatur is far from certain, as it assumes that the Bureau would not approve any future lease sales.  Also, any potential harm would not occur for

---

[9] Bureau of Ocean Energy Management, *Combined Leasing Report as of November 1, 2012* https://www.boem.gov/sites/default/files/documents/regions/pacific-ocs-region/oil-gas/Lease%20stats%2011-1-21.pdf (last visited November 28, 2021)
[10] Leasing Program Report, *supra* n.7, at 5.

years, as the Bureau states in its opening brief at the Fifth Circuit, "[r]oyalty-generating production on a new lease typically does not begin until at least *five years* after a lease is issued." Appellant's Br. 50.  At bottom, API's and Louisiana's arguments against vacatur are based on speculation—concerns over future, long-term investments and the companies' ability to stockpile leases and maintain control offshore resources.  And though API argues that vacatur would require the disclosure of confidential business information, complicate transactions, and inconvenience business (API Br. 41–45), those concerns are not sufficient justification for departing from the ordinary remedy of vacatur so that the Bureau can cure its violations of federal law.

## CONCLUSION

The Bureau's approval of Lease Sale 257 was arbitrary and in violation of NEPA and the APA.  *Amici* respectfully request that plaintiffs' motion for summary judgment is granted and that Lease Sale 257 is vacated so that the Bureau can fully comply with federal law.

Respectfully submitted December 3, 2021.

/s/ *W. Eric Pilsk*
W. Eric Pilsk (DC Bar No. 419901)
Nathaniel H. Hunt (Admission Pending)
Kaplan Kirsch & Rockwell LLP
1634 I (Eye) St., NW, Suite 300
Washington, DC
Telephone: (202) 955-5600
epilsk@kaplankirsch.com
nhunt@kaplankirsch.com

*Counsel for Members of Congress*

**CERTIFICATE OF SERVICE**

I certify that on this 3rd day of December, 2021, I filed the above motion for leave with the Court's CM/ECF system, which provided notice of this filing by email to all counsel of record.

_/s/ W. Eric Pilsk_
W. Eric Pilsk