IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF THE EARTH, et al.,<br>　　　　*Plaintiffs*,<br><br>　　v.<br><br>DEBRA A. HAALAND, et al.,<br>　　　　*Defendants*,<br>and<br><br>STATE OF LOUISIANA,<br>　　　　*Intervenor-Defendant*. | Case No. 1:21-cv-02317-RC |

### SUPPLEMENTAL BRIEF

For the reasons discussed in Louisiana's summary judgment briefing (Doc. 42-1 at 8-20), this Court should uphold the Lease Sale 257 Record of Decision (ROD) in full. But if this Court determines that the ROD is insufficient under the National Environmental Policy Act, it should remand this case without vacatur. For if this Court vacates the ROD, it makes no practical difference whether the next step is Interior's initiating a new closed bidding process or reprocessing the prior bids that it already received; both options create such massive disruptive consequences for settled federal, state, and private expectations that remand without vacatur is the only tenable outcome should the Court find a NEPA violation.

When deciding "whether to remand without vacatur," courts consider "'the seriousness of the [action's] deficiencies'" and "the 'likely disruptive consequences of vacatur.'" *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020). Both factors would justify remand without vacatur here.

As to the first factor, Louisiana has already explained why any defects in the ROD would not be serious enough to warrant vacatur. Doc. 42-1 at 21-22; Doc. 64 at 17-19. To briefly recap, this Court has held under similar circumstances that a "failure to fully discuss the environmental

effects" of lease sales under NEPA is not a serious enough shortcoming to warrant vacatur. *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 (D.D.C. 2019). Because BOEM has already conducted extensive environmental analysis in three separate EISs, "the probability that [BOEM] will be able to justify retaining [the ROD] is sufficiently high that vacatur ... is not appropriate." *Id.* (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002)).

Second, even if any deficiencies were "not insignificant," vacatur's potential for disruptive consequences still supports a court's exercising discretion to remand without vacatur. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002). And here, disruptive consequences from vacating the ROD are not just possible—they are certain.

That conclusion follows from the uncontestable fact that Lease Sale 257 was held on November 17, 2021. All bids have been made public. U.S. Dep't of the Interior, *Sale Statistics* (Nov. 17, 2021), https://bit.ly/3GXsh3n. And the first payments attendant to the sale have been made. *See, e.g.*, Doc. 71-1 at ¶7. Those bells cannot be unrung. Vacating Lease Sale 257's ROD would irreparably disrupt not only private industry's bids in reliance on the ROD but also their accompanying, essential revenue streams for Louisiana and other coastal States. Those consequences will follow regardless of whether BOEM has discretion to reprocess the prior bids.

Consider the Court's first hypothetical: Suppose BOEM lacks discretion to reprocess the November 17 sale bids. In this scenario, BOEM would have to hold Lease Sale 257 again regardless of the outcome of its review of the ROD on remand. This would abrogate and disrupt the extensive review process that preceded the lease sale. BOEM has been planning for Lease Sale 257 for years—it is the culmination of an exhaustive process including State input and multiple rounds of environmental review. *See* Doc. 42-1 at 4-7. Vacating the ROD means BOEM would have to re-do at least some part of that exhaustive process, harming coastal States by further

2

delaying their receipt of bonus bids and royalties. That would also further delay the preparation of the next OCSLA Five Year Plan, for Department of Interior resources devoted to re-doing Lease Sale 257 are resources that cannot be devoted to completing the next Five Year Plan.

The disruptive consequences that would create for coastal States like Louisiana cannot be overstated. They rely on the orderly functioning of the OCSLA oil-and-gas lease sale process. Louisiana structures its budgets with an eye to revenue from lease sales, particularly a sale as important as Sale 257. *See* Doc. 3-6, *Louisiana v. Biden*, No. 2:21-cv-778 (W.D. La. Mar. 31, 2021) (Decl. of Jerome Zeringue, Chairman of Louisiana State Legislature Appropriations Comm.). Take Louisiana's Coastal Restoration Plan: it's the "largest climate-adaption plan in the country" and seeks to protect and restore all 20 Louisiana coastal parishes. *Id.* ¶7. The Plan has resulted in over 315 miles of levees, 60 miles of barrier islands, and 46,000 acres of new land. *Id.* ¶8. The Plan's "only annual recurring source of revenue from the federal government comes from the Gulf of Mexico Energy Security Act (GOEMSA)." *Id.* ¶11. GOMESA has two primary sources of revenue: bonus bids from Gulf of Mexico lease sales and oil-and-gas production royalties from the Gulf. *Id.* ¶13. The federal government distributes Louisiana's bonus bids in one annual lump sum. *Id.* ¶17. Chevron alone has already paid nearly $9.5 million in Lease Sale 257 bonus bids to the federal government and is slated to pay nearly $38 million more. Doc. 71-1 at ¶7. In fact, a total of $38,337,796.80—from all high bidders—was due to the federal government on November 18, 2021. *See* U.S. Dep't of the Interior, Notice of EFT One-Fifth Bonus Liability (Nov. 17, 2021), https://bit.ly/3FZ7Ul4. After that, high bidders still owe $153,351,187 in outstanding bonus bids to be paid to the government from Lease Sale 257. *See* U.S. Dep't of the Interior, *Sale Statistics* (Nov. 17, 2021), https://bit.ly/3GXsh3n.

