**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| FRIENDS OF THE EARTH, *et al.*, | : | | |
| | : | | |
| *Plaintiffs*, | : | | |
| | : | | |
| v. | : | Civil Action No.: | 21-2317 (RC) |
| | : | | |
| DEBRA A. HAALAND, *et al.*, | : | Re Document No.: | 34, 42, 43, 45 |
| | : | | |
| *Defendants*, | : | | |
| | : | | |
| STATE OF LOUISIANA, | : | | |
| *Intervenor-Defendant*, | : | | |
| | : | | |
| AMERICAN PETROLEUM INSTITUTE, | : | | |
| *Intervenor-Defendant.* | : | | |

<u>**MEMORANDUM OPINION**</u>

**Granting in Part and Denying in Part Plaintiffs' Motion for Summary Judgment; Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Granting in Part and Denying in Part Intervenor-Defendant Louisiana's Cross-Motion for Summary Judgment; Granting in Part and Denying in Part Intervenor-Defendant American Petroleum Institute's Cross-Motion for Summary Judgment**

## I. INTRODUCTION

Lease Sale 257 is the eighth in a series of sales offering federal lands in the Outer

Continental Shelf to leasing for the production and development of oil and gas under the Bureau

of Ocean Energy Management ("BOEM")'s 2017–2022 Program.  Lease Sale 257 made 80.8

million acres in the Gulf of Mexico available for oil and gas leasing, the largest offshore oil and

gas lease sale in U.S. history.  Organizational Plaintiffs Friends of the Earth, Healthy Gulf, Sierra

Club, and Center for Biological Diversity brought suit against the Secretary of the United States

Department of the Interior, the Assistant Secretary of the Interior for Land and Minerals

Management, the Department of the Interior, and the Bureau of Ocean Energy Management, alleging that the federal defendants violated the National Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA).  Compl. ¶¶ 1, 5–8, ECF No. 1.

Now pending before the Court are four cross-motions for summary judgment filed by Plaintiffs, Federal Defendants, Intervenor-Defendant Louisiana, and Intervenor-Defendant American Petroleum Institute ("API").  *See* Mem. Supp. Pls.' Mot. Summ. J. ("Pls.' Mot."), ECF No. 34-1; Defs.' Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 45; Mem. Supp. Louisiana's Cross-Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J. ("La. Mot."), ECF No. 42-1; Mem. of Intervenor-Def. American Petroleum Institute in Supp. Cross-Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J. ("API Mot."), ECF No. 43-1.  For the reasons that follow, the Court will grant in part and deny in part all four motions.

## II.  BACKGROUND

The Gulf of Mexico "is a unique and important part of the American landscape and economy."  *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 151 (D.D.C. 2014).  It is one of the nation's most biologically diverse ecosystems, sustaining thousands of marine plant and animal species, including numerous endangered and threatened species.  *See* Compl. ¶¶ 54–56, ECF No. 1.  It produces over one third of the country's domestic seafood supply and supports "a robust economy" of coastal tourism and commercial fishing.  *Id.* ¶ 57.  It also contains significant oil and gas reserves in the Outer Continental Shelf, "a vast underwater expanse nearly equal in size to the Australian continent" that "extends roughly two hundred miles into the ocean to the seaward limit of the international-law jurisdiction of the United States."  *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 592 (D.C. Cir. 2015) [hereinafter "*Sustainable Economy*"].  Oil and gas production on the Outer Continental Shelf is accomplished

through leases that are awarded in a competitive bidding process subject to a complex statutory and regulatory scheme. *See, e.g.*, 43 U.S.C. § 1337.  The challenged agency decision in this case, Lease Sale 257, made 80.8 million acres of the Outer Continental Shelf in the Gulf of Mexico available for lease.  AR0029790.

### A.  Statutory and Regulatory Context

1.  Outer Continental Shelf Lands Act ("OCSLA")

The Outer Continental Shelf Leasing Act ("OCSLA") is the statutory framework under which the Department of the Interior may lease areas of the Outer Continental Shelf.  43 U.S.C. § 1334; *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009) [hereinafter "*Biological Diversity*"].  OCSLA sets forth a four-stage process for potential oil and gas production that is "pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent."  *State of Cal. ex rel. Brown v. Watt*, 668 F.2d 1290, 1297 (D.C. Cir. 1981).  First, the Department of the Interior "creates a leasing program by preparing a five-year schedule of proposed lease sales," and second, "solicits bids and issues leases for particular offshore leasing areas."  *Biological Diversity*, 563 F.3d at 473.  "After a lease is approved, a lessee may conduct ancillary activities, which include geological and geophysical explorations and development, and surveys."  *Oceana*, 37 F. Supp. 3d at 150 (citing 30 C.F.R. § 550.207).  At the third stage, lessees must submit a more detailed exploration plan, which Interior may only approve if exploration "will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, unreasonably interfere with other uses of the area, or disturb any site, structure, or object of historical or archeological significance."  43 U.S.C. § 1340(g)(3).  The final stage is the development and production stage, during which "Interior and those affected state and local

3

governments review an additional and more detailed plan from the lessee" that may be

terminated if Interior determines that the plan would "probably cause serious harm or damage."

*Biological Diversity*, 563 F.3d at 473 (quoting 43 U.S.C. § 1351(h)(1)(D)(i)).

### 2.   National Environmental Policy Act ("NEPA")

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331 *et seq.*, "is a

procedural statute intended to ensure Federal agencies consider the environmental impacts of

their actions in the decision-making process."  40 C.F.R. § 1500.1 (2019).[1]  It requires Federal

agencies to "include in every recommendation or report on . . .  major Federal actions

significantly affecting the quality of the human environment, a detailed statement by the

responsible official" that includes "(i) the environmental impact of the proposed action; (ii) any

adverse environmental effects which cannot be avoided should the proposal be implemented,

[and] (iii) alternatives to the proposed action."  42 U.S.C. § 4332(2)(C).  "This environmental

impact statement ["EIS"], as it has come to be called, has two purposes.  It forces the agency to

take a 'hard look' at the environmental consequences of its actions . . . [and] [i]t also ensures that

these environmental consequences, and the agency's consideration of them, are disclosed to the

public."  *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) [hereinafter "*Sierra Club
(Southeast Market)*"].  NEPA also requires agencies to prepare a supplemental EIS for

outstanding federal actions if "[t]here are significant new circumstances or information relevant

---

[1] The regulations for NEPA, found at 40 C.F.R. §§ 1500 *et seq.*, were amended in 2020.
*See* Update to the Regulations Implementing the Procedural Provisions of the National
Environmental Policy Act, 85 Fed. Reg. 43,304-01 (July 16, 2020).  However, because those
modifications did not apply to NEPA processes begun before September 14, 2020, *id.* at 43372–
73, including this one, the Court will (as the parties have) refer to the regulations as codified at
40 C.F.R. Parts 1500-08 (2019).  *See* Pls.' Mot. at 24, n.10; Defs.' Mot. at 4, n.1.

to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. §§ 1502.9(c)(1)(ii) (2019).

### 3.  Interaction of OCSLA and NEPA

The statutory schemes of NEPA and OSCLA are not inconsistent.  Interior must consider the environmental impacts of a decisions to open up federal lands for oil and gas leases in accordance with NEPA prior to holding a lease sale.  *See Sec'y of the Interior v. California*, 464 U.S. 312, 338 (1984) (noting that the "[r]equirements of the National Environmental Protection Act and the Endangered Species Act must be met" before the lease sale stage).  And although OCSLA's primary purpose is development of the Outer Continental Shelf, "OCSLA does not mandate the approval of every proposed lease sale."  *Gulf Restoration Network v. Bernhardt*, 456 F. Supp. 3d 81, 97 (D.D.C. 2020); *see also State of Cal. ex rel. Brown*, 712 F.2d at 588 ("[W]hile an area excluded from the [Five-Year] leasing program cannot be leased, explored, or developed, an area included in the program may be excluded at a latter stage.").

Nor does the multi-step framework of OCSLA purport to lessen the rigor of the "hard look" that NEPA requires.  *See* 43 U.S.C. § 1346(a)(1) (requiring environmental studies "of any area or region included in any oil and gas lease sale" under OCSLA); (*Vill. of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984) (interpreting § 1346 to mean that "[a]t the lease sale stage, OCSLA implies this review must meet NEPA standards.").  Although the D.C. Circuit has stated that OCSLA itself "concerns the local environmental impact of leasing activities" and therefore "does not authorize—much less require—Interior to consider the environmental impact of post-exploration activities such as consuming fossil fuels on either the world at large," *Biological Diversity*, 563 F.3d at 485, that opinion concerned only OCSLA itself and did not reach the NEPA challenges to the Five-Year Program on the merits.  "In the context of NEPA,

which requires government agencies to comply with its strictures 'to the fullest extent possible,' 42 U.S.C. § 4332(2)(C), courts have been especially reluctant to hold that another statute overrules it." *Nat. Res. Def. Council v. Lujan*, 768 F. Supp. 870, 880 (D.D.C. 1991).  To the contrary, "NEPA may, within the boundaries set by Congress, authorize the agency to make decisions based on environmental factors not expressly identified in the agency's underlying statute." *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 665 (D.C. Cir. 2011) (quotations omitted).  In other words, NEPA sets a floor that agencies must comply with even if an agency's underlying statute, such as OCSLA, could be construed to set a lower one.

## B.  Factual and Procedural Background

1.  The Five-Year Lease Plan and the 2018 Supplemental Environmental Impact Statement

Lease Sale 257 is part of the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program, the five-year plan which proposed ten region-wide lease sales. *See* 82 Fed. Reg. 6643-02 (Jan. 19, 2017); Compl. ¶ 75.  When developing that five-year program, BOEM issued both a programmatic EIS for the entire five-year program, AR0014242–15179 ("Program EIS"), and a Multisale EIS for sales 249, 250, 251, 252, 253, 254, 256, 257, 259, and 261, the ten sales planned to occur in the Gulf of Mexico, AR0008116–9973 ("Multisale EIS").  Those EISs were published in 2016 and 2017, respectively.  Compl. ¶¶ 79, 82.

For multi-step agency programs such as oil and gas leases authorized under OCSLA, "NEPA provides that the environmental analysis conducted at each stage may incorporate by reference previous, related analyses," a method known as "tiering." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 53 (D.D.C. 2019).  The Multisale EIS stated that BOEM expected to utilize the tiering process to supplement its NEPA analysis "on a regular basis," and that it expected to "issue a Supplemental EIS once a calendar year."  AR0008202.  The Multisale EIS

even provided a graphic description of the tiering relationships of its expected supplemental

EISs.  Figure 1-6, AR0008203 (below).



BOEM released a Supplemental EIS for evaluating Lease Sales 250 and 251 in 2017

that tiered from and updated the two prior EISs ("The 2018 Supplemental EIS").  AR0015471–

16365.  But BOEM did not issue another EIS subsequent to the 2018 Supplemental EIS.  *See*

Pls.' Mot. at 9.  At one point BOEM issued a notice of intent to prepare an additional

supplemental EIS, but it rescinded that notice in early 2020.  *See* 85 Fed. Reg. 2437-02 (Jan. 15,

2020).  Instead, BOEM published a Determination of NEPA Adequacy on September 11, 2020,

that concluded the analysis in the Program EIS, Multisale EIS, and 2018 Supplemental EIS were

sufficient to comply with NEPA for the purpose of moving ahead on Lease Sale 257.

AR0029969–85.

### 2.  The Decision to Hold Lease Sale 257

Based on that Determination of NEPA Adequacy, BOEM issued its first Record of

Decision for Lease Sale 257 in January 2021, during the final days of the Trump administration.

*See* 86 Fed. Reg. 6365-01 (Jan. 21, 2021).  But just a few days later, President Biden issued

Executive Order 14,008, which in relevant part "pause[d] new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review and reconsideration."  Exec. Ord. 14008, Tackling the Climate Crisis at Home and Abroad § 208, 86 Fed. Reg. 7619, 7624-25 (Jan. 27, 2021).  The Record of Decision to hold Lease Sale 257 was rescinded in accordance with that executive order.  86 Fed. Reg. 10,132-01 (Feb. 18, 2021).

Louisiana, along with a coalition of states, brought suit challenging that recission in the Western District of Louisiana, and the district court there preliminarily enjoined Interior officials from "implementing the Pause of new oil and natural gas leases on public lands or in offshore waters," including with respect to Lease Sale 257.  *Louisiana v. Biden*, -- F. Supp. 3d --, No. 2:21-cv-778, 2021 WL 2446010, at *22 (W.D. La. June 15, 2021).  In accordance with that injunction, BOEM moved forward with Lease Sale 257, issuing another Determination of NEPA Adequacy in August 2021 stating that a supplemental EIS was not required for the sale. AR0029801–942.  BOEM issued a new Record of Decision for Lease Sale 257 on August 31, 2021, AR0029788–800, which was published in the Federal Register on September 7, 2021, 86 Fed. Reg. 50,160-02 (Sept. 7, 2021).

### 3.   The Current Status of Lease Sale 257 and Procedural Background

Immediately after the Federal Defendants published the new Record of Decision to hold Lease Sale 257, Plaintiffs filed the present action alleging that the Federal Defendants violated NEPA and the APA.  Compl. ¶¶ 1, 5–8.  The State of Louisiana and API sought and were granted leave to intervene as defendants.  *See* Order of Sept. 22, 2021, ECF No. 24 (granting Louisiana's motion to intervene); Mem. Op. & Order Granting API's Mot. Intervene, ECF No. 60 (granting API's motion to intervene).

The parties agreed to an expedited briefing schedule for summary judgment that would allow the purely legal issues in this case to be resolved after Lease Sale 257 took place, but before the leases were issued. *See* Joint Status Report of Sept. 20, 2021 (proposing briefing schedule); Order of Sept. 22, 2021 (setting merits briefing schedule); Minute Order of Dec. 8, 2021 (granting a limited extension of the briefing schedule). The schedule was based on the Federal Defendants' representations that the earliest any lease from the sale would become effective was February 1, 2022. *See* 2d Decl. Bernadette Thomas ¶ 9, ECF No. 58-1.

The challenged lease sale was held on November 17, 2021, but the leases have not yet been awarded.[2] *Id.* ¶ 4. Now pending before the Court are four cross-motions for summary judgment filed by Plaintiffs, Federal Defendants, Louisiana, and API, *see generally* Pls.' Mot.; Defs.' Mot.; La. Mot.; API Mot., to which the parties have filed their respective oppositions and replies, *see generally* Pls.' Combined Opp'n & Reply Supp. Mot. Summ. J. ("Pls.' Opp'n"), ECF No. 51; Reply Supp. Louisiana's Cross-Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J. ("La. Reply"), ECF No. 64, Defs.' Reply Supp. Mot. Summ. J. ("Defs.' Reply"), ECF No. 65; Reply Br. Intervenor-Def. American Petroleum Institute Supp. Cross-Mot. Summ. J. ("API Reply"), ECF No. 66. The Court has also considered the *amicus* briefs filed by Members of Congress and Chevron, USA. *Amicus Curiae* Br. Members Congress Supp. Pls.' Mot. Summ. J. ("Congress Amicus Br."), ECF No. 57; Chevron U.S.A., Inc.'s *Amicus* Br. Supp. Defs.' & Intervenor-Def.s' Mots. Summ. J. & Opp'n Pls.' Mot. Summ. J. ("Chevron Amicus Br."), ECF No. 71.

---

[2] Chevron was the apparent high bidder on 34 tracts in that sale, leading it to move to intervene. *See* Chevron U.S.A. Inc.'s Mot. Intervene Supp. Defs. at 1, ECF No. 53. The Court denied Chevron's intervention as a party but granted it leave to file an *amicus* brief. Mem. Op. & Order Denying Chevron U.S.A., Inc.'s Mot. Intervene, ECF No. 70.

### III.  LEGAL STANDARD

In a typical case, a court may grant summary judgment to a movant who "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  But when assessing administrative action, at the summary judgment stage "the district judge sits as an appellate tribunal," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), limited to determining whether, as a matter of law, the evidence in the administrative record supports the agency's decision, *Citizens for Responsibility & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013).  "In the APA context, summary judgment is the mechanism for deciding whether, as a matter of law, an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Gulf Restoration Network*, 456 F. Supp. 3d at 93.  Accordingly, judicial review is limited to "deciding whether, as a matter of law, an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Id.*

Under the APA, a reviewing court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Ass'n v. State Farm Mutual Auto. Ins.*, 463 U.S. 29, 43 (1983).  "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."  *Citizens to Preserve Overton Park Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

"This standard applies when assessing an agency's compliance with NEPA." *WildEarth Guardians*, 368 F. Supp. 3d at 57–58. "An environmental impact statement is reviewed to ensure that the agency took a hard look at the environmental consequences of its decision to go forward with the project." *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (internal quotations and citation omitted). "When an agency is evaluating scientific data within its technical expertise, an extreme degree of deference to the agency is warranted." *Id.* (internal quotation marks and citation omitted). Therefore, the Court's task "is not to 'flyspeck'" the agency's analysis "for 'any deficiency no matter how minor.'" *Sierra Club v. FERC*, 827 F.3d 36, 46 (D.C. Cir. 2016) (quoting *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011)). Rather, NEPA's "rule of reason" dictates that an agency's assessment is sufficient unless its "deficiencies are significant enough to undermine informed public comment and informed decisionmaking." *Sierra Club (Southeast Market)*, 867 F.3d at 1368 (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2017); *Oceana*, 37 F. Supp. 3d at 154.

## IV.  ANALYSIS

### A.  Ripeness

As a threshold issue, Intervenor-Defendants API and Louisiana first argue that Plaintiffs' claims are not ripe. *See* La. Mot. at 8–10; API Mot. at 16–18; *see also Sustainable Econ. v. Jewell*, 779 F.3d at 596 ("We must address standing and ripeness issues at the threshold.").[3] The

---

[3]Although none of the parties have challenged Plaintiffs' standing, the Plaintiff organizations have attached multiple declarations of their members that satisfy their burden of establishing Article III standing. *See WildEarth Guardians*, 368 F. Supp. 3d at 60 ("Plaintiffs, as the parties invoking this Court's jurisdiction, bear the burden of establishing all three elements of standing."). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*

ripeness doctrine limits Article III courts to hearing cases that are "constitutionally and prudentially ripe," meaning that they involve a "present injury" and "take into account prudential concerns" of whether judicial resolution is appropriate at that time. *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999). In the NEPA context, "an agency's NEPA obligations mature only once it reaches a 'critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment.'" *Ctr. for Biological Diversity*, 563 F.3d at 480 (quoting *Wyo. Outdoor Council*, 165 F.3d at 49).

The D.C. Circuit has addressed the issue of NEPA ripeness in the context of multi-stage leasing programs such as OCSLA on several occasions. For instance, in both *Biological Diversity* and *Sustainable Economy*, the Circuit rejected as unripe NEPA claims brought at the first stage of the OCSLA process: the five-year program. *See Sustainable Econ.*, 779 F.3d at 599 ("Here, as in [*Biological Diversity*], we confront a challenge to a multiple-stage program under which no lease sale has yet occurred and no irreversible and irretrievable commitment of resources has been made."); *Biological Diversity*, 563 F.3d at 480. Both of those cases suggested that those claims would normally ripen at the second stage of OCSLA: the lease sale

_____

(TOC), Inc., 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). The declarations include detailed descriptions of members' planned and ongoing use of geographic areas in and around the Gulf of Mexico—including personal, recreational, aesthetic, and commercial use—that adequately establish an injury-in-fact. *See* Decls., ECF Nos. 34-2–34-8. These declarations likewise satisfy the causation and redressability prongs of standing. "In NEPA procedural-injury cases, an 'adequate causal chain' contains two links: 'one connecting the omitted EIS to some substantive government decision that may have been wrongly decided because of the lack of an adequate EIS,' and 'one connecting that substantive decision to the plaintiff's particularized injury.'" *WildEarth Guardians*, 368 F. Supp. 3d at 63 (quoting *Fla. Audubon Soc'y*, 94 F.3d at 668). Here, the Federal Defendants' alleged failure to comply with NEPA led directly to the Record of Decision and the holding of Lease Sale 257, "which will enable the oil and gas development causing Plaintiffs' injuries." *Id.*

stage, which is the one at issue in the present case. *See Sustainable Econ.*, 779 F.3d at 600

("[Plaintiff] will have an opportunity to raise its NEPA claims . . . in response to specific lease

sales."); *Biological Diversity*, 563 F.3d at 481 ("Petitioners suffer little by having to wait until

the leasing stage has commenced . . . .").

      Unlike *Biological Diversity* and *Sustainable Economy*, this case has been brought at the

lease sale stage, the second step of the OCSLA process.  Courts in this district and others have

routinely addressed NEPA claims on the merits at this stage.  *See, e.g.*, *Gulf Restoration

Network*, 456 F. Supp. 3d at 90; *Oceana*, 37 F. Supp. 3d 147, 154 (D.D.C. 2014); *Defs. of

Wildlife v. Bureau of Ocean Energy Mgmt., Regul., Enf't*, 871 F. Supp. 2d 1312, 1333 (S.D. Ala.

2012) ("NEPA and its [Supplemental EIS] requirement undoubtedly apply to the bid approval

stage of an OCSLA drilling project.").

      When this action was filed, the Record of Decision to hold Lease Sale 257 had been

published and BOEM had issued a determination of NEPA adequacy for that decision, but the

sale had not yet taken place.  *See* Compl. ¶ 4.  Since then, the sale has gone forward as planned,

and high bidders identified, but no leases have yet become effective.  *See* 2d Decl. of Bernadette

Thomas ¶¶ 4, 9.  The fact that the leases have not become effective does not impact the Court's

ripeness analysis.  Although additional steps occur between the sale and the issuance of the

leases, none of those steps involve further environmental analysis, and no party argues

otherwise.[4]  The Record of Decision is thus the final agency action that "mark[s] the

---

    [4] Louisiana's opening ripeness argument at points appears to make this argument.  *See*
La. Mot. at 9 ("The D.C. Circuit and courts in this Circuit have consistently . . . reject[ed] NEPA
challenges to OCSLA oil and gas actions as unripe whenever they occur before leases are
issued."); *id.* ("Merely holding a lease sale confers no right to perform any surface disturbing
activity. And BOEM retains authority to reject bids and impose conditions upon leases issued.").
But Louisiana's Reply brief effectively concedes any suggestion of this argument, citing at
length the relevant portion of the District Court opinion in *Fisheries* which noted that

consummation of the agency's decisionmaking process" for Lease Sale 257 and is an action

"from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)

(cleaned up).

Intervenor-Defendants rely heavily on the Circuit's recent *per curiam* opinion in

*Fisheries Survival Fund v. Haaland*, 858 F. App'x 371 (D.C. Cir. 2021), in which a NEPA

challenge to an offshore wind farm was found to not be ripe even after the challenged lease was

issued because BOEM had reserved the right to preclude all activity on the lease site pending

further evaluation of development plans.  There, the Circuit clarified that the relevant question is

not whether any given stage has been reached, but whether the specific lease in question

"reserves both the authority to preclude all activities pending submission of site-specific

proposals and the authority to prevent proposed activities if the environmental consequences are

unacceptable." *Id.* at 372 (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir.

1983)).  In particular, Defendant-Intervenors point to language in the district court opinion in

*Fisheries* that described the relevant inquiry as whether the agency retains the authority to

"preclude all surface disturbing activities." *Fisheries Survival Fund v. Jewell*, No. 16-cv-2409,

2018 WL 4705795, at *7 (D.D.C. Sept. 30, 2018), *aff'd sub nom. Fisheries Survival Fund v.*

*Haaland*, 858 F. App'x 371) (quoting *Wyo. Outdoor Council*, 165 F.3d at 49); *see also id.* at *9,

n.7 ("[T]he heart of [ripeness] is the question of whether the agency retains the authority to

---

"identif[ying] lease issuance as the point when NEPA claims ripen" is "misleading" because
those cases "described lease issuance as the critical stage for ripeness only as part of an explicit
application of the *Peterson* rule." *See* La. Reply at 5–6 (quoting *Fisheries Survival Fund v.*
*Jewell*, No. 16-cv-2409, 2018 WL 4705795, at *9, n.7 (D.D.C. Sept. 30, 2018), *aff'd sub nom.*
*Fisheries Survival Fund v. Haaland*, 858 F. App'x 371).  Neither Louisiana nor any other party
puts forth any reason as to why waiting for the issuance of the leases will result in a different or
more factually developed administrative record, or points to any additional NEPA analysis that
takes place between the lease sale and the issuance of the lease.

preclude all surface disturbing activity.").  Defendant-Intervenors take this language to mean that as long as BOEM can still theoretically prevent drilling, NEPA claims are unripe and thus unreviewable.[5]  *See* API Mot. at 18; La. Reply at 6.

Defendant-Intervenors' interpretation overextends the relevant precedent and fails to take into account the differences between this lease sale and the one in *Fisheries*.  As the D.C. Circuit has explained in the context of the Endangered Species Act, which agencies must similarly apply at each phase of the OCSLA process, "the multi-stage nature of leasing programs under OCSLA" requires courts to "consider any environmental effects of a leasing program on a stage-by-stage basis, and correspondingly evaluate [the statute's] obligations with respect to each particular stage of the program."  *Biological Diversity*, 563 F.3d at 483; *see also Oceana*, 37 F. Supp. 3d at 162 ("NEPA regulations provide that agencies are allowed to 'tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision *at each level of environmental review*.'" (quoting 40 C.F.R. § 1502.20 (2013)) (emphasis added)).  Determining which NEPA claims are ripe at which stages of the OSCLA process will necessarily overlap somewhat with the merits of the challenge, as Plaintiffs point out.  *See* Pls.' Opp'n at 38.  But that is a feature of the multi-stage process, not a bug.  *See Biological Diversity*, 563 F.3d at 473 ("This multi-tiered approach was designed to forestall premature litigation regarding adverse environmental effects that will flow, if at all,

---

[5] Defendant-Intervenors' argument also overlooks the procedural nature of a NEPA injury.  Plaintiffs may hope that BOEM will change its mind, but their alleged injury is not that drilling may eventually occur, but that it may occur without the requisite "hard look" being taken.  *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998) ("[A] person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.").

only from the latter stages of [Outer Continental Shelf] exploration and production." (internal quotations omitted)).

    *Peterson*, the case upon which *Fisheries* primarily relies, provides a useful example. As Plaintiffs point out, that case addressed on the merits whether the agency was obligated to prepare an EIS before a lease sale even though it anticipated conducting further analysis of the site-specific plans for exploration and development. *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C. Cir. 1983). In holding that the agency was obligated to prepare an EIS, the Circuit explained that "[i]n bifurcating its environmental analysis . . . the agency has taken a foreshortened view of the impacts which could result from the act of leasing." *Id.* "[T]he appropriate time for preparing an EIS is *prior* to a decision, when the decisionmaker retains a maximum range of options." *Id.* at 1414 (citations omitted). Therefore, the Court must determine whether the Bureau relinquished control of at least some activities with foreseeable environmental impacts during this specific lease sale.[6] Like in *Peterson*, the Court believes that the agency's options and the information it can consider are meaningfully restricted following the lease sale.

    Plaintiffs point to the "ancillary activities" that lessees are allowed to begin conducting upon issuance of a lease, including "[g]eological and geophysical (G&G) explorations and

---

[6] API also cites *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) as support for its ripeness argument. API Mot. at 18. But that case bolsters, rather than contradicts, the basic framing of this question. Far from holding that the NEPA claims were unripe, *North Slope* decided on the merits that the agency did not have to consider the still-uncertain costs and benefits of a "worst case" oil spill at the lease sale stage because of the future EIS and the fact that "[a]t this stage of review . . .we are chiefly (though not exclusively) concerned about those hazards associated with the limited preliminary activities permitted to the lessees during the lease sale phase." *N. Slope*, 642 F.2d at 605–06; *see also id.* at 606 ("At this stage, with prodigious proposing and reviewing to follow, we have no doubt that this EIS, useful and reasonably foresighted as it is, is valid under NEPA.").

development G&G activities," as a distinction from *Fisheries*.  30 C.F.R. § 550.207(a); *see* Pls.'
Opp'n at 42–43.  The record suggests that this activity, while perhaps minor in comparison to the
total potential exploration and drilling that may occur at later stages, does itself impact the
environment.  *See* AR0008317 ("The G&G surveys can occur in both shallow and deepwater
areas.  Usually fishermen are precluded from a very small area for several days during active
G&G surveying."); AR0008798 ("Underwater noise sources from G&G activities include
impulsive sound sources such as airguns, boomers, subbottom profilers, multibeam echo-
sounders, and side-scan sonars, as well as continuous sources such as vessel and aircraft noise"
which may impact marine mammals); AR0008800 ("Another impact-producing factor to marine
mammals that is associated with G&G activities is the potential for . . . . various marine life [to]
become entangled in some types of lines associated with G&G activities.").

As API points out, the lessee must submit a notice before commencing those activities,
30 C.F.R. § 550.208, and the Regional Supervisor may require additional documentation and
approval if the ancillary activity does not satisfy the regulatory performance standards, 30 C.F.R.
§ 550.209, one of which is that the activity "[d]oes not cause undue or serious harm or damage to
the human, marine, or coastal environment."  30 C.F.R. § 550.202(e).[7]  Still, this notice-and-
potential-documentation procedure for ancillary activities is an inadequate substitute for the
rigorous and comprehensive "hard look" NEPA imposes at the lease sale stage, not to mention
the opportunities for public comment that an EIS provides.  *See Sierra Club (Southeast Market)*,

---

[7] The EISs seem to treat the issuance of at least some ancillary permits as a certain impact
of the lease sale itself.  *See* AR0008199 ("[A]t the lease issuance stage, no activities *beyond
certain ancillary activities* are actually authorized by the lease; therefore, there are few
environmental impacts reasonably expected from the lease sale itself . . . ."); AR0015585
(estimating between 19 and 214 ancillary permits "leading up to and following" a given lease
sale).

867 F.3d at 1367 (The EIS "forces the agency to take a 'hard look' at the environmental consequences of its actions" and "ensures that these environmental consequences, and the agency's consideration of them, are disclosed to the public.").

And as Plaintiffs point out, the lease sale stage is the last point at which the Bureau is definitively required to conduct an EIS for leases in the Gulf of Mexico.  Pls.' Opp'n at 39–40. Interior's Department Manual[8] and regulations state that the preparation of a 5-Year Program and each Lease Sale "will normally require the preparation of an EIS," but unlike leases in other areas, exempts development and production plans in the central and western Gulf of Mexico from that requirement.  516 DM § 15.4(A); *see also* 43 U.S.C. § 1351(e)(1) ("At least once the Secretary shall declare the approval of a development and production plan in any area or region (as defined by the Secretary) of the outer Continental Shelf, other than the Gulf of Mexico, to be a major Federal action."); 30 C.F.R. § 550.269(a) ("At least once in each OCS planning area (other than the Western and Central [Gulf of Mexico] Planning Areas), the Director will declare that the approval of a proposed [Development and Production Plan] is a major Federal action, and [the Bureau] will prepare an EIS.");  *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 18 (D.D.C. 2017) (noting that "Interior invoked these categorical exclusions when it approved British Petroleum's initial and revised exploration plan" for the well that eventually "blew out and caused the Deepwater Horizon oil rig to explode.").

API takes issue with this characterization, replying that the Bureau "employs a detailed process for evaluating *whether* to apply a categorical exclusion."  API Reply at 12 (emphasis in original).  It similarly points out that BOEM requires lessees to submit an environmental impact

---

[8] *Managing the NEPA Process, Minerals Management Service*, *Departmental Manual*, 516 DM § 15.4(A), U.S. Dep't of Interior, https://www.doi.gov/sites/doi.gov/files/elips/documents/516-dm-15.pdf (last updated May 2004).

assessment "to assist the Regional Supervisor in complying with [NEPA]", 30 C.F.R.
§ 550.227(a)(3), and in practice routinely requires additional information from lessees with
proposed projects in order to meet its NEPA obligations at later stages.  API Reply at 12–13.
Even so, just as was the case with the notice requirement for ancillary activities, deciding
whether to apply a categorical exemption for a particular lease is not a substitute for the
requirement to take a "hard look" at the environmental consequences of the project.  An agency
cannot avoid its procedural obligations under NEPA by deferring its analysis to processes that do
not meet the same standard.  Allowing it to avoid review of an allegedly inadequate NEPA
action it did take on the basis that it will undertake further discretionary review down the road
would amount to an impermissible "just trust us" from the agency.

It is also ill-suited for considering the collective impacts of the leases together, something
the agency is required to consider under NEPA.  *See* 40 C.F.R. § 1508.7 (2019) (defining
cumulative impacts for the purpose of NEPA);[9] *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976)
("[W]hen several proposals . . . will have cumulative or synergistic environmental impact upon a
region . . . their environmental consequences must be considered together.  Only through
comprehensive consideration of pending proposals can the agency evaluate different courses of
action."); *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988) (finding
inadequate under NEPA an EIS that did not consider the cumulative impact of multiple leases);
*Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 503 (9th Cir. 2014) ("Once BOEM made the
determination that production is reasonably foreseeable, it was required to consider the full
cumulative impact of that production.").  A site-specific environmental assessment may be

---

[9] This particular definition has since been replaced in NEPA's implementing regulations,
but as previously explained, was controlling at the time of the challenged action.

preferable for certain environmental impacts, such as the risk of oil spills, *see N. Slope Borough v. Andrus*, 642 F.2d 589, 605–06 (D.C. Cir. 1980), but "[i]t is only at the lease sale stage that the agency can adequately consider cumulative effects of the lease sale on the environment, including . . . the effects of the sale on climate change," *Point Hope*, 740 F.3d at 504.  The need for consideration of the cumulative impacts of multiple leases was notably absent from *Fisheries*, which involved a single proposed lease site where all future development would be approved or disapproved in the later analysis.  *Fisheries*, 2018 WL 4705795, at *3.

Indeed, this appears to be the way that BOEM itself understands its NEPA obligations.  The Program EIS and Multisale EIS described the agency's decision to prepare an EIS for the five-year program as "discretionary" because "the obligation to fully comply with NEPA does not mature until leases are issued."  AR0014248; AR0008199.  In contrast, the 2018 Supplemental EIS, which was prepared "to inform decisions for each of the two lease sales scheduled in 2018," noted that "[t]he decision on whether and how to proceed with proposed Lease Sale 250 will be made following the completion of this [NEPA] analysis" with no such mention of discretionary preparation.  AR0015479.  Notably, the Federal Defendants do not challenge this action on ripeness grounds, and none of the parties argue that the lease sale was not a "major federal action" requiring the agency to take a hard look at its actions under NEPA.

*Fisheries* is further distinguishable from the present situation because the lease and regulations at issue here are meaningfully more restrictive of BOEM's discretion to prevent and preclude environmental impacts once the leases are issued.  *See* Pls.' Opp'n at 45.  Both the district court and the Circuit in *Fisheries* examined the regulations and the terms of the lease closely.  *Fisheries*, 858 F. App'x at 372; *Fisheries*, 2018 WL 4705795, at *7–8.  The wind lease in *Fisheries* by its terms did not "authorize any activity within the leased area," offering only the

exclusive right to submit a Construction and Operations Plan. *Fisheries*, 2018 WL 4705795, at

*8. By contrast, the relevant form that will be used for Lease Sale 257 is Form BOEM-2005,[10]

which grants "the exclusive right and privilege to drill for, develop, and produce oil and gas

resources" subject to applicable statutes and regulations.

The regulations applicable to the wind lease in *Fisheries* and oil and gas leases here are

similar, but not identical. For instance, both the relevant regulations allow the agency to cancel a

lease after "notice and opportunity for a hearing," if continued activity would cause "harm or

damage" to the environment that "would not disappear or decrease to an acceptable extent within

a reasonable period of time; and . . . [t]he advantages of cancellation outweigh the advantages of

continuing the lease or grant in force." *Compare* 30 C.F.R. § 585.437(b)(4) (cancellation of

wind lease) *with* 30 C.F.R. § 550.181(a–c) (cancellation of oil and gas leases). The district court

in *Fisheries* found that those conditions did not rise to the level of "any transfer of authority to

prevent lease activities out of BOEM's hands." *Fisheries*, 2018 WL 4705795, at *8. In contrast,

the oil and gas lease cancellations carry the additional requirements that "[a] suspension has been

in effect for at least 5 years or" the lessee requests cancellation, 30 C.F.R. § 550.181(d), and the

lessee is entitled to compensation, 30 C.F.R. § 550.184. *See also* 43 U.S.C. § 1334(a)(2)(A–C).

These additional limitations, while not allowing for drilling, represent an irretrievable

commitment of resources in the sense that once a lease is issued, BOEM cannot unilaterally undo

that decision for at least five years and the government must pay a penalty if it does so.[11]

---

[10] *Oil and Gas Lease of Submerged Lands Under the OCS Lands Act*, U.S. Dep't of Interior, https://www.boem.gov/sites/default/files/about-boem/Procurement-Business-Opportunities/BOEM-OCS-Operation-Forms/BOEM-2005.pdf (last updated Feb. 2017).

[11] Furthermore, approval of the exploration and development plans also moves along a quicker timeline that necessarily limits the scope of inquiry at that stage. *See* 30 C.F.R. § 550.23330 (requiring the Regional Director to take action on a submitted exploration plan within 30 calendar days). And challenges to the third and fourth stages of OCSLA can only be brought

Taking into account the limits on the Bureau's discretion once the leases have been issued, ancillary activity that may begin immediately, the lack of requirement for BOEM to prepare an additional EIS at later stages, the need for BOEM to review the cumulative impact of the sale, the requirement for compensation should BOEM decide to cancel a lease, and the sheer size of Lease Sale 257, it is all but certain that completion of this stage will be the point of no return for at least some environmental consequences.  *Cf. WildEarth Guardians*, 368 F. Supp. 3d at 66 ("While it may be true that after the leasing stage [the agency] can impose conditions to limit and mitigate . . . emissions and other environmental impacts, . . . the leasing stage is the point of no return with respect to emissions.").  The agency has therefore reached the "critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment."  *Wyo. Outdoor Council*, 165 F.3d at 49.  Although BOEM was not required to do all that Plaintiffs request, that is not a question of ripeness but of the merits, to which the Court turns next.

## B.  NEPA Challenges

### 1.  Exclusion of Foreign Consumption in the Calculation of Greenhouse Gas Emissions

Plaintiffs' first challenge is to the Bureau's calculation of total greenhouse gas emissions from Lease Sale 257, specifically, its exclusion of foreign greenhouse gas emissions from its quantitative calculation in the No Action Alternative.  *See* Compl. ¶¶ 174–83.  The Program EIS—prepared for the full five-year program—analyzed the upstream and downstream emissions for the program, AR0014378–83, relying in large part on a more targeted BOEM report entitled

---

in a U.S. Court of Appeals.  *See* 43 U.S.C. § 1349(c)(2) ("Any action of the Secretary to approve, require modification of, or disapprove any exploration plan or any development and production plan under this subchapter shall be subject to judicial review only in a United States court of appeals for a circuit in which an affected State is located.").

*OCS Oil and Natural Gas Emissions and Social Cost of Carbon* ("Wolvovsky and Anderson Report"), AR0014186–241.  In that report, BOEM quantified the difference between the greenhouse gas emissions that would occur under the five-year program and the emissions that would occur if no leasing took place during that period.  AR0014207.  "[T]he majority of [greenhouse gas] emissions" in all alternatives resulted from downstream emissions, and primarily consumption.  AR0014233.  Calculating emissions as a result of consumption in the No Action Alternative, however, required BOEM to calculate the consumption emissions that would be substituted, at least in part, from other sources, some of which may be more carbon intensive.  AR0014207–09.

BOEM also recognized that the decision not to produce oil and gas through the leasing program would decrease the supply of those fuels and raise the price, thereby impacting consumption through the basic functioning of supply and demand.  AR0014214–15.  In order to calculate the impact of those changes in consumption on downstream emissions, BOEM ran a market simulation model called MarketSim.  AR0014208.  After applying MarketSim to the downstream emissions analysis for the No Action Alternative, BOEM reached the conclusion that total greenhouse gas emissions "would be slightly *higher* if BOEM were to have no lease sales" during the five-year program.  AR0014233 (emphasis added).  When completing the Multisale EIS and the 2018 Supplemental EIS, BOEM relied on the Wolvovsky and Anderson Report and again reached the same conclusion: That total greenhouse gases emissions would actually be higher if no lease sales took place.  AR0015651; AR0008545.

Plaintiffs argue that this counterintuitive conclusion is the result of certain erroneous assumptions.  *See* Pls.' Mot. at 30–31; Pls.' Opp'n at 4.  Specifically, the model assumed that foreign production would substitute for domestic production and would be more carbon-

intensive, and it excluded changes in foreign demand from its calculation.  AR0014188 ("BOEM assumed that . . . foreign sources of oil will substitute for reduced [Outer Continental Shelf] supply, and the production and transport of that foreign oil would emit more [greenhouse gasses]."); AR0014220 ("The reduction in foreign consumption of oil and gas in a no action analysis is not taken into account.").  Plaintiffs argue that the record shows both that BOEM had the ability to calculate the emissions results of change in foreign consumption and that it was necessary to do so.  Pls.' Mot. at 11.  Importantly, the MarketSim model did in fact calculate a substantial decrease in "foreign oil consumption of approximately 1, 4, and 6 billion barrels of oil for the low, mid, and high price scenarios respectively over the duration of the 2017–2022 Program" in that same report.  AR0014220.  Nevertheless, BOEM excluded the reduction in consumption of barrels of oil that it had itself identified from its emissions analysis.  *Id.*

### a.  The *Liberty* and *Willow* Decisions

Importantly, both the Ninth Circuit and the District Court for the District of Alaska have had occasion to evaluate the use of this exact same model, and exact same assumption, and both found it to be arbitrary and capricious.  *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) [hereinafter "*Liberty*"]; *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, No. 3:20-cv-00290, 2021 WL 3667986 (D. Alaska Aug. 18, 2021) [hereinafter "*Willow*"].[12]  In *Liberty*, the Bureau utilized the MarketSim model to calculate the downstream

---

[12] Although neither *Liberty* nor *Willow* are binding, the Court finds them highly persuasive in light of the fact that they analyzed the exact same market model methodology— and in *Liberty*, the same Wolvovsky and Anderson Report—as is at issue here.  *See* Resp't's Answering Br., *Liberty*, 18-cv-73400, 2019 WL 2713970, at *9, n.1 ("The full methodology for this lifecycle analysis is described in a BOEM report that is part of the administrative record. *See* OCS Oil and Natural Gas: Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon (Nov. 2016)."); Compl., *Willow*, 3:20-cv-00308, 2020 WL 7624155, ¶ 50 (D. Alaska Dec. 21, 2020) ("BLM reached this implausible conclusion through a flawed application of a market simulation model (MarketSim) developed by BOEM.").

indirect emissions from foreign oil consumption in its No Action alternative for the proposed

drilling project known as the Liberty Project. *Liberty*, 982 F.3d at 736.  Just as in the challenged

EIS here, the MarketSim used in the *Liberty* EIS "assume[d] that foreign oil consumption will

remain static, whether or not oil is produced at Liberty." *Id.*  And just as here, the *Liberty* EIS

"estimate[d] that the no-action alternative will result in a reduction in oil consumption of one,

four, or six billion barrels of oil, depending on the market price of oil" but did not include the

effect on greenhouse gas emissions resulting from those reductions "because [BOEM]

determined it did not have sufficiently reliable information on foreign emissions factors and

consumption patterns." *Id.* at 737.  The Ninth Circuit found that determination to be arbitrary

and capricious, holding that BOEM "'should have either given a quantitative estimate of the

downstream greenhouse gas emissions' that will result from consuming oil abroad, or 'explained

more specifically why it could not have done so,' and provided a more thorough discussion of

how foreign oil consumption might change the carbon dioxide equivalents analysis." *Id.* at 740

(quoting *Sierra Club (Southeast Market)*, 867 F.3d at 1374).

Similarly, in *Willow* the agency "used the same emissions modeling approach" for the

Willow development project and relied on the same justifications of "a negligible impact and a

purported lack of information on foreign energy consumption and emissions patterns" to justify

not calculating foreign greenhouse gas emissions. *Willow*, 2021 WL 3667986, at *10–11.

Significantly, although the agency in *Willow* provided "a lengthier explanation" of its decision

not to do so, the court rejected that explanation because it did not "describe the research it relied

upon to reach these conclusions" or "address the studies that were [also] in the agency record in

*Liberty*." *Id.* at *12.

25

*b.  BOEM's Analysis is Entitled to Deferential Review*

Before drilling down into the merits of BOEM's analysis in the present case, the Court must briefly survey the applicable standard of review.  Reviewing courts should "give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise."  *Communities for a Better Env't v. E.P.A.*, 748 F.3d 333, 336 (D.C. Cir. 2014); *see also Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) (stating that when an agency makes scientific predictions "within its area of special expertise," "a reviewing court must generally be at its most deferential").  Defendants naturally argue that this standard applies here.  *See* Defs.' Mot. at 24; La. Mot. at 8; API Mot. at 19–20.  But Plaintiffs push back on that argument, noting that estimation of market trends, while technical, is outside of BOEM's area of expertise.  Pls.' Opp'n at 8.  In fact, the Ninth Circuit held exactly that in *Liberty*, explaining that BOEM's "area of expertise is the management of conventional (e.g., oil and gas) and renewable energy-related functions, including activities involving resource evaluation, planning, and leasing.  The scope of its expertise does not include the economic analysis of greenhouse gas emissions."  *Liberty*, 982 F.3d at 740 (cleaned up).

The Court acknowledges that even though economic market calculations fall outside the traditional core of BOEM's expertise, it does have significant experience in those matters.  *Cf. Delta Air Lines, Inc. v. Exp.-Imp. Bank of United States*, 85 F. Supp. 3d 436, 462 (D.D.C. 2015) (determining that an agency with "much experience with global financial markets generally and the aircraft financing market in particular" was entitled to substantial deference even though it had "not, until recently, subjected aircraft financing transactions to in-depth economic impact analysis").  The Court therefore gives BOEM's use of the MarketSim model substantial deference.  Nevertheless, substantial deference "does not mean that our review is toothless but

merely that we must be very cautious in entertaining an invitation to reverse." *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000) (quoting *Thomas v. NLRB*, 213 F.3d 651, 657 (D.C. Cir. 2000)).  Even under a deferential review, the Court believes that BOEM acted arbitrarily in excluding foreign consumption from its emissions analysis.

   *c.  The Application of the MarketSim Model to Exclude Foreign Emissions was Arbitrary and Capricious*

All Defendants first argue that BOEM was not required to consider the downstream effects of emissions from consumption at the lease sale stage at all because it is so speculative. *See* La. Mot. at 10–12; API Mot. at 24–25; Defs.' Mot. at 19–20.  There is some merit to this argument.  Both *Liberty* and *Willow* were cases that evaluated the EIS for a proposed development and production plan rather than a lease sale.  *Liberty*, 982 F.3d at 731; *Willow*, 2021 WL 3667986, at *1–2.  And it is true that agencies are not required to quantitatively assess potential consequences that are too remote or speculative at the lease stage.  *See Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 202 (D.C. Cir. 2017) [hereinafter "*Sierra Club (FLEX)*"] (the agency did not need to quantify the net effect on emissions from the potential competition of exported liquified natural gas with other energy sources); *N. Slope Borough v. Andrus*, 642 F.2d at 605–06 (agency's discussion of a potential worst-case oil spill scenario in a lease sale EIS was sufficient where additional relevant information would become known at later stages, which themselves would require a new EIS); *Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1192 (9th Cir. 1988) (the Ninth Circuit was "least troubled by what may seem to be incomplete or speculative data" on oil spill risks in a lease sale EIS because "an oil spill risk analysis can never be more than speculative" without more information on the location and amount of production); *Gulf Restoration Network*, 456 F. Supp. 3d at 98 (the "underlying assumption that the effects of holding the lease sales now, as opposed to sometime in the future, are virtually the same" was

reasonable for the purpose of considering a No Action Alternative); *Wilderness Soc'y v. Salazar*, 603 F. Supp. 2d 52, 62 (D.D.C. 2009) (lease sale EIS contained sufficient analysis of site-specific environmental impacts where the agency "did not know the exact location of exploratory wells and development at the time of the EIS" and "further site-specific analysis will be conducted prior to exploration in the planning area").  Many of those cases involved calculation of the risk from oil spills or to specific animals, which is more easily and accurately calculated at the exploration or development stage and on a site-specific basis.  The same is not true of the reduction in foreign consumption discussed here, which depends on trends and production in other countries rather than any site-specific information.[13]

The Federal Defendants' discussion of *Sierra Club (FLEX)* is more analogous, but still distinguishable.  In that case, the agency compared the foreign emissions from exported liquified natural gas "to emissions of coal or other sources of natural gas" but did not also consider "the potential for [liquified natural gas] to compete with renewables."  *Sierra Club (FLEX)*, 867 F.3d at 202.  It is unclear the extent to which the suggested factor in *Sierra Club (FLEX)* would have introduced uncertainty to an otherwise reliable analysis.  *See id.* (noting that method employed to calculate downstream emissions was not challenged).  Here, though, it is doubtful that consideration of the decrease in foreign consumption would have been any more speculative than the quantitative result the agency produced in the absence of that factor.  Indeed, it is highly likely that the failure to consider it undermined the reliability of the ultimate quantitative, but

---

[13] Louisiana's argument that "the hazard of climate change . . . is far more remote than the hazard of an oil spill" is unpersuasive for this same reason.  *See* La. Mot. at 12.  Also worth noting is that many of Defendant-Intervenor's cited cases included a requirement for further site-specific analysis, which may not be the case here because BOEM is not required to prepare another EIS at the exploration or production stages in the Gulf of Mexico.  *See supra* Section IV.A.

uncertain, result the agency reached.[14]  *See* AR0014381 (stating in the Program EIS that "[t]here

is a significant degree of uncertainty in these numbers" in part because "the likely overseas

reduction in consumption under the No Action Alternative is not calculated in this analysis").

Moreover, in addition to concerns about feasibility, the Department of Energy reasonably

concluded in *Sierra Club (FLEX)* that the resulting conclusion would "be too speculative to

inform the public interest determination" that it was tasked with making.  *Sierra Club (FLEX)*,

867 F.3d at 202 (quotations omitted).  Here, there is little doubt that a more complete

consideration of total greenhouse gas emissions would have significantly informed BOEM's

decision.  All three EISs emphasized the importance of climate change to the agency's decision

and the relevance of lifecycle greenhouse gas emissions to U.S. efforts to combat it.  *See, e.g.*,

AR0014284 (pointing out in the Program EIS that "the U.S. Intended Nationally Determined

Contributions [] memorialized in the 2016 Paris Agreement do not assume 'zero' oil and gas

production or consumption in the future, but rather declining *emissions* from oil.'") (emphasis

added); *see also WildEarth Guardians*, 368 F. Supp. 3d at 70 ("[The agency] did in fact have

information allowing it to forecast [greenhouse gas] emissions . . . . [It] could have expressed the

forecasts as ranges, and it could have explained the uncertainties underlying the forecasts, but it

---

[14] Louisiana's characterization of this Court's opinion in *WildEarth Guardians* as creating a bright-line rule that excuses agencies from considering climate change on the international level is unwarranted.  *See* La. Mot. at 15.  That case involved an agency that refused to quantify emissions resulting from particular lease parcels, and thus "could not conceptualize the extent to which the lease sales would contribute to the local, regional, and global climate change discussed qualitatively in the . . . tiered EISs."  *Wildearth Guardians*, 368 F. Supp. at 77.  Moreover, any such bright-line rule could not be squared with NEPA's mandate that all federal agencies "recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment."  42 U.S.C. § 4332(F).

was not entitled to simply throw up its hands and ascribe any effort at quantification to a crystal ball inquiry." (quotations omitted)).

API's assertion that the agency did not need to consider the impacts of emissions at this stage because it "lacks authority under OCSLA to withhold leasing" likewise fails. *See* API Mot. at 27. While true that "[a]n agency has no obligation to gather or consider environmental information if it has no statutory authority to act on that information," *Sierra Club (Southeast Market)*, 867 F.3d at 1372, the relevant question is not "[w]hat activities does [the agency] regulate?," but "[w]hat factors can [the agency] consider when regulating in its proper sphere?", *id.* at 1373. BOEM had the ability to cancel Lease Sale 257 "on the ground that [it] would be too harmful to the environment," making it "a legally relevant cause of the direct and indirect environmental effects . . . it approves." *Id.* (quotations omitted).[15] API overreads this Court's opinion in *Oceana*, which addressed the reasonableness of BOEM's conclusion "that the environmental impact of cancelling this particular lease would not significantly change because . . . . if this particular lease sale did not go forward, another lease sale in the same area eventually would" when deciding that BOEM had adequately considered a No Action Alternative. *Oceana*,

---

[15] The Department of the Interior recently confirmed this discretion about whether to hold each particular lease sale at oral argument in another OCSLA case, saying that "the fact that there is a schedule of ten leases [in the Five-Year Plan] does not mean that Interior is going to do each of those leases . . . after scheduling, here, ten lease sales over a five-year period, Interior can't then add an eleventh sale to that five-year period, but . . . within the five-year plan, decisions about how many leases and what those leases look like are made at the second stage." Oral Arg. at 24:15–25:26, *Gulf Restoration Network v. Haaland*, 20-cv-5179 (D.C. Cir. Jan. 10, 2022), *on appeal from Gulf Restoration Network v. Bernhardt*, 456 F. Supp. 3d 81, 97 (D.D.C. 2020), https://www.cadc.uscourts.gov/recordings/recordings2021.nsf/33994C9D49F6983485258 7C60066564E/$file/20-5179.mp3. In addition to being at odds with the agency's own understanding of OCSLA, API's position is also in serious tension with the fact that NEPA claims are considered not to be ripe at the Five-Year Program stage. *See Sustainable Econ.*, 779 F.3d at 599. Accepting API's position would mean that all planned lease sales in a five-year program must take place even though the Five-Year Program was never subject to judicial review for NEPA compliance. Such a result would all but render NEPA toothless.

37 F. Supp. 3d at 172 (cleaned up).  The fact that such an assumption might be reasonable does not mean that OCSLA "mandate[s] the approval of <u>every</u> proposed lease sale."  *Gulf Restoration Network*, 456 F. Supp. 3d at 97 (emphasis in original).[16]

Perhaps most importantly, BOEM actually did quantify the effect of the proposed lease sales on foreign consumption.  The relevant section of the Wolvovsky and Anderson Report states that "for the global oil market, MarketSim substitutions under the No Action Alternative show a reduction in foreign oil consumption of approximately 1, 4, and 6 billion barrels of oil for the low-, mid-, and high-price scenarios respectively over the duration of the 2017–2022 Program."  AR0014220.  But despite that recognition that the change in foreign consumption was both foreseeable and quantifiable in terms of *barrels of oil*, the very next sentence goes on to state that this effect was nevertheless excluded from the total quantitative *emissions* calculation. *Id.*  In doing so, BOEM "entirely failed to consider an important aspect of the problem" that it had just identified the sentence before, a classically arbitrary action.  *See State Farm Mutual Auto. Ins.*, 463 U.S. at 43.  Plaintiffs' argument is therefore not that BOEM was required to consider "all emissions effects in one EIS," *see* La. Reply at 7, but rather that it "should have used its ability to estimate foreign emissions . . . rather than zeroing out a key variable" in the quantitative analysis it chose to conduct, *see* Pls.' Opp'n at 13.[17]

In fact, "[t]he record belies BOEM's contention that it could not have summarized or estimated foreign emissions with accurate or credible scientific evidence."  *Liberty*, 982 F.3d at

---

[16] Further, Plaintiffs have not challenged that particular assumption of the No Action Alternative in this case, making API's reliance on the similarity between the language of the No Action Alternative in this case and *Oceana* inapposite.  *See* API Mot. at 28–29.

[17] The MarketSim model did not calculate any change in foreign demand for natural gas or likewise include foreign emissions for natural gas in its analysis, AR0014220, but Plaintiffs have not challenged that particular exclusion.

738.  The record in this case includes papers from the Stockholm Environment Institute that underscore the likely decrease in foreign consumption and provides a methodology for translating the reduction in barrels of oil into a reduction in greenhouse gas emissions, some of which were also present in the *Liberty* record.  *Id.*; AR0026911–AR0026958 (Erickson & Lazarus 2016, *How would phasing out U.S. Federal Leases for Fossil Fuel Extraction affect CO2 Emissions and 2°C goals?*); AR0026965–66 (Erickson 2017, *Final Obama Administration Analysis Shows Expanding Oil Supply Increases CO2*); AR0026967–AR0026969 (Erickson 2016, *U.S. Again Overlooks Top CO2 Impact of Expanding Oil Supply . . . But that Might Change*).  One of those reports did exactly what BOEM claims was not possible, translating the agency's own estimate of the reduction in barrels of oil at each price point into greenhouse gas emissions by "[u]sing standard energy contents (from the U.S. Department of Energy) and carbon contents (from the U.S. Environmental Protection Agency), and discounting the oil used in products and not combusted."  AR0026966.[18]

The Wolvovsky and Anderson Report, as well as the later EISs that incorporated it, acknowledged that a decrease in foreign emissions was likely, but was not reflected in its analysis.  AR0014220; AR0014381 (acknowledging "a significant degree of uncertainty" in the lifecycle greenhouse gas emission numbers, including that "the likely overseas reduction in consumption under the No Action Alternative is not calculated" in the Program EIS);

---

[18] The Federal Defendants criticize the usefulness of the Stockholm studies on several grounds. Defs.' Mot. at 22–23.  But "because a reviewing court . . . must judge the propriety of agency action solely by the grounds invoked by the agency, *post hoc* explanations that the agency did not articulate when it acted are insufficient."  *NAACP v. Trump,* 298 F. Supp. 3d 209, 237 (D.D.C. 2018) (cleaned up).  Plaintiffs are correct that these critiques are nowhere to be found in the agency record, and that in fact the Draft EIS for Lease Sale 258 largely adopts the Stockholm model.  *See* Pls.' Opp'n at 12 (quoting LS 258 DEIS 47–48)).  As the Federal Defendants do not respond to that point in their Reply brief, the Court deems those particular arguments conceded.

AR0015651 (same in the 2018 Supplemental EIS).  While "the effects of assumptions on

estimates can be checked by disclosing those assumptions so that readers can take the resulting

estimates with the appropriate amount of salt," *Sierra Club (Southeast Market)*, 867 F.3d at

1374, an agency's obligation in the face of missing or incomplete information goes beyond just

acknowledging it.  The relevant regulation, 40 C.F.R. § 1502.22 (2019), requires that:

> If the information relevant to reasonably foreseeable significant adverse impacts
> cannot be obtained . . . the agency shall include within the environmental impact
> statement: (1) A statement that such information is incomplete or unavailable; (2)
> a statement of the relevance of the incomplete or unavailable information to
> evaluating reasonably foreseeable significant adverse impacts on the human
> environment; (3) a summary of existing credible scientific evidence which is
> relevant to evaluating the reasonably foreseeable significant adverse impacts on the
> human environment, and (4) the agency's evaluation of such impacts based upon
> theoretical approaches or research methods generally accepted in the scientific
> community.

40 C.F.R. § 1502.22(b) (2019).

The entirety of the Wolvovsky and Anderson Report's explanation for excluding the

reduction in foreign consumption from its emissions analysis was that "Oil consumption in each

country is different and BOEM does not have information related to which countries would

consume less oil.  This is important information since consumption patterns vary by country."

AR0014220.  This nearly verbatim language, which "does not cite any materials in support of

these statements nor describe the research it relied upon to reach these conclusions," was found

"insufficient to satisfy NEPA's requirements" by the Ninth Circuit in *Liberty*.  *Liberty*, 982 F.3d

at 738.  This Court agrees and believes that it is insufficient under the relevant D.C. Circuit

precedent as well.[19]

---

[19] While not controlling or as factually similar as *Liberty*, the Tenth Circuit's reasoning in
*WildEarth Guardians v. U.S. Bureau of Land Mgm't*, 870 F.3d 1222 (10th Cir. 2017), is likewise
persuasive.  That Court found the agency's assumption of perfect substitution of coal production
in the No Action Alternative to be "arbitrary and capricious because it lacks support in the
administrative record and ignores basic supply and demand principles; and it ignored readily

In *Sierra Club (Southeast Market)*,[20] the D.C. Circuit held that "NEPA analysis necessarily involves some 'reasonable forecasting,' and that agencies may sometimes need to make educated assumptions about an uncertain future" in the context of finding FERC's decision not to quantify "the downstream greenhouse emissions that will result from burning the natural gas that the pipelines" at issue would transport was arbitrary and capricious. *Sierra Club (Southeast Market)*, 867 F.3d at 1374. In reaching that conclusion, it pointed to the fact that FERC had "already estimated how much gas the pipelines will transport" and that the record "even cited a Department of Energy report that gives emissions estimates per unit of energy generated for various types of plant." *Id.* This case is directly analogous: The Wolvovsky and Anderson report already estimated the reduction in foreign demand for barrels of oil, and the record includes the Stockholm papers, which provide a methodology and application of how to translate those numbers into emissions. *See* AR0014220 (Wolvovsky and Anderson Report); AR0026911–69 (Stockholm papers). Therefore, just as in *Sierra Club (Southeast Market)*, BOEM "should have either given a quantitative estimate of the downstream greenhouse emissions that will result from" the reduced foreign consumption "or explained more specifically why it could not have done so." *Sierra Club (Southeast Market)*, 867 F.3d at 1374.

---

available tools to measure the market impact of such a large contraction in the nation's coal supply." *Id.* at 1233–34. The Tenth Circuit rejected a similar argument to the ones Defendants make here, that the assumption was only a small piece of the agency's overall analysis, pointing out that the agency's "[p]rioriti[zation of] the carbon emissions and global warming analysis . . . suggest[ed] that this question was critical to the decision to open the leases for bidding. . . . The perfect substitution assumption was more than a 'mere flyspeck' in the [agency]'s NEPA analysis." *Id.* at 1236.

[20] This is incidentally the same case that the Ninth Circuit relied on in *Liberty*. *See Liberty*, 982 F.3d at 739.

*d.  The Discussion in the Determination of NEPA Adequacy Addendum did not Remedy BOEM's Error*

In response to the *Liberty* decision, BOEM did provide a more detailed explanation for excluding the probable reduction in foreign consumption from its emissions analysis in an Addendum to its Determination of NEPA Adequacy for Lease Sale 257 in January 2021.[21] AR0029962–68.  The Addendum explicitly acknowledged that the impact on foreign consumption was a "relevant" consideration under 40 C.F.R. § 1502.22(b) and provided the four-part explanation required by that regulation.  AR0029966 (citing 40 C.F.R. § 1502.22(b) (2019)).  It stated that there was "incomplete and unavailable information . . . regarding the degree to which different countries would be impacted by a small drop in oil prices resulting from OCS production, the differences in the energy substitution patterns for each of those countries, and the types and rates of GHG emissions resulting from those substitute sources," that this data "would not be obtainable at any cost for any near-term analyses," and that BOEM's previous "modeling analysis represents the best available approach to a quantitative analysis and comparison of GHG emissions from the Proposed Action and the No Action Alternative."  AR0029966.  It also asserted that BOEM's qualitative analysis of changes to foreign greenhouse gas emissions made quantitative analysis unnecessary.  AR0029966–67.  The Addendum's only cited source was the Wolvovsky and Anderson Report itself.  AR0029968.

---

[21] The Addendum was released in January 2021 in support of the original Record of Decision for Lease Sale 257, which was rescinded soon after with the change in administration. The second Record of Decision for Lease Sale 257 published in September 2021 merely referenced that analysis and stated that "The potential impacts of [greenhouse gas] emissions from foreign oil consumption are not inconsistent with conclusions from the" Program EIS, Multisale EIS, 2018 Supplemental EIS, or the updated Lease Sale 257 Determination of NEPA Adequacy.  AR0029788.

Although the Addendum elaborated in more detail about what information it would like to have to conduct an ideal analysis, it never grappled with Plaintiffs' core contention in both *Liberty* and the action here: That methods to estimate that information were already available.  It did not discuss the Stockholm papers and only vaguely referred to "[a] survey of relevant studies and literature show[ing] that . . . reliable and uniform global data are not reasonably available at this time," without a single reference.  AR029965.  The total lack of attention to that issue is disconcerting both in light of *Liberty*, which the Addendum purported to address, and the regulations' mandate that when information relevant to "reasonably foreseeable significant adverse impacts cannot be obtained," the agency provide "a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and . . . the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community."  40 C.F.R. § 1502.22(b)(3)–(4) (2019).

Undercutting BOEM's argument that it could not have calculated the emissions resulting from changes to foreign consumption is the fact that it did exactly that just a few weeks after releasing the September 2021 Record of Decision, in the Draft EIS for its next proposed lease sale (258), relying substantially on the Stockholm methodology.  *See* Ex. A of Pls.' Opp'n ("LS 258 Draft EIS"), ECF No. 51-2; Ex. 1 of Defs.' Reply, ECF No. 65-1 (same) at 47–48.  That analysis "applied a single emissions factor to all combusted oil, due to a continuing lack of information about the end petroleum products consumed in foreign markets." Defs.' Mot. at 17, n.6.  The Lease Sale 258 Draft EIS acknowledges that "[n]o new data or capabilities have been made available to BOEM since the *Liberty* decision" that would have precluded it from adopting this new methodology before.  *Id.* at 42–43.  And while the new EIS is still in draft form, it is

useful not because it demonstrates the best or only way to quantify the change in foreign emissions, but because it demonstrates that it was *possible* for BOEM to have done so in a scientifically reliable way with the information available to it when it evaluated Lease Sale 257.

Defendants are correct that an agency's implementation of a new methodology does not presuppose that the previous methodology was unreasonable. Defs.' Reply at 9. But at the time the Record of Decision for Lease Sale 257 was published in September 2021, both the *Liberty* and *Willow* decisions had held that it was.[22] *See Liberty*, 982 F.3d at 740; *Willow*, 2021 WL 3667986, at *1–2. The Addendum makes multiple references to timing, expressing its concern that "[a] quantitative approach . . . is not currently or reasonably feasible *to make the lease sale decision in a timely manner*." AR0029965 (emphasis added). Delay of a scheduled project can be a permissible consideration in whether to adopt a new technology, but this case is unlike others in which an agency was reasonable in using an outdated—but still acceptable— methodology. For instance, in *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497 (D.C. Cir. 2010), the D.C. Circuit held that an agency was not required to "employ the best, most cutting-edge methodologies" and permissibly relied on a methodology it admitted was outdated by the time of the decision rather than delay a scheduled project. *Id.* at 510–11. Crucially, the agency there "reasonably concluded that the estimates derived by the [old] method were adequate and did not need to be recalculated using a different method." *Id.* at 511. Similarly, in *Oceana* this Court held that BOEM did not have to rerun its full Oil Risk Spill Analysis based on updated data about spill rates and likely spill sizes "because it reasonably

---

[22] Plaintiffs, along with other environmental organizations, had also pointed out this specific deficiency in public comments at each stage. *See* Ex. 3 of Hardy Decl. at 16–17, ECF No. 34-12 (drawing the agency's attention to the Stockholm research in a comment to the Program EIS); AR0029621–24 (same, in a comment on the Supplemental EIS); Ex. 4 of Hardy Decl. at 4–7 (same, in a letter to the agency regarding Lease Sale 257).

concluded that a new [spill risk analysis] run would not be expected to substantially affect probabilities" and it did conduct a special catastrophic scenario run.  *Oceana*, 37 F. Supp. 3d at 170 (cleaned up).

In contrast, excluding the reduction in foreign consumption emissions was not a reasonable methodology at the time of the preparation of the original Wolvovsky and Anderson Report, and BOEM provided no reasons even in the Addendum to think that it was.  And by the time the second Record of Decision was released, BOEM had been informed of that problem by not one but two different courts.[23]  "It would be incongruous with . . . [NEPA]'s manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval."  *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989).  Barreling full-steam ahead with blinders on was simply not a reasonable action for BOEM to have taken here.

The closest the Addendum comes to a reasoned justification for not calculating impact of foreign consumption on emissions is its argument that the total proposed sales for the 2017–2022 Program would increase global oil consumption "by 3.9 billion barrels," which it claims is a drop in the proverbial ocean in comparison to the 2.8 trillion-barrel global demand that would exist even in the absence of lease sales, with Lease Sale 257 accounting for an even smaller portion of that.  AR0029965–66.  But the fact that the sale would have a relatively small marginal impact on global oil consumption, and thus greenhouse gases, on its own says nothing about the adequacy of the conclusions in the prior NEPA analysis.  The problem is that considering foreign

---

[23] The Addendum accompanied the original Determination of NEPA Adequacy, which was of course rescinded in early 2021.  The August 2021 Record of Decision for referenced the *Liberty* decision as well, but with even less analysis.  AR0029794.

consumption likely does change the bottom line of a key conclusion in the prior EISs: That greenhouse gas emissions if the Lease Sale Programs were held "would be similar to but slightly lower than the No Action Alternative" in two price scenarios.  AR0014381.  BOEM's vague reference to its "qualitative analysis of foreign emissions"—which it does not attempt to pinpoint and appears to only refer to the disclosure of the assumption itself—does not fill this gap.  *See* AR0029966.  "[D]eficiencies in the [Program] EIS may affect the ability of [the agency] to tier to that document when making individual leasing decisions."  *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1245 (D.C. Cir. 2018) (quotations omitted).  In short, acknowledging that a key quantitative conclusion is unreliable and simultaneously declaring that it is "still valid for use" and has "not change[d]" is arbitrary.  *See* AR0029967.

A reasoned explanation is especially crucial where, as here, the agency has varied so dramatically in its approach over the past year, in which the agency announced Lease Sale 257, rescinded it and all other pending sales, and then reinstated it based on the same analysis.  As *amici* Members of Congress point out, the Federal Defendants' position that the prior EISs were adequate to fulfill NEPA's hard look requirement for Lease Sale 257 is in some tension with its own treatment of that issue over the past several months.  Congress Amicus Br. at 8–11.  For instance, in its public statement describing the decision to appeal the *Louisiana v. Biden* litigation, Interior stated that "the current programs fail to adequately incorporate consideration of climate impacts into leasing decisions or reflect the social costs of greenhouse gas emissions." *See* Press Release, Dep't of Interior (Aug. 16, 2021).[24]  That inconsistency lends itself to some skepticism of the agency's conclusion that the analysis in the prior EIS was sound.  *Cf.*

---

[24] Available at: https://www.doi.gov/pressreleases/interior-department-issues-statement-oil-and-gas-leasing-program.

*Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 648 (D.C. Cir. 2020) ("Because the Directive contains no discussion of [the agency's] prior conclusion at all, the Directive crossed the line from the tolerably terse to the intolerably mute.") (cleaned up).

Finally, even if the Determination of NEPA Adequacy and Addendum could substantively squeak past arbitrary and capricious review, Plaintiffs rightly point out such a justification would likely be procedurally inadequate as well.  *See* Pls.' Opp'n at 15.  The twin aims of NEPA are to force the agency to take a 'hard look' at the environmental consequences of an action, to "ensure[] that these environmental consequences, and the agency's consideration of them, are disclosed to the public."  *Sierra Club (Southeast Market)*, 867 F.3d at 1367; *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) ("Publication of an EIS . . . gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process, and, perhaps more significantly, provides a springboard for public comment." (citations and quotations omitted)).

A Determination of NEPA Adequacy is of course an appropriate mechanism for an agency to determine whether its existing analysis is sufficient.  43 C.F.R. § 46.120(c).  But it cannot substitute for an EIS itself unless there is an opportunity for public input.  *See Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) ("[A] post-EIS analysis—conducted without any input from the public—cannot cure deficiencies in an EIS."); *cf. Friends of Animals v. U.S. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 59, 63 (D.D.C. 2017) (holding that relying on a Determination of NEPA Adequacy that had been released in draft form for public comment did not violate the agency's commitment to provide ongoing NEPA analysis).  BOEM is not required to circulate a draft Determination of NEPA adequacy for public

comment, but it cannot rely on that document to cure the errors in the underlying EISs unless it does.

### 2. Failure to Prepare a Supplemental EIS

NEPA itself does not directly state when an agency must prepare a supplemental EIS, but as the Supreme Court has held, they are "at times necessary to satisfy [NEPA]'s 'action-forcing' purpose. *Marsh*, 490 U.S. at 370–71. The relevant regulations make this abundantly clear by requiring agencies to "prepare supplements to either draft or final environmental impact statements if . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (2019). "[T]he need for supplementation 'turns on the value of the new information to the still pending decisionmaking process.'" *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1058 (D.C. Cir. 2017) (quoting *Marsh*, 490 U.S. at 374).

An agency's decision about whether to prepare a supplemental EIS is entitled to deference because it involves the agency's technical expertise. *Gulf Restoration Network*, 456 F. Supp. 3d at 102. "That said, 'courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Stand Up for Cal.! v. U.S. Dep't of Interior*, 410 F. Supp. 3d 39, 57 (D.D.C. 2019), *aff'd*, 994 F.3d 616 (D.C. Cir. 2021) (quoting *Marsh*, 490 U.S. at 378). "The overarching question is whether an EIS's deficiencies are significant enough to undermine informed public comment and informed decisionmaking." *Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017) (quoting *Sierra Club (Southeast Market)*, 867 F.3d at 1368 (D.C. Cir. 2017)). Plaintiffs have compiled a list of new information that they

contend was significant enough that the Bureau was required to prepare a supplemental EIS.[25]
Although Plaintiffs assemble a compelling litany of information, they have not shown that this
new information is "sufficient to show that the remaining action will affect the quality of the
human environment . . . to a significant extent not already considered." *Marsh*, 490 U.S. at 374
(internal quotations and alterations omitted); *Stand Up for Cal.!*, 994 F.3d at 628 (same).

### a.  New Science Regarding Climate Change Impacts of Leasing

Plaintiffs provide several studies highlighting the need to keep global temperature from
rising past 1.5 degrees Celsius, and the counterproductive role of oil and gas leasing to reaching
that goal.  Pls.' Mot. at 14.  Of those, the Determination of NEPA Adequacy explicitly
mentioned consideration of two, the IPCC Study and the Merrill Study, in the main document,
but listed several others and provided additional discussion, including of the 1.5-degree goal, in
the attached Impact Producing Factors Analysis form.  *See* AR0029812; AR0029849–52.
Despite acknowledging and discussing these sources, BOEM determined that the new

---

[25] Plaintiffs also suggest in passing that BOEM's statements in its prior EIS may have
created a binding duty on the agency to prepare Supplemental EISs with greater regularity.  Pls.'
Mot. at 16; Pls.' Opp'n at 19, n.6; *see also W. Org. of Res. Councils*, 892 F.3d at 1245
(contemplating that agency's commitments to update and EIS "might have created a binding
duty on the agency at one point").  Specifically, the Multisale EIS states: "BOEM plans to
supplement this Multisale EIS on a regular basis to provide for more consistency and for
planning purposes.  Unless circumstances or information warrants an earlier Supplemental EIS,
BOEM expects to issue a Supplemental EIS once a calendar year. An additional NEPA review
(e.g., a Determination of NEPA Adequacy, an environmental assessment [EA] or, if determined
necessary, a Supplemental EIS) will be conducted prior to the decision on an individual proposed
GOM lease sale to address any relevant new information."  AR0008202.  Without foreclosing
the possibility that such a duty may exist, the Court agrees with the Federal Defendants that here
the agency at most committed itself to conducting additional NEPA analysis, which could
include alternate documentation such as Environmental Assessments or Determinations of NEPA
Adequacy.  *See Friends of Animals*, 232 F. Supp. 3d at 63 (issuing a Determination of NEPA
adequacy satisfied an agency's affirmative commitment to evaluate future actions through the
"appropriate level of NEPA analysis" internal quotations omitted)).

information would not "alter the impact conclusions for Climate Change" found in the previous EISs.  AR0029849.

      Plaintiffs fail to show that this new research would alter BOEM's analysis of climate change "to a significant extent not already considered" in its previous EISs.  *Marsh*, 490 U.S. at 374.[26]  Those documents included an extensive discussion of climate change and were unflinching in their recognition of the threat climate change presents to humanity.  *See, e.g.*, AR0014284, AR0014377–83, AR0014542 (Program EIS); AR0008543–46 (Multisale EIS); AR0014188, AR0014199–202 (Wolvovsky and Anderson Report); AR0015650–51 (2018 Supplemental EIS).  Indeed, the seriousness with which BOEM considered climate change as part of its analysis was precisely what made its reliance on its counterintuitive conclusion that the No Action Alternative would increase greenhouse gas emissions such a grave error.  *See supra* Section IV.B.1.  Plaintiffs do not take issue with the reliability or representativeness of the sources that BOEM did consider.  The Court cannot say under its deferential standard of review that the new information provided by the Plaintiffs would alter its evaluation of this issue to any significant extent.  Plaintiffs would no doubt have preferred that BOEM act with greater urgency, but "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351.

---

[26] Plaintiffs mention within this argument that BOEM failed to take into account "new evidence demonstrat[ing] that existing operations in the Gulf of Mexico emit twice the amount of methane than previously thought," and that "racial minorities and low-income communities bear a disproportionate burden from climate change."  Pls.' Mot. at 16.  Although they include some studies relevant to those topics, *see* Ex. 15 of Pls.' Mot., ECF No. 34-24; Ex. 17 of Pls.' Mot., ECF No. 34-26; Ex. 19 of Pls.' Mot., ECF No. 34-28, they do not develop these arguments with any specificity.  Since the Determination of NEPA Adequacy did consider both of these topics, however, Plaintiffs have not shown that BOEM's lack of a more in-depth discussion violated NEPA's rule of reason or was otherwise arbitrary and capricious.  *See* AR0029856–57 (discussing recent research on methane emissions from drilling operations); AR0029921–31 (collecting and discussing extensive research on environmental justice concerns).

*b.  2021 GAO Report on Safety of Oil and Gas Operations in the Gulf of Mexico*

Plaintiffs further argue that the finding in a 2021 Government Accountability Office

Report that the Bureau of Safety and Environmental Enforcement (BSEE) "does not have a

robust oversight process for ensuring the integrity of approximately 8,600 miles of active

offshore oil and gas pipelines in the Gulf of Mexico" undermines BOEM's prior determination

that BSEE's regular safety checks made the risk of pipeline spills and leaks relatively low.

*Compare* Ex. 12 of Pls.' Mot. at 2, ECF No. 34-21 ("GAO Report") *with* AR0008604 ("New

regulations focusing on improved safety, more regulatory checks, and inspections should

decrease the already small likelihood of the occurrence of . . . spills") *and* AR0008305–07

(describing BSEE's various regulatory safety requirements for pipelines).  Plaintiffs also

highlight the finding from that study that BSEE "has authorized industry to leave over 97 percent

of pipeline mileage (almost 18,000 miles) on the Gulf of Mexico seafloor following the

conclusion of their active use," presenting further risks for leaks from those pipelines.  GAO

Report at 13.

Another court in this district recently rejected a highly similar challenge to BOEM's

reliance on BSEE enforcement in light of a different GAO Report that criticized BSEE.  *Gulf*

*Restoration Network*, 456 F. Supp. 3d at 101.  In doing so, it noted that "an agency may properly

base its evaluation of environmental impacts on the assumption that other specialized agencies

with jurisdiction will enforce permits and related mitigation measures according to the law."  *Id.*

(citation and quotation omitted).  It also rejected the argument that the GAO report in that case

suggested BSEE was "not performing its enforcement duties at all," instead reading that report as

"suggest[ing] that there is room for improvement of the BSEE's existing policies."  *Id.*

The same outcome is warranted in this case.  The 2021 GAO Report, like the one in *Bernhardt*, offers constructive criticism and areas for improvement, as such reports generally do. And it was perfectly reasonable for BOEM to assume that its sister agency would follow its own regulations, which remain in effect.  *See* 30 C.F.R. §§ 250.1000 *et seq.*  Nor did BOEM treat its sister agency's regulations as a fail-safe in the EISs, instead acknowledging that leaks and spills from pipelines are a real and ongoing risk and quantifying those risks.  *See* AR0008401 (analyzing the potential for pipeline failures as a result of hurricanes and other factors); AR0015605 (including the probability of spills with a separate category for pipelines).  Plaintiffs do not challenge the methodology for arriving at those estimates.  It was therefore not arbitrary or capricious for BOEM to decide that those estimates did not need to be updated at this time.

That said, the 2021 GAO Report appears to be at least the second such report identifying similar shortcomings, the first being the one at issue in *Gulf Restoration Network*.  *See* La. Mot. at 19 ("The alleged shortcomings identified in the 2021 GAO report are the same ones raised in the 2017 report."); *but see* Pls.' Opp'n at 30, n.8 ("The 2017 Report was about other serious enforcement shortcomings at BSEE, not specifically addressing pipeline enforcement.").  The Court does not foreclose the possibility that there may eventually be a tipping point at which another fellow agency's poor track record could make continued reliance on its rigorous enforcement unreasonable, at least for the purposes of risk analysis.  But any such threshold has not been passed here.

### c. Information About the Depth at which Drilling Would Occur

Next, Plaintiffs argue that contrary to the reasoning in the 2018 Supplemental EIS, which indicated that most drilling and support structure activity would occur in the shallower water of the continental shelf, *see* AR0015587–88 (support structures); AR0015589, AR0015592 (drilling

and production), recent trends indicate that most permits are in fact being issued for deeper

water, implicating safety risks not previously considered.  *See* Pls.' Mot. at 18.

      The EISs already discuss and tentatively forecast the varying different drilling depths in

different production scenarios.  AR0015589–90.  The parties debate whether those forecasts

remain accurate in light of the recent permit trends, *compare* Pls.' Mot. at 18 *with* Defs.' Mot. at

33, but the Court need not resolve that issue.  While drilling depth will almost certainly be a

relevant consideration for the agency later on, Intervenor-Defendants persuasively argue that

BOEM had no obligation to consider it right now.  *See* La. Mot. at 18; API Mot. at 39.

      This Court considered a similar argument about whether BOEM's consideration of the

relative risks of drilling depths was adequate at the lease sale stage in *Oceana*.  37 F. Supp. 3d at

167.  It determined that because the risks of deepwater drilling are necessarily site-specific,

BOEM had taken the requisite hard look required for the lease sale stage.  *Id.*  Such post-lease

operational issues will receive ample review that must also comply with NEPA at the later

exploration and production stages.  *Id.*  If BOEM fails to give the risks of deepwater drilling the

requisite hard look at the later stages of OCSLA, Plaintiffs can raise another claim at that time.

But BOEM's decision not to supplement the existing EIS at this stage based on that particular

information is more than defensible, and it has done all that was required.

*d.  Information Regarding the Endangered Rice's Whale (f/k/a "Gulf of Mexico Bryde's Whale")*

      The Court turns next to whether new information regarding the Rice's Whale required a

new EIS.  At the time the EISs were completed, the whale was believed to be a sub-species of

the Bryde's Whale and is referred to in the EISs as the Gulf of Mexico Bryde's Whale.  This past

year, however, the National Marine Fisheries Service reclassified the whale as a unique species

now known as Rice's Whale.  86 Fed. Reg. 47,022-01 (Aug. 23, 2021).[27]  The taxonomy and name change later recognized by the Fisheries Service "does not change the listing status of the species under the [Endangered Species Act] and does not alter any protections afforded the species" under that Act.  *Id.* at 47023.

The Rice's Whale was not classified as endangered at the time of the prior EISs.  Nevertheless, it was extensively considered in a section of the Multisale EIS evaluating the impacts of a range of oil-and-gas-related activities on marine mammals in the Gulf of Mexico.  AR0008778–824.  That section anticipated that the Gulf of Mexico Bryde's Whale could soon be classified as an endangered species.  AR0008787; AR0008794; *see also* AR0015747–48 (including the same discussion in the 2018 Supplemental EIS).  It stated that "there are insufficient data to determine the population trends for this stock" but recognized that the population was likely to be very small.  AR0009794.  Various negative impacts that could affect the Gulf of Mexico Bryde's Whale specifically were identified.  *See* AR0008800 (noting that "nearby noise from seismic surveys occurring in the [Central Planning Area]" could affect the Bryde's whale); AR0008807 (acknowledging that baleen whales, including the Bryde's Whale, "use low frequency sounds that overlap broadly with the dominant frequencies of many industrial sounds, and there are indications that baleen whales are sensitive to low- and moderate-frequency sounds"); AR0008809 ("Baleen whales are particularly vulnerable to direct impacts from oil [spills] causing fouling of baleen plates, which could impact feeding behavior."); AR0008813 ("Impacts to the Gulf of Mexico Bryde's whales' habitat or to individual Bryde's whales exposed to an oil spill or associated spill response activities would increase the risk of extinction of this distinct population segment, which would elevate the

---

[27]The Court will use the two names interchangeably for the purpose of this opinion.

impact for this analysis to major."); AR0008018 ("An example of a major impact would be if a discarded monofilament fishing net were to cause physical injury or mortality to a marine mammal species with a low population estimate (e.g., Bryde's whale).").

Ultimately, although the Multisale EIS recognized that "energy exploration and development is one of many contributing factors adding to the [] Bryde's whale's risk of extinction," it concluded that the proposed Multisale Program would only minimally contribute to that risk because the whale's "current primary habitat" was in the Eastern region of the Gulf of Mexico, which was under Congressional moratorium.  AR0008800.  The 2018 Supplemental EIS referenced the Bryde's Whale and tiered to the Multisale EIS's analysis, but it did not identify any specific new information about the species.  *See* AR0015742–55.

The Fisheries Service classified the Gulf of Mexico Bryde's Whale as endangered in 2019.  84 Fed. Reg. 15,446 (Apr. 15, 2019).  That classification cited a study estimating the population at about 44 individuals.  84 Fed. Reg. at 15,473; *see also* AR0037444 (citing the "approximately 44 individuals" figure).  The listing also cited a scientific study finding that the Gulf of Mexico Bryde's Whale spends most of its time during the night in shallower depths, thereby increasing the risk for vessel collisions, and concluded that "any increase in the number of vessels in the Bryde's whales' habitat, such as could occur following the expiration of the moratorium on lease sales, would increase the severity of this threat."  *Id.* at 15463; *see also* Ex. 20 of Pls.' Mot., ECF No. 34-29 (attaching that study).  Although recognizing that the historic range of the whale was likely much larger, the Fisheries Service determined that its current distribution was limited to the northeastern part of the Gulf of Mexico and identified the whale's Biologically Important Area as waters between 100 m and 400 m deep from approximately

Mobile Bay, Alabama to just south of Tampa, Florida.[28]  *See* 84 Fed. Reg. at 15,472–73. This

area falls fully within the portion of the Gulf of Mexico that was subject to congressional

moratorium and that was excluded from the entire 2017–2022 Program, including Lease Sale

257.  *See* AR0037490 (overlaying map of Bryde's Whale area onto map of Congressional

moratorium, below).



        Following the listing of the Gulf of Mexico Bryde's Whale as an endangered species, the

Fisheries Service released a Biological Opinion examining the impact of the offshore oil and gas

program, including to the Gulf of Mexico Bryde's Whale.  *See* AR0036866–7493.  That report

identified the four primary threats to the species as sound, vessel collisions, energy exploration,

and oil spills.  AR0037060.  The Biological Opinion's prognosis for the Gulf of Mexico Bryde's

Whale was grave indeed.  It concluded that absent mitigation, "[b]ased on the combined effects

of exposure to the stressors . . . we expect that all individual[s] . . . not killed by vessel strikes . . .

are likely to experience chronic stress and behavioral disruption associated with noise from the

---

        [28] This was slightly larger than a Biologically Important Area previously identified in
2015 as "waters between 100 m and 300 m deep from approximately Pensacola, Fla. to just south
of Tampa, Fla."  84 Fed. Reg. 15472.

proposed action, significant masking, and hearing loss," and that as a result "the proposed action is likely to jeopardize the continued existence of the Gulf of Mexico Bryde's whale." AR0037444–45.

In light of those conclusions, the Biological Opinion proposed a Reasonable and Prudent Alternative "to avoid the likelihood of jeopardizing the continued existence of the Gulf of Mexico Bryde's whale." AR0037488. That Alternative imposes several restrictions to limit the potential for vessel strikes in the Bryde's Whale's Biologically Important Area, including a speed limit and a bar on transit at night or during low visibility conditions. AR0037488–89. The Fisheries Service concluded that with the implementation of the Alternative, the oil and gas program would not jeopardize the continued existence of the Bryde's Whale, AR0037491, but would likely still result in the "incidental take . . . by death, injury, and harassment" of endangered species such as the Rice's Whale, AR0037493. *See also* AR0034710–34 (updated Incidental Take Statement concluding the same).

In addition, the findings of the Biological Opinion regarding the risks to the Bryde's Whale from energy development assumed that the Congressional moratorium would expire in 2022. *See* AR0037060 ("[I]f new leases are offered after the . . . moratorium expires, Bryde's whales could be exposed to increased threats associated with energy exploration and development."); AR0037441 (clarifying for its table of estimated impacts that it did "not account for removal of the . . . moratorium area"). The moratorium has since been effectively extended through 2032. AR0034751.

With that background in place, the Court turns to the question it must decide: Whether the information on the Rice's Whale in the endangered species classification and the related Biological Opinion by the Fisheries Service is "sufficient to show that the remaining action will

affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374 (internal quotations omitted).  The Court concludes that it is not.

The Determination of NEPA Adequacy for Lease Sale 257 discussed the endangered classification of Rice's Whale and the related Fisheries Service opinions.  AR0029815–17.  BOEM noted that it had adopted the Fisheries Service's Reasonable and Prudent Alternative that would avoid placing the survival of the Rice's Whale in jeopardy.  AR0029816.  It determined that many of the harms discussed in the Biological Opinion would not result from this particular Lease Sale, because none of the alternatives would have offered tracts in the Rice's Whale's Biologically Important Area, which is fully encompassed by the congressional moratorium.  AR0029816; *see also* AR0037490 (map).  The Determination of NEPA Adequacy also reasoned that collisions were unlikely to result from this particular sale because "vessels expected to service leases issued as a result of this proposed lease sale are likely to use ports closer to the" Western and Central planning areas rather than transiting across the Eastern area and clarified that "BOEM and BSEE will also verify the service-vessel routes on post-lease Approvals to determine if any additional post-lease mitigations are required."  AR0029816.   Finally, the Determination of NEPA Adequacy noted that "in the unlikely event that post-lease activities are proposed that could impact the Bryde's whale, both BSEE and BOEM have the discretion to require additional mitigations at that time."  *Id.*

Plaintiffs take issue with BOEM's reliance on the Reasonable Prudent Alternative as obviating the need for a supplemental EIS.  Mitigation measures can sometimes suffice to allow an agency to forego an EIS if they are sufficiently specific and effective.  *See Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982) ("If

. . . the proposal is modified prior to implementation by adding specific mitigation measures which completely compensate for any possible adverse environmental impacts stemming from the original proposal, the statutory threshold of significant environmental effects is not crossed and an EIS is not required."); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001) ("In evaluating the sufficiency of mitigation measures, we consider . . . whether the mitigation measures will render such impacts so minor as to not warrant an EIS.").  The same reasoning applies to supplementation of an EIS, which "is not necessary when the mitigation measure is within the scope of the EIS's discussion of mitigation measures or is a minor variation from it."  *Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67, 78 (D.D.C. 2013).  Reliance on the Alternative is a minor variation from the Multisale EIS's anticipation that the Bryde's Whale may become classified as endangered and recognition that "the species will receive additional protections and Federal agencies will be required to consult under Section 7 for Federal actions that may affect the species" if that became the case.  AR0008787.

Plaintiffs' related argument that a no-jeopardy determination for an endangered species does not equate to the lack of a significant impact under NEPA because "there can be a significant impact on a species even if its existence is not jeopardized" is sound, but unavailing. *See* Pls.' Opp'n at 33 (quoting *Makua v. Rumsfeld*, 163 F. Supp. 2d 1202, 1218 (D. Haw. 2001)). BOEM did not simplistically equate those two standards to absolve itself of the issue.  Rather, it considered the mitigation measures in the Reasonable Prudent Alternative that it had already committed to along with the low likelihood of impact based on the location of the tracts in Lease Sale 257 specifically, and it concluded that "the decision to hold this proposed lease sale is not expected to reduce appreciably the likelihood of both survival and recovery of the Bryde's whales" beyond the analysis already existing in the Multisale EIS.  AR0029816.

Although the Determination of NEPA Adequacy focused solely on the potential for vessel collisions, Plaintiffs correctly note that the concerns identified in the Biological Opinion were much broader.  By way of reminder, the Biological Opinion identified four primary threats to the Rice's Whale: sound, vessel collisions, energy exploration, and oil spills.  AR0037060.  The concerns about energy exploration were grounded in the potential for oil and gas activity to occur within the area of the congressional moratorium.  *See id.* ("[I]f new leases are offered after the . . . moratorium expires, Bryde's whales could be exposed to increased threats associated with energy exploration and development.").  And the concerns about the incremental possibility for vessel collisions was sufficiently mitigated by BOEM's adoption of the Reasonable Prudent Alternative.  BOEM therefore reasonably determined that the concerns in that opinion about vessel collisions and energy exploration did not significantly change the landscape for the purpose of approving Lease Sale 257, and the concerns about noise and oil spills had already been considered in the Multisale EIS.  *See* AR0008800 (noting that "nearby noise from seismic surveys occurring in the [Central Planning Area]" could affect the Bryde's whale); AR0008807 (acknowledging that baleen whales, including the Bryde's Whale, "use low frequency sounds that overlap broadly with the dominant frequencies of many industrial sounds, and there are indications that baleen whales are sensitive to low- and moderate-frequency sounds"); AR0008809 ("Baleen whales are particularly vulnerable to direct impacts from oil [spills] causing fouling of baleen plates, which could impact feeding behavior."); AR0008813 ("Impacts to the Gulf of Mexico Bryde's whales' habitat or to individual Bryde's whales exposed to an oil spill or associated spill response activities would increase the risk of extinction of this distinct population segment, which would elevate the impact for this analysis to major.").

Perhaps a more thorough and holistic discussion of these impacts would have been ideal. But the lack thereof is not "significant enough to undermine informed public comment and informed decisionmaking." *Mayo*, 875 F.3d at 20 (quoting *Sierra Club (Southeast Market)*, 867 F.3d at 1368).

### e.  New Information on Fracking

Next, the Plaintiffs point to accumulating evidence on the environmental hazards of hydraulic fracturing, or "fracking."  *See* Pls.' Mot. at 23.  Hydraulic fracturing involves injecting a "pressurized, high-density, gelatin-like fluid" "into a wellbore at high pressure to break open the rock to create/improve the flow path for hydrocarbon to flow into the well."  AR0008291. BOEM did not mention either the study offered by Plaintiffs specifically, *see* Ex. 22 of Pls.' Mot., ECF No. 34-31 ("Toxic Waters Report"), or hydraulic fracturing generally, in its Determination of NEPA Adequacy.

The Federal Defendants unsuccessfully attempt to recast Plaintiffs' concern about fracking as a concern about discharges.  The sections of the Determination of NEPA Adequacy that Federal Defendants claim considered those issues in fact address "Discharges and Waste" or "Chemical and Drilling-Fluid Spills" more generally, with no mention of fracking.  *See* AR0029831; AR0029836.  Toxic discharge features prominently in the Toxic Waters Report, but it is far from the only concern about fracking that it raises.  *See, e.g.*, Toxic Waters Report at 6 (describing direct and indirect negative health and environmental justice impacts); *id.* at 7 (pointing out the high fatality rates for gas and fracking workers); *id.* at 9–10 (describing negative impacts on the fishing and tourism industries).  It therefore appears that BOEM did not give fracking, or its wider implications distinct from all drilling discharge, specific attention in the Determination of NEPA Adequacy.

The Court nevertheless determines that Plaintiffs have not met their burden of showing that this "new information provides a *seriously* different picture of the environmental landscape." *City of Olmsted Falls, Ohio v. F.A.A.*, 292 F.3d 261, 274 (D.C. Cir. 2002) (quotation omitted) (emphasis in original).  The Multisale EIS does contain a reasonably thorough discussion of hydraulic fracturing in the Gulf of Mexico, which explains the procedure, likely additives, and its connection to the EPA permitting process.  AR0008290–93.  Plaintiffs do not point to anything in the Toxic Waters Report that makes that discussion unreasonable or unreliable.  And the more general impacts of fracking referenced in the report are not necessarily new information at all.  "'[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof.'"  *City of Olmstead Falls, Ohio*, 292 F.3d at 271 (quoting *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000) (alteration in original).  Plaintiffs have not met that burden here.

### f.  Impacts on Offshore Wind Development

Finally, Plaintiffs believe that mounting evidence requires BOEM to consider the potential for its Lease Sale to conflict with the agency's simultaneous attempt to develop offshore wind sites.  For this argument, they do not even cite specific new information that would have warranted a Supplemental EIS, merely invoking BOEM's duty to "consider the location of the [lease] area 'with respect to other uses of the sea and seabed.'"  Pls.' Mot. at 42–43 (quoting 43 U.S.C. § 1344(a)(2)(D)).  But BOEM has done exactly that, considering the potentially conflicting use of lease areas in the prior EISs—including to wind development.  *See* AR0008452–54 (Multisale EIS); AR0015616–22 (2018 Supplemental EIS); AR0014358 (listing wind and renewable energy as a potential space-use conflict in Program EIS).  Plaintiffs may prefer that BOEM prioritize offshore wind development, but "[i]t is . . . for the agency to decide

the exact trade-off among conflicting goals that best promotes the Congressional goal in question." *Cont'l Air Lines, Inc. v. Dep't of Transp.*, 843 F.2d 1444, 1451 (D.C. Cir. 1988) (quotations omitted).  Nothing in the record suggests that BOEM failed to consider the issue or was arbitrary and capricious in doing so.

## C. Remedies

Having determined that BOEM and the Department of the Interior acted arbitrarily and capriciously in excluding foreign consumption from their greenhouse gas emissions calculation, the Court must address the appropriate remedy.  Plaintiffs request vacatur of Lease Sale 257, pointing out that vacatur of an unlawful agency action is the standard remedy under the APA and NEPA.  Pls.' Mot. at 43.  Defendant-Intervenors API and Louisiana request that that the decision be remanded to the agency without vacatur if any violation is found.  La. Mot. at 22; API Mot. at 41.  The Federal Defendants did not take a position on the appropriate remedy in their original motion other than to request further briefing on remedies if necessary.  Defs.' Mot. at 38.  In response to this Court's request for further briefing on the question of whether the lease sale would necessarily need to be reinitiated and the impact of remand with or without vacatur on the agency's options, *see* Min. Order of Jan. 19, 2022, the Federal Defendants addressed the varying impacts of remand with or without vacatur, but did not take a position on which relief they were requesting from the Court, *see generally* Defs.' Resp. Court's Jan. 19, 2022 Min. Order ("Defs.' Supp. Br."), ECF No. 74.[29]  Plaintiffs and both Intervenor-Defendants likewise submitted

---

[29] The lack of a clear position from the Federal Defendants is particularly troubling given that they bear the burden of showing that the Court should part from the standard remedy of vacatur.  *See Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019) ("Because vacatur is the default remedy, plaintiffs are correct that defendants bear the burden to prove that vacatur is unnecessary.").  The Court will not treat the issue as conceded in light of the fact that Intervenor-Defendants have zealously assumed the mantle of arguing it but declines the Federal Defendants' request to delay this case any further by ordering additional briefing.

additional briefing on that same issue.  *See* Supp. Br. Intervenor-Def. Am. Petroleum Institute

("API Supp. Br."), ECF No. 73; Supp. Br. ("La. Supp. Br."), ECF No. 75; Supp. Remedy Br.

("Pls.' Supp. Br."), ECF No. 76.

 "The ordinary practice . . . is to vacate unlawful agency action, and district courts in this

circuit routinely vacate agency actions taken in violation of NEPA."  *Standing Rock Sioux Tribe*

*v. U.S. Army Corps of Engineers*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) (citations and quotations

omitted).  Vacatur is the standard remedy for good reason.  NEPA is an action-forcing statute,

which serves "not to generate paperwork or litigation, but to provide for informed decision

making and foster excellent action."  40 C.F.R. § 1500.1(a).  The goal of informed and excellent

decision making can only take place if agencies "take the required hard look *before* taking [the

proposed] action."  *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 532 (D.C.

Cir. 2018) (emphasis in original).  Advance consideration of environmental consequences

"allows the decisionmaker to take environmental factors into account when he is making

decisions, at a time when he has an open mind and is more like[ly] to be receptive to such

considerations."  *See Kleppe v. Sierra Club*, 427 U.S. 390, 417–18 (1976) (Marshall, J.,

concurring in part).  In contrast, "experience suggests that [remand without vacatur] sometimes

invites agency indifference."  *In re Core Commc'ns, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008)

(Griffith, J., concurring); *see also* Kristina Daugirdas, *Evaluating Remand Without Vacatur: A*

*New Judicial Remedy for Defective Agency Rulemakings*, 80 N.Y.U. L. Rev. 278, 302–04 (2005)

(collecting cases and reviewing studies to conclude that agencies often delay remedying arbitrary

and capricious decisions that have been remanded without vacatur).  The default rule of vacatur

thus serves to avoid creating perverse incentives for the agency to press forward with a faulty

decision and fill in its analysis later.  "When it comes to NEPA, it is better to ask for permission

than forgiveness: if you can build first and consider environmental consequences later, NEPA's action-forcing purpose loses its bite." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 471 F. Supp. 3d 71, 85 (D.D.C. 2020), *rev'd in part on other grounds*, *Standing Rock Sioux Tribe*, 985 F.3d 1032.

Courts do have discretion "to leave agency action in place while the decision is remanded for further explanation." *Standing Rock Sioux Tribe*, 985 F.3d at 1051. "The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (quotations omitted). "Put otherwise, this Court must determine whether there is 'at least a serious possibility that the [agency] will be able to substantiate its decision on remand,' and whether vacatur will lead to impermissibly disruptive consequences in the interim." *WildEarth Guardians*, 368 F. Supp. 3d at 84 (quoting *Standing Rock Sioux Tribe*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017)). Still, the availability of that discretion does not shift the burden for showing whether it is warranted, which remains on the Defendants. *See Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019) ("Because vacatur is the default remedy, plaintiffs are correct that defendants bear the burden to prove that vacatur is unnecessary."). The Court therefore considers whether the Defendants and Intervenor-Defendants have met their burden under the *Allied Signal* factors.

### a. Seriousness of the Deficiency in the Agency's Decision

Beginning with the seriousness of the deficiency in BOEM's decision, the Court believes that BOEM's error was indeed a serious failing. By excluding foreign consumption from its emissions analysis, BOEM reached a conclusion that was in direct tension with—if not

completely contradictory to—its own finding in the very same report that the No Action Alternative would result in a significant decrease in foreign consumption.  AR0014233.  The conclusion that that total greenhouse gases emissions would actually be *higher* if no lease sales took place was without a doubt highly relevant to the ultimate decision in light of the otherwise careful consideration BOEM gave to the effects of climate change.  *See* AR0015651; AR0008545.  Although this is not a situation in which "an agency bypasse[d] a fundamental procedural step" altogether, the significance of BOEM's error to the decision at issue here—to proceed with Lease Sale 257—leaves the Court "harbor[ing] substantial doubt that the agency chose correctly."  *Standing Rock Sioux Tribe*, 985 F.3d at 1052.  With an informed hard look at the full emissions impacts of Lease Sale 257, BOEM "may well approve another alternative included in the EIS or deny the lease altogether."  *Liberty*, 982 F.3d at 740.

The Court is also skeptical about whether BOEM would be able to adequately justify its Record of Decision for Lease Sale 257 if that decision was remanded without vacatur.  Louisiana misunderstands the relevant question when it asserts that "BOEM almost certainly can remedy any deficiency on remand."  La. Mot. at 21; *see also* La. Reply at 18 ("BOEM has a greater chance of remedying the purported violations here because it has already conducted extensive environmental analysis and produced three separate EISs").  Successful compliance with NEPA—which the Court is sure BOEM will eventually achieve—is distinct from BOEM's ability to retroactively justify the decision it did make.  BOEM "entirely failed to consider an important aspect of the problem" that it had itself identified, *State Farm Mutual Auto. Ins.*, 463 U.S. at 43, and, even upon acknowledging the error, determined that it could continue to rely on the implausible conclusion that the lease sale would *decrease* greenhouse gas emissions.  After having been alerted to that exact flaw by the *Liberty* case, BOEM failed to grapple with the

shortcomings in its methodology or address the argument that it was presently able to perform the necessary calculation.  *See* AR029965; *cf. Standing Rock Sioux Tribe*, 985 F.3d at 1051 (noting that "the district court concluded that the [agency] was unlikely to resolve the controversies on remand because the court had previously remanded without vacatur for just that purpose and the [agency] had nonetheless failed to resolve them).  The Court is doubtful, especially given the multiple opportunities at which BOEM could have remedied this error and did not, that it can remedy that misstep on remand.

*b.  Disruptive Consequences of Vacatur*

Defendant-Intervenors and *amicus* Chevron focus their arguments primarily on the second prong of *Allied Signal*, the disruptive consequences of vacatur.  *See* La. Mot. at 22 ("To vacate the sale would be to disrupt a massive undertaking and unsettle the lessee's ability to bid on leases and prepare for exploration planning."); API Mot. at 44 ("Federal Defendants have spent years preparing for this sale[,] . . .  the leases will generate valuable payments to the United States[,] . . . The State of Louisiana relies heavily on the revenues that it receives from offshore leasing in federal waters[,] . . . leases issued pursuant to Lease Sale 257 will be valuable contractual and property interests that will also promote employment (including for many API members), labor income, tax revenues, and other economic impacts . . . ."); Chevron Amicus Br. at 2 ("Chevron has already paid the United States over $9 million in initial bonus bid payments on the 34 tracts and will pay nearly $38 million more if the Department of Interior approves Chevron's bids.").  The economic consequences of vacatur, particularly for non-parties, is an important consideration when deciding whether vacatur is warranted.  *See, e.g.*, *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) ("[V]acatur in this case would

60

certainly be disruptive because it would prompt yet another refund, which would require yet another charge on uninvolved market participants.").

But a closer examination of the specific consequences of vacatur is warranted in light of the unusual timing in this case. Although Lease Sale 257 took place in November 2021, none of the leases from that sale have yet been awarded or become effective, according to the government's most recent submission. *See* 3d Decl. Bernadette Thomas ¶¶ 4, 7–9, Ex. 1 of Defs.' Supp. Br., ECF No. 74-1. "[A] quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020). Here, though, BOEM would not need to unravel anything. It would simply not award or execute the leases that it has not to this point awarded or executed. To the extent bonus bid payments have been made, relatively little time has passed and the number of payments is relatively few in number. This is therefore not the kind of "invitation to chaos" that would require the parties to "attempt[] to recoup and redistribute funds that changed hands years ago in numerous separate transactions." *Am. Great Lakes Ports Ass'n*, 962 F.3d at 519.

Overall, API, Louisiana, and Chevron's other broad assertions of large-scale economic disruptions remain largely speculative. For instance, Louisiana points out that it allocates its budget in reliance on the revenue from bonus bids and royalties from operations in the Gulf of Mexico, including the budget for its coastal restoration efforts. La. Supp. Br. at 3–4. But it is wrong that those transactions are "settled." *See id.* at 4 (quoting *Am. Great Lakes Ports Ass'n*, 962 F.3d at 519). Louisiana is not entitled to any portion of the bonus bids until the leases are actually executed. In the meantime, drilling, exploration, and royalty payments continue throughout much of the Gulf. *See* Congress Amicus Br. at 24–25 (pointing out that 75% of

active offshore leases in the Gulf of Mexico are currently non-producing and royalties do not generally commence for several years after a lease is issued).  Any delay or inconvenience that would result "is the nature of doing business, especially in an area fraught with bureaucracy and litigation."  *WildEarth Guardians*, 368 F. Supp. 3d at 84, n.35 (quoting *Standing Rock Sioux Tribe*, 282 F. Supp. 3d at 104).

One potentially disruptive consequence of vacatur is that because the 2017–2022 Five-Year Program is drawing to a close, there may not be another Gulf of Mexico Lease Sale under that Program if Lease Sale 257 does not go forward because no sales may take place under the current program after it expires in June 2022.  *See* Defs.' Supp. Br. at 4–5; *see also* API Mot. at 45.  The Federal Defendants represent that if the decision were remanded without vacatur, the sale date of November 2021 would remain effective and could be affirmed later on.  Defs.' Supp. Br. at 4.  In contrast, if the decision were vacated and BOEM did decide to proceed with Lease Sale 257 after taking the requisite hard look under NEPA, it would need to complete that process before the Five-Year Program expires.  *Id.*  That may be a demanding timeline, but in light of the substantial progress that BOEM has made toward adequately calculating the impact of foreign consumption on greenhouse gas emissions, as demonstrated by its subsequent Draft EIS for Lease Sale 258, it may not be impossible.  And, as the Federal Defendants note, the agency could still decide to include all or part of the area included in Lease Sale 257 in its next Five-Year Program.  *Id.* at 5.

The most persuasive argument the parties raise is that if Lease Sale 257 is vacated, participants—including *amicus* Chevron and other API members—will have disclosed their confidential valuation of unleased acreage, making their competitors "fully aware of which tracts [they have] targeted for potential development as well as the valuation that [they have] placed on

leasing those parcels . . . ."  Chevron Amicus Br. at 1–2; API Mot. at 41; API Supp. Br. at 2.  In the supplemental briefing, the parties were in agreement that vacatur would necessitate a new confidential bidding process, if the sale were to take place at all.  *See* Defs.' Supp. Br. at 4 ("If Lease Sale 257 were vacated, Interior could not use the same bidding process even if it were to re-offer the sale at a later date . . . ."); Pls.' Supp. Br. at 1 ("Because vacatur would invalidate Interior's Decision, it would need to initiate a new closed bidding process if it later decided to proceed with a lease sale.").   But those bids would have become public even if BOEM decided not to accept them, as it undisputedly had authority to do.  *See* 30 C.F.R. § 556.516(a–b) ("BOEM opens the sealed bids at the place, date, and hour specified . . . for the sole purpose of publicly announcing and recording the bids. BOEM does not accept or reject any bids at that time.  BOEM reserves the right to reject any and all bids received, regardless of the amount offered.").[30]  And as Plaintiffs point out, the bidders assumed the risk of this information becoming public by participating in Lease Sale 257 despite full knowledge of this pending lawsuit.  Pls.' Opp'n at 52.

Plus, affirmance of Lease Sale 257 exactly as it occurred or the No Action Alternative are not the only two options available to the agency.  BOEM could also consider any of the other alternatives identified in the Record of Decision that offer some, but not all, of the tracts that were made available in the November sale, which would also require a new closed bidding process.  Moreover, should the lease sale be held in the future, companies' valuation of particular tracts may have changed for any number of reasons unrelated to the prior sale.

---

[30] Plaintiffs also point out that most of the tracts for Lease Sale 257 in fact only received a single bid, suggesting that the competition may not be as fierce as Intervenor-Defendants indicate.  Pls.' Supp. Br. at 4.

The Court does not lightly discount the asserted harms that would flow from vacatur. But remand without vacatur is not required when there are *any* disruptive consequences, but rather when those consequences are unacceptable in light of the seriousness of the error. *See Env't Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021) (finding vacatur appropriate in light of a serious administrative error even though the pipeline at issue was already operational); *Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009) (pointing out that "the second *Allied–Signal* factor is weighty only insofar as the agency may be able to rehabilitate its rationale"). On balance, the disruptive consequences of vacatur do not outweigh the seriousness of the NEPA error in this case and the need for the agency to get it right.

Finally, the Federal Defendants and Intervenor-Defendants suggest that vacatur is not necessary because the agency has the regulatory discretion to suspend leases and lease operations. Defs.' Supp. Br. at 3; API Supp. Br. at 4. The Court is not so sure. The sole source of this authority that the Federal Defendants cite states that "BOEM may order a suspension . . . [w]hen necessary to comply with judicial decrees prohibiting some or all activities under [a] lease." 30 C.F.R. § 585.417(a)(1). But if the Record of Decision were remanded without vacatur and without an injunction, such a decree would not prohibit activities on any leases, and suspension would not be necessary to comply with it. The plain text of 30 C.F.R. § 585.417(a)(1) therefore suggests that it would be inapplicable to this situation. Likewise, API cites 30 C.F.R. § 250.172(d), which allows BOEM to suspend operations or production "[w]hen necessary to carry out the requirements of NEPA." API Supp. Br. at 4 (quoting 30 C.F.R. §

250.172(d)).  That provision applies to operations and production on leases, but it says nothing about suspension of the bidding process or executing the leases.[31]

   If the leases become effective, however, the reliance interests asserted by Intervenor-Defendants would become much more concrete than they are at this time and procedural hurdles would make it more difficult for BOEM to eventually cancel the leases.  *See* 30 C.F.R. § 550.181 (requiring notice and an opportunity for a hearing before cancelling a lease); *id.* § 550.184 (requiring compensation to be paid for cancelled leases).  In short, remand without vacatur would "result[] in the same prejudice to Plaintiffs that the expedited schedule was intended to avoid."  Pls.' Supp. Br. at 5.

### c. Relationship Between Vacatur and Injunctive Relief

   In the original briefing, Defendant-Intervenors and *amicus* Chevron strenuously argued that Plaintiffs have not met the standard for injunctive relief.  The Supreme Court and the D.C. Circuit alike have made clear in recent decisions that an injunction is not simply "a necessary consequence of vacatur" in a NEPA case, and that it cannot issue without the requisite application of the four-factor test for injunctions.  *Standing Rock Sioux Tribe*, 985 F.3d at 1054; *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010) ("It is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test set out above.") (emphasis in original).  Defendant-Intervenors are indeed correct that Plaintiffs have not attempted to establish that the four factors for injunctive relief—irreparable injury, inadequacy of remedies at law to compensate for that injury, the

---

[31] API's point that bids not accepted by a certain date are "deemed rejected" in fact suggests that if the Record of Decision is remanded without vacatur, the bids would have to be either accepted or rejected.  *See* API Supp. Br. at 1.

balance of hardships, and the public interest—would be served by the specific action they request.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. at 156-57 (citation omitted).  But although the Complaint does request as relief that the Court "vacate or enjoin" the leases and "[e]nter any other appropriate injunctive relief to ensure that Defendants comply with NEPA and the APA," Compl. ¶¶ 5–6, Plaintiffs make abundantly clear in their opposition brief that they "do not request any freestanding relief beyond vacatur," Pls.' Opp'n at 54.

A closer look at *Monsanto* and *Standing Rock* elucidates any confusion here.  In *Monsanto*, the Supreme Court addressed a decision that vacated the agency's decision to *completely* deregulate Round-up Ready Alfalfa and also enjoined the agency from even *partially* deregulating before an EIS had been prepared*.  Monsanto Co.*, 561 U.S. at 160.  In *Standing Rock*, the D.C. Circuit upheld the district court's decision to vacate an easement for a pipeline but overturned its injunction ordering the pipeline to be shut down.  *Standing Rock Sioux Tribe*, 985 F.3d at 1054.  The Circuit cautioned that "[i]f a district court could, in every case, effectively enjoin agency action simply by recharacterizing its injunction as a necessary consequence of vacatur, that would circumvent the Supreme Court's instruction in Monsanto that a court must determine that an injunction should issue under the traditional four-factor test."  *Id.* (quotations omitted).  In both those situations, the injunction extended to some agency action beyond that which was vacated itself.  *Cf. WildEarth Guardians v. United States Bureau of Land Mgmt.*, 870 F.3d at 1240 (declining to vacate leases because "the question remains what will happen to the leases which have already been issued and whether mining the lease tracts should be enjoined—a question that the parties have not touched on in their arguments before us").

In contrast, there is nothing to be enjoined here.[32]  The leases have not become effective and no activity on them is taking place.  Instead, vacatur and remand of the Record of Decision to hold Lease Sale 257 will do exactly what is implied: vacate Lease Sale 257 and allow the agency an opportunity to remedy its NEPA error as it so chooses in the first instance.  The Court does not specify how BOEM must do so, on what timeline, or what ultimate conclusion it must reach, leaving those issues to the sound discretion of the agency.

*     *     *

The Court holds that there is insufficient reason to depart from the standard remedy of vacatur in this case and no reason to consider an injunction at this time.  Accordingly, it will vacate the Record of Decision for Lease Sale 257, and the action taken based on that Record of Decision, including Lease Sale 257, and remand to the agency for further proceedings.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Summary Judgment (ECF No. 34), **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (ECF No. 45). **GRANTS IN PART AND DENIES IN PART** Intervenor-Defendant Louisiana's Motion for Summary Judgment (ECF No. 42), and **GRANTS IN PART AND DENIES IN PART** Defendant-Intervenor American Petroleum Institute's Motion for Summary Judgment (ECF No. 43).  The Court **VACATES** and **REMANDS** the Record of Decision for Lease Sale 257 to the Department of the Interior.  An Order consistent with this Opinion is separately and contemporaneously issued.

---

[32] API's last-minute request that the Court require BOEM to either accept or reject bids by February 15th or extend the deadline, *see* API Supp. Br. at 5, is, by contrast, a perfect example of injunctive relief that does not flow from the necessary consequences of vacatur, and the Court declines to grant it.

Dated: January 27, 2022                    RUDOLPH CONTRERAS
                                           United States District Judge