Louisiana and other coastal States are entitled to 37.5 percent of these funds. *See* P.L. 109-432, 120 Stat. 3000, 43 U.S.C. §1331 note. Louisiana budgets coastal restoration projects in reliance on receiving these funds. By undoing Lease Sale 257 through vacatur, the Court would seriously disrupt Louisiana's Coastal Restoration Plan and the ability of all Gulf States to rely on a steady stream of GOMESA revenues. *See* Zeringue Decl. ¶14 ("The cancellation of Lease 257, which was originally scheduled for March 2021, causes the State an immediate short-term loss in revenue from the bonus bids on the sale, as well as longer term revenue losses in rents and royalties.").

Abrogating the bids for the November lease sale would also present the archetypical disruptive consequence—disrupting settled transactions. *Am. Great Lakes Ports Ass'n*, 962 F.3d at 519 ("[A] quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome."). Money has already changed hands as a result of Lease Sale 257. And, as Chevron extensively documents, Lease Sale 257 cannot be redone with anything resembling a level playing field because bidding strategies are now public. *See, e.g.*, Doc. 71 at 2-3 ("Equally, if not more, damaging is that the bids Chevron submitted for the leases are in the public domain, meaning that BOEM cannot simply restart the bidding process down the road."); *see Am. Great Lakes Ports Ass'n*, 962 F.3d at 519 (remand without vacatur "is appropriate when vacatur would disrupt settled transactions"). Given this exchange of money and the impossibility of re-doing Lease Sale 257 in a fair manner, "[t]he egg has been scrambled and there is no apparent way to restore the status quo ante." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002).

The Court's second hypothetical—assuming BOEM has discretion to hold over the bids after vacatur—is so unprecedented as to call into question whether it is even practical. Vacating

the ROD and allowing BOEM to reprocess the same bids is an "invitation to chaos." *Sugar Cane Growers*, 289 F.3d at 97. Vacating the lease sale ROD would create legal uncertainty about whether the Lease Sale 257 bids are valid. Louisiana could not then know whether it could rely on receiving its portion of Chevron's bonus bid in its annual GOMESA lump sum disbursement. Zeringue Decl. ¶17. In that unprecedented GOMESA-bonus-bid limbo, Louisiana could not confidently plan budgets for coastal restoration projects, thereby undermining not just those projects but also Louisiana's ability to administer the State Coastal Trust Fund. *Id.* ¶18. (This Fund relies on GOMESA revenue to front-fund projects. *Id.*) In short, vacating the ROD would create legal uncertainty about Louisiana's claim to the bonus bid and royalty revenue from Sale 257—undermining its ability to plan and front-fund Trust Fund projects, and to defend and restore its coastline. *Id.* ¶19-22 ("If GOMESA funds vanish, Louisiana will essentially be left without a major source of funding for a $50 billion coastal recovery and restoration program.").

Putting aside the uncertainty attached to bids issued on a lease with a vacated ROD, the delay occasioned by vacatur would seriously disrupt Louisiana's ability to plan for the future and would upend Gulf States' settled expectations. If the ROD is vacated, the entire OCSLA process will be effectively halted. BOEM would have to both remedy the EIS and decide how old bids could be reprocessed. And old bids would presumably remain valid only if BOEM re-held Lease Sale 257 based on identical units or parcels—an outcome not guaranteed if the ROD is vacated. In short, these multiple layers of uncertainty portend unnecessary chaos that can be avoided by a remand without vacatur.

## CONCLUSION

Either of the Court's proposed hypotheticals would lead to quintessential disruptive consequences. Accordingly, if the Court finds that BOEM's NEPA analysis was insufficient, it should remand the ROD without vacatur.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: January 24, 2022 | **JEFF LANDRY**<br>**ATTORNEY GENERAL OF LOUISIANA** |
| TYLER R. GREEN*<br>DANIEL SHAPIRO*<br>CONSOVOY MCCARTHY PLLC<br>222 S. Main Street, 5th Floor<br>Salt Lake City, UT 84101<br>(703) 243-9423 | /s/   *Elizabeth B. Murrill*<br>ELIZABETH B. MURRILL*<br>  Solicitor General<br>JOSEPH S. ST. JOHN*<br>  Deputy Solicitor General<br>LOUISIANA DEPARTMENT OF JUSTICE<br>1885 N. Third Street<br>Baton Rouge, LA 70804<br>Tel: (225) 326-6766<br>murrille@ag.louisiana.gov<br>stjohnj@ag.louisiana.gov<br><br>*Counsel for Intervenor-Defendant*<br>*State of Louisiana* |

## **CERTIFICATE OF SERVICE**

      I filed this motion and its attachments with the Court via ECF, which will notify Plaintiffs' and Defendants' counsel.

Dated: January 24, 2021                                */s/ Elizabeth B. Murrill